(58)                                          1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------

UNITED STATES OF AMERICA

                                        04-CR-402

        -versus-

                                   **(DETENTION HEARING)**

YASSIN MUHIDDIN AREF

and MOHAMMED MOSHARREF HOSSAIN

                Defendants.

-----------------------------------------------

                TRANSCRIPT OF PROCEEDINGS held in and for the United States District Court, Northern District of New York, at the James T. Foley United States Courthouse, 445 Broadway, Albany, New York  12207, on TUESDAY, AUGUST 10, 2004, before the HON. DAVID R. HOMER, United States District Court Magistrate Judge.

2

**APPEARANCES:**

FOR THE GOVERNMENT:

HON. GLENN SUDDABY, United States Attorney - NDNY

BY:   DAVID M. GRABLE, Assistant U.S. Attorney

BY:   GREGORY WEST, Assistant U.S. Attorney

FOR THE DEFENDANT AREF:

BY:   TERENCE E. KINDLON, ESQ.

FOR THE DEFENDANT HOSSAIN:

BY:   KEVIN A. LUIBRAND, ESQ.

(Court commenced in chambers at 2:03 PM.)

(Discussion off the record.)

THE CLERK:  United States of America versus Yassin Mohammed Aref and Mohammed Mosharref Hossain, 04-CR-402.

Can we have appearances for the record.

MR. GRABLE:  Dave Grable and Gregory West appearing on behalf of the United States.  Good afternoon, your Honor.

MR. KINDLON:  Terence Kindlon, 74 Chapel Street, Albany, on behalf of the accused.  Good afternoon, sir.

THE COURT:  The record should reflect that we're in chambers to discuss a matter that's just been raised.  Mr. Grable, if you could repeat what you just told me off the record.

MR. GRABLE:  Sure.  Your Honor, the Government wanted to speak with the Court beforehand with Mr. Kindlon here because we had some concerns about a potential conflict issue and just wanted to make sure that it didn't raise problems down the road.

It's our understanding that Mr. Kindlon himself served in the U.S. military and has relatives currently serving in the U.S. military.  We had heard through the rumor mill that he had a son who was serving or

served in Iraq, but I spoke with him before coming here and he disabused me of that notion.

THE COURT:  Mr. Kindlon did.

MR. GRABLE:  Yes.  And he should explain fully I think the nature of his relatives and the relationship with the military.  Our concern here is that, as has been disclosed in a search warrant affidavit that has now been unsealed, this defendant's name was found in an address book that was recovered by U.S. forces following a raid on a terrorist camp in northern Iraq, and our concern is that we would certainly like to make sure that the defendant understands, at least if there is a conflict issue, the relationship there, and executes or makes some sort of waiver just to avoid problems down the road.

THE COURT:  Mr. Kindlon.

MR. KINDLON:  I thank Mr. Grable for an excess of caution.  And I suspect what the source of the concern is arises from the fact that I have one son who's a lawyer and a Captain in the United States Marine Corps right now, but he's stationed in Camp Lajeune, North Carolina, and as of last week was informed that it is unlikely he's going to be deployed any time soon.  I have another -- that son is Lee Kindlon; he's 28 year old.  I have an older son, Gordon Kindlon, who's my adopted son actually, and he is 33 years old, and for much of last year and until April 1st of 2004,

he was working with an NGO, non-governmental organization, called Mercy Corp in southern Iraq. On April the 1st of 2004, he took new employment with the United Nations and that employment is in Afghanistan which is where he's currently stationed. And his contract with the UN to be in Afghanistan terminates, I believe, at the end of October. And he has told his mother and me that it is his intention at that time to return to the United States.

Now, I do have a, I do have a cousin who has a son who enlisted in the Marine Corps a year or two ago. I haven't heard anything about him. I don't know where he is. I don't know what he's doing. So -- and I don't know, I don't know the fellow, I've never met him in my life. I heard through the family grapevine he was...

THE COURT: Mr. Grable, what relief do you seek or procedure are you recommending?

MR. GRABLE: I think it would be sufficient if the defendant were informed of the family relationships or relatives that Mr. Kindlon has, at least this one, the son who's currently in the Marine Corps and perhaps the cousin with the son. I don't know what you call that. A cousin once removed.

MR. KINDLON: I guess. I don't know.

MR. GRABLE: I don't know the answer to that.

MR. KINDLON: I couldn't pick him out of a

UNITED STATES v AREF and HOSSAIN                6

line-up, quite frankly.

MR. GRABLE:  If the defendant could have a communication perhaps with Mr. Kindlon and otherwise have something put on the record indicating that he understands this familial affiliation.  And it's my understanding, Mr. Kindlon, that you served in the -- you were a decorated veteran in the military during the Vietnam --

MR. KINDLON:  The reason that came up was because somebody called my office and said I wasn't much of an American because I was representing...

MR. GRABLE:  I'm not saying it came up in this case.  I know that it came up before; I know you served this country.  And I think it's also worthwhile to have the defendant -- unless the Court thinks I'm out in left field here -- have the defendant understand that and say I understand all that and it does not concern me, doesn't cause me any concern about Mr. Kindlon's ability to zealously represent me in this case.

THE COURT:  I think it's close to left field but I understand the abundance of caution that you bring to the issue.

Mr. Kindlon, what's your thought?  I'm torn being doing nothing and leaving it to you to talk to your client first and then having you proceed in a week or so.

MR. KINDLON:  I will advise him.  With all

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

UNITED STATES v AREF and HOSSAIN                    7

objectivity, it strikes me as truly excessive caution.  The fact is, as I understand it, that was an Army -- a U.S. Army unit that made the raid.  The Marine Corps wasn't even involved.  Whatever that may be worth.

THE COURT:  Well, it sounds to me like there's no basis for believing there's any connection between the notebook or whatever it was that was seized in the northern Iraqi camp and any member of the Kindlon family, is what Mr. Kindlon is telling me.

MR. KINDLON:  That's exactly what I'm saying, yes.

THE COURT:  There's no connection there.  Now we're talking about whether or not there's a potential conflict which may arise either from Mr. Kindlon's past military service or the military service or government service of a child; is that where we are?

MR. GRABLE:  Yes, your Honor.

THE COURT:  If there were an issue related to the seizure of the notebook, I think we probably would have to talk about something because the potential would be witness issues and so forth.  The other conflict I'm missing.

MR. KINDLON:  Then I guess -- excuse me.  I'm sorry.  That notebook was seized when?

MR. GRABLE:  June of 2003.

MR. KINDLON:  June of 2003.  I think my son Captain was still in Quantico, Virginia going through what they call the basic school down there.

THE COURT:  But I also don't want to open the door for any future litigation and issues I don't see.  And so I'm -- in an abundance of caution, we can probably put this on the record, I suggest we do it on a different day to give Mr. Kindlon a chance to talk to his client about it first, and then we'll have him brought in on some occasion and put it on the record.

MR. KINDLON:  Will do, Judge.

THE COURT:  As I understand it -- is there anything else on the record?

MR. GRABLE:  No.

THE COURT:  Off the record.

MR. GRABLE:  Thanks, Judge.

(Discussion off the record.)

(Adjourned in chambers at 3:15 PM.)

(In open court at 3:17 PM.)

THE CLERK:  United States of America versus Yassin Muhiddin Aref and Mohammed Mosharref Hossain, criminal docket number 04-CR-402.

Could we have appearances for the record, please.

MR. GRABLE:  David Grable with Assistant U.S.

Attorney Gregory West, FBI Special Agents Tim Coll and Laurie Youngblood, appearing on behalf of the United States. Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. KINDLON:  Terence Kindlon, 74 Chapel Street, Albany, New York, appearing on behalf of Yassin Aref.  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. LUIBRAND:  Good afternoon, Judge.  Kevin Luibrand, for Mohammed Mosharref Hossain, from Tobin & Dempf, 33 Elk Street, Albany, New York.

THE COURT:  Good afternoon.

Before we commence with the arraignment, Mr. Kindlon, it's my understanding that your client is able and willing to proceed without an interpreter today; is that correct?

MR. KINDLON:  I've discussed this with him at some length.  His English is good enough for him to understand what's going on.  He does sometimes, when under pressure, not understand things as well as somebody who grew up in New Jersey might, but he is able to understand just about anything.  And if there's any problem, I would advise the Court and perhaps stop and go over it again.

THE COURT:  That's fine.  And if you would, if you haven't already, advise your client of that fact.

UNITED STATES v AREF and HOSSAIN                      10

Please interrupt if he needs additional time and needs to consult about anything else.

MR. KINDLON:  Yes, thank you, Judge, we've discussed that.

THE COURT:  Thank you.

Mr. Hossain, it's my understanding that you -- you may remain seated, Mr. Hossain, as long as you can see me over the monitor.

DEFENDANT HOSSAIN:  I can see you.

THE COURT:  Mr. Hossain, it's my understanding that you wish now to apply for the appointment of counsel, is that correct?

DEFENDANT HOSSAIN:  Yes, sir.

THE COURT:  I have the financial affidavit that you completed last week.  Did you sign that affidavit at the bottom?

(Pause.)

THE COURT:  Would you like to see it?

DEFENDANT HOSSAIN:  Yes, your Honor.

THE COURT:  Is that your signature at the bottom?

DEFENDANT HOSSAIN:  Yes, your Honor.

THE COURT:  Is the information you provided true and accurate to the best of your belief?

DEFENDANT HOSSAIN:  It is, to my knowledge.

THE COURT:  Now, Mr. Hossain, based on your financial affidavit, it appears that you, from what you say you derive, about $10,000 a month in income from your business and that you have expenses against that business of $9,000, or a little over, which would be close to what we would call a wash.  But it also appears -- which if that were the only income and costs that you had against income, you would clearly qualify for the appointment of counsel. But it also appears from your affidavit that you own four rental properties from which you receive rental income and which you own free and clear of any liens or encumbrances; is that correct?

DEFENDANT HOSSAIN:  Yes, your Honor.

THE COURT:  All right.  Based on what you assess the value of those properties to be, it does appear that you have assets from which to pay an attorney.  So here's what I'm proposing.  I will appoint an attorney for you, and it will be Mr. Luibrand.  I would require, however, that you agree to forfeit property which -- and the agreement will be held by the Court until the conclusion of the case, at which time that property would be used to reimburse the Government for the costs of the attorney that is assigned to represent you.  I do this because it appears from your affidavit that you do have assets which could be used to defray the cost of an attorney.  Do you understand

that?

DEFENDANT HOSSAIN:  Yes, your Honor.

THE COURT:  Do you have any questions about it?

DEFENDANT HOSSAIN:  No, your Honor.

THE COURT:  Are you agreeable to doing that?

DEFENDANT HOSSAIN:  Yes, your Honor.

THE COURT:  All right.  I'm going to present to you now an agreement to forfeit property and I'm going to require that you put on that forfeiture two of the properties that you own, which I believe would be sufficient to reimburse the Government for any costs of the attorney that's appointed to represent you.  If you have any questions about it, you can consult with Mr. Luibrand who is here with you and who is appointed to represent you.

Mr. Hossain, I take it you are the only named owner on those properties?  Is your wife on the deed?

DEFENDANT HOSSAIN:  No, myself.  I provide years and years, we call it my children's fund, and those money I put it into a --

THE COURT:  I'm just concerned with whose names are on the deed.

DEFENDANT HOSSAIN:  Mine.

THE COURT:  Then it only requires your signature.

UNITED STATES v AREF and HOSSAIN                    13

(Pause.)

THE COURT:  Since the initial appearances in this case, I believe an Indictment has been returned for purposes of arraignment.  Mr. Grable or Mr. West, can you summarize the charges and the maximum penalties.

MR. GRABLE:  Yes.  Thank you, your Honor.  On Friday of last week a grand jury handed up a 19 count Indictment, a copy of which has been provided to both defendants, charging them with multiple counts of money laundering and multiple counts of attempted and conspiracy to conceal what they believe was the source of material support for a specified terrorism offense.

Summarizing the Indictment, Count 1 is a money laundering conspiracy count that charges both Yassin Muhiddin Aref and Mohammed Mosharref Hossain with conspiring to commit the laundering money offense.  Counts 2 through 11 are substantive money laundering counts.  All of those, Counts 1 through 11, carry a maximum term of incarceration of 20 years, a maximum fine of $250,000, a maximum term of supervised release of three years, and a mandatory special assessment upon conviction of $100.

Count 12 of the Indictment is a conspiracy to commit an offense under 18 USC Section 2339A.  That is the provision that prohibits conspiring or attempting to conceal the source of material support or resources for a specified

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

offense.  The specified offense in this case is the unlawful use of a weapon of mass destruction in violation of 18 United States Code Section 2332(a).  Count 12 is a conspiracy count, and Counts 13 through 19 are substantive counts that follow up on that which occurred during the course of the conspiracy.  The maximum penalty for all of those 2339A counts are a maximum term of imprisonment of 20 years, a $250,000 fine, a maximum term of supervised release of three years and a mandatory special assessment upon conviction for each count of $100.

THE COURT:  Thank you, Mr. Grable.

Mr. Kindlon, have you received a copy of the Indictment?

MR. KINDLON:  Yes, sir.

THE COURT:  Have you had adequate time to discuss the case with Mr. Aref for purposes of arraignment?

MR. KINDLON:  I have, your Honor.

THE COURT:  Does Mr. Aref wish the Indictment read to him or does he waive the reading?

MR. KINDLON:  He waives the reading.

THE COURT:  And how does he plead?

MR. KINDLON:  Not guilty.

THE COURT:  Mr. Luibrand, have you received a copy of the Indictment?

MR. LUIBRAND:  Yes, your Honor.

UNITED STATES v AREF and HOSSAIN                    15

THE COURT:  Have you had adequate time, adequate opportunity to discuss the case with Mr. Hossain for purposes of arraignment?

MR. LUIBRAND:  Yes, your Honor.

THE COURT:  Does Mr. Hossain wish the Indictment read to him or does he waive the reading?

MR. LUIBRAND:  Your Honor, we waive the reading.

THE COURT:  And how does he plead?

MR. LUIBRAND:  Not guilty, your Honor.

THE COURT:  A not guilty plea has been placed on behalf of Mr. Aref and Mr. Hossain.  A scheduling order has been entered and is being provided to counsel at this time setting forth the schedule for the progression of the case.

Now, prior to today's proceeding, a matter was brought to my attention which -- regarding Mr. Aref which requires a further hearing.  Mr. Kindlon, I understand you are going to be gone for a period of time.  During what week would you be available?

MR. KINDLON:  I'll be gone as of this Thursday and for all of next week, your Honor, returning the next -- the following Monday, and I don't know what the date is, I don't have a calendar.

THE COURT:  Looks like August 23, 24.

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

MR. KINDLON:  August 24 is perfect, Judge.

THE COURT:  August 24 at 2 PM.  Is that agreeable with the Government?

MR. GRABLE:  Yes, your Honor.  Thank you.

THE COURT:  All right.  2 PM, August 24.

Now, matter also on for today is the Government's motion for detention as to both Mr. Aref and Mr. Hossain.  Is the Government ready to proceed?

MR. GRABLE:  Yes, we are, your Honor.

THE COURT:  Mr. Kindlon, are you ready to proceed?

MR. KINDLON:  Yes, sir.

THE COURT:  Mr. Luibrand?

MR. LUIBRAND:  Could I have a moment, your Honor?

THE COURT:  Yes.

(Pause.)

MR. LUIBRAND:  Yes, your Honor, we're ready.

THE COURT:  All right.  Thank you.  Mr. Grable, I'll hear from the Government first.

MR. GRABLE:  Thank you, your Honor.  I'm holding in my hand a pretrial services report which was prepared following the interview with each of these defendants, and the recommendation contained in both of the pretrial services report is that both defendants be detained

pending trial because there is no condition or combination of conditions that would reasonably ensure the defendants' appearance in court or the safety of the community. The Government joins in these recommendations and asks the Court to detain both of these defendants on both of those grounds; that is, that their release would pose a risk of danger to the community and a serious risk of flight.

As the Court is well aware, there are four factors that it needs to consider in determining whether to release or detain a defendant pending trial. Those factors are set forth in 18 USC Section 3142(g). The first two factors are really linked in the sense that they deal with the type of case and the strength of the evidence; the first factor being the nature and circumstances of the offense charged, the second factor being the weight of the evidence. We submit, beginning with those two factors, that as to both of these defendants, they strongly favor detention in this case. The Court is familiar with the affidavits that have been submitted in support of the complaint that was issued and search warrants that were issued in this case. I'm going to try not to recite every detail contained in those affidavits, but we would ask that the Court incorporate those by reference when considering the nature of the case and the strength of the evidence in this case.

As your Honor is well aware, this case

involves circumstances in which these defendants laundered what they believed, were led to believe were the proceeds of a missile sale to terrorists in New York City and that these terrorists in New York City intended to use the missile for a particular purpose; that is, an attack on a Government official.

THE COURT: Do any of the charges in this case raise the presumption?

MR. GRABLE: One of the charges in this case, 2339A, is a crime of violence, your Honor, under the Bail Reform Act.

THE COURT: Which count is that?

MR. GRABLE: That's Count 12, the conspiracy to commit, 2339A, and Counts 13 through 19, the substantive 2339A counts.

So you've got, you've got a crime of violence, crimes in this case, and aside from that, Judge, you have recurring criminal conduct, multiple transactions, meetings and discussions, the vast majority of which were captured on audio and videotape. We submit that speaks strongly to the weight of the evidence. The complaint sets forth -- the affidavit attached to the complaint sets forth the detail, the nature of those conversations.

In general, going through sort of a summary chronology, sometime in the summer of 2003 a cooperating

witness struck up a relationship with the defendant Hossain. Soon after striking up that relationship, the defendant Hossain asked the cooperating witness to assist Hossain's brother in acquiring a fraudulent document.  The cooperating witness performed the service and got the brother the fraudulently obtained document.  During the course of those meetings about that transaction, there was discussion about religion, politics and other issues, there was discussion about jihad, and the question was raised and discussed as to whether money could be made through jihad.  During the course of these conversations --

THE COURT:  What definition of jihad does the Government assume here?

MR. GRABLE:  There were two definitions as set forth in the complaint, two definitions or two forms of jihad that were discussed.  There was this outer jihad that was discussed; it was essentially phrased as a -- well, at least to include the violent terrorist type attacks that I think people see and hear about on the news.  And there was also the in -- an inner jihad that was discussed, which talks about essentially, I think, controlling one's own desires and other matters like that.  As set forth in the complaint affidavit, defendant Hossain during this time period opined that now was not the time for the violent outer jihad, but it was the time for the inner jihad.  And

that's all set forth in our complaint affidavit.

But in the discussion of making money through jihad and right around the same time the defendant Hossain asked the cooperating witness for a loan, the opportunity was opened up for the sting operation to begin. And as set forth in the complaint affidavit on November 1 -- on November 20, 2003, the cooperating witness showed defendant Hossain a shoulder-fired missile. He had told defendant Hossain in sum and substance --

THE COURT: Showed him the missile itself or a photograph of the missile?

MR. GRABLE: He actually showed him the missile. With the Court's permission, I provided a copy to Mr. Kindlon already, I'm handing a copy to Mr. Luibrand right now, what's been marked as Government's Exhibit 1, I would like to offer this for purposes of the detention hearing.

THE COURT: It will be accepted for that purpose.

MR. GRABLE: Government Exhibit 1 depicts a November 20, 2003 meeting that was captured on hidden video in which the cooperating witness is displaying to defendant Hossain the shoulder-fired missile.

During the course of that meeting, the cooperating witness explained to defendant Hossain in sum

and substance that he imports this missile and other types of equipment like that from China, that he provides it to mujahid brothers down in New York City and he uses it for hitting airplanes.

Sometime following that meeting, but before December 3, 2003, Hossain reiterated his request that the CI provide him with a loan. On December 3, 2003, the cooperating witness linked up that request to this missile and proposed to defendant Hossain that he assist the cooperating witness in laundering the $50,000 proceeds from the importation and shipment of that missile down to New York City. The cooperating witness in a recorded conversation, audio recorded only, not video recorded, described again how he brought these -- brought this missile into the United States to go down to New York City, to jihadis in New York City and -- I believe the term that he used in that conversation was jihadis -- and proposed that Hossain take the $50,000 cash proceeds from this missile, pay back the cooperating witness in monthly $2,000 payments on checks that would make it appear as though the cooperating witness had worked for Hossain.

In a meeting a couple of days later, on December 5, 2003, the defendant Hossain in the course of a conversation about having this transaction be performed in accordance with the laws of Allah, the defendant Hossain

represented that a witness be part of the transaction, and after the cooperating witness eliminated certain ethnic groups from the pool of individuals that he wished to serve as a witness in this case, the defendant Hossain recommended co-defendant Yassin Aref and said that Yassin Aref could be a witness and guarantor in this transaction.

After that December 5th meeting but before the December 10th meeting, Hossain told the cooperating witness in sum and substance that he had had some conversation but just some minor conversation with Aref about the laundering scheme and that on December 10th in a recorded conversation, the cooperating witness met with the defendant Hossain and defendant Aref and talked about this proposal, about this laundering proposal, during which time the defendant Aref recommended that the parties create a receipt to further follow the laws of Allah, a receipt of each transaction that was performed. And although the cooperating witness initially resisted, saying, amongst other things, that he didn't -- or suggesting amongst other things that he didn't want people to know where this money came from, he eventually acquiesced and agreed to have receipts generated. And in a minute I'll get to where the receipts come in.

Fast-forwarding approximately a month to January 2 of 2004, when this scheme gets consummated, on

January 2, 2004, the cooperating witness met with Yassin Aref and Mohammed Mosharref Hossain in his office. And with the Court's permission, I would like to hand up what's been marked as Government's Exhibit 2 and we would like to offer this for purposes of the hearing. A copy has been provided to Mr. Kindlon, and I'm providing a copy to Mr. Luibrand. Government's Exhibit 2 is a still photo of the videotape of that January 2, 2004 meeting in which the defendant Hossain, who's pictured in the white cap, and defendant Aref, who's pictured without a cap but with his -- I think it's pretty clear from the picture it's defendant Aref sitting on one side of the desk and the cooperating witness standing on the other side of the desk and the cooperating witness holding in his hands the trigger mechanism for this surface to air missile. During this meeting the cooperating witness again went over the terms of the laundering deal, talked about this piece of equipment, this trigger mechanism needing to go down to New York City, and that when it did, he would get the remaining $45,000 from the $50,000 he was getting for bringing this piece of equipment in. And they essentially consummated the laundering deal in the sense that the cooperating witness provided -- first attempted to provide the defendant Hossain but being directed to provide to defendant Aref $5,000 cash. He provided the cash, on the videotape, Aref counts out the cash and then hands it to

Hossain.  Following on, a receipt is generated in which all three of the individuals signed the receipt simply talking about the money owed from one person to another.  And Hossain makes a check payable or at least says that he will make a check payable to the cooperating witness' business. The cooperating witness gives him a card so that Hossain can see the business name that the check is supposed to be made payable to.

THE COURT:  Does the use of receipts in an alleged criminal conspiracy strike you as unusual and even bizarre?

MR. GRABLE:  It does not, your Honor, especially since it appears that the understanding was -- well, number one, that that's the way to do it according to the laws of Allah and that's the way transactions are done in this culture.  And number two, there was information or at least the conversations suggest that the receipts weren't going to be simply kept anywhere, but they would be kept by Aref in a place -- not necessarily a secret place, but a place that he would have secure and would be kept by the cooperating witness.  These aren't receipts that would be given just to anybody; they would be kept by the participants in this transaction.  And the conversations bear out the purpose of the receipts; that is, to serve as a guarantee in the event, for example, the CW dies or

something, then the guarantor, in this case Aref, can help to collect the money on the CW's family's behalf.  So this January 2 transaction is where the scheme is actually consummated, money is accepted first by Aref and he ensures all of it is there, it's given to Hossain, and then later in the day the cooperating witness, as set forth in the affidavit, meets with Aref and picks up a copy of the check, $2,000 check payable to the cooperator's business and picks up a copy of the receipt.  Aref has taken the receipt, generated a copy and given one copy to the cooperating witness.

Following on, after that January 2 meeting, there are a number of additional meetings in which cash is provided to both defendants and they follow the same pattern.  And they're all captured on videotape, save one. And those are transactions, again, in which the cooperating witness provides the cash to Aref, who counts the cash and ensures that it's all there, gives it to Hossain, a receipt is generated and a check is provided to the cooperating witness, representing that it was payable to his business, again, in line with the scheme, goal to demonstrate or at least provide the indication and cover that the cooperating witness had provided legitimate services and work for Hossain.

As the case progressed, the defendants

UNITED STATES v AREF and HOSSAIN                    26

learned more about the particular use to which the missile will be put.  As the case progressed, the cooperating witness had conversations with Hossain alone, with Aref alone and with the two of them together, in which he described his affiliation with the group called Jaish-e-Mohammed or JEM and described how this missile was being sent down to New York City to be used in a terrorist attack against a Pakistani government official in retaliation for the policies of the Pakistani President Musharraf.  And this information was provided to each of the defendants separately and then provided to both of them together in a following February 12th conversation that the CW had during a money-passing transaction.

The evidence in this case shows that as the defendants learn more about the particular use to which this missile would be put, they didn't sever their relationship with this defendant, they didn't notify law enforcement about the information that they had learned; they continued to engage in these transactions and, in fact, the defendant Hossain asked for additional money after he had learned about this information, and defendant Aref had conversations with the cooperating witness about acting secretly, about keeping quiet, about the particular use to which the missile would be put because that's how people who are doing that sort of thing do it.

As the transactions progress farther along, later on in the scheme, in the early summer, around June of 2003 -- excuse me -- 2004, Aref actually asked the cooperating witness to go in on a business proposal in which he said to the cooperating witness, can I purchase -- or would you like to go in with me on the purchase of Hossain's pizza place, and Aref proposed that the cooperating witness use some of the proceeds that were still in Hossain's possession and essentially forgive some debt in order to pay the cooperating witness his share. During the course of that conversation, which is again recorded, the cooperating witness represented to Aref that he might be interested in doing that, that he would have to be a silent partner and, amongst other things, that once this missile was used down in New York City, he would have to leave the country for a couple months because, essentially, I think that the implication was the heat would be on. And Aref responded in sum and substance that that wouldn't be a problem.

As the Court is aware, the takedown took place earlier -- or excuse me -- at some point last week. During the course of the execution of the search warrant, receipts were found at the Masjid As Salam mosque where Aref served as the Imam. Over $6,000 in cash was found in Mohammed Mosharref Hossain's residence. Another thousand dollars cash was found on his person. As the Court is aware

today, we had an arraignment on a 19-count indictment that a grand jury issued on Friday endorsing essentially, at least as far as the grand jury could, the strength of the evidence in this case. And included in the Indictment are some sentencing allegations in the back portion which essentially allege certain sentencing factors in the wake of the Blakely decision, and included in those allegations which the grand jury endorsed is the allegation that this case involves crimes that involved or were intended to promote what's called a federal crime of terrorism. As your Honor may be aware, that enhancement, if found guilty by a jury, would make this case an offense level 36, a criminal history category of VI, yielding a guideline range of 210 to 262 months.

We certainly submit that those penalties create a tremendous incentive to flee in this case. And all of the information I've described, again, is captured on tape. We submit that because of the nature of the case, the evidence is very strong, and the characteristics of the case and the weight of the evidence all strongly favor detention in this case.

THE COURT: Let's assume for the sake of argument that certainly given the audio and videotapes that the Government will have no difficulty proving what is alleged in the complaint, but a reading of the complaint

also suggests certain defenses, including entrapment. What, if any, evidence does the Government have of the predisposition of either defendant?

MR. GRABLE: Your Honor, the Government has evidence of -- or at least we would introduce evidence and say that it shows predisposition on a number of different fronts.

As the Court is well aware, and was included in the search warrant application for the mosque, Aref's house and Hossain's residence, as to defendant Aref in particular, his name in June of 2003, we've been informed by the Department of Defense, was recovered and found in a notebook following a raid on a terrorist camp in -- near Rawa, Iraq. Included in that notebook were the names of various individuals. The notebook was found along with other pocket litter, rocket propelled grenades, from my understanding, shoulder fired missiles, and small arms and weapons manuals. And in that notebook was included an entry for the name Yassin Aref; it had a Leonard Place, Albany, New York street address, with a specific number which was Aref's address for his early portion of his time here in the United States. It had a telephone number which was Aref's telephone number for his early portion of his time in the United States. And it had underneath it a title, Commander Yassin, New York, United States.

UNITED STATES v AREF and HOSSAIN                    30

THE COURT:  In what language was the word "commander" written?

MR. GRABLE:  It's my understanding that it was an Arabic language document.

THE COURT:  Is it subject to any other interpretation other than commander?

MR. GRABLE:  I don't know the answer to that, your Honor.  We're relying on a translation provided to us by the Department of the Defense.

When Aref was arrested and interviewed by law enforcement following his arrest, he did not -- well, first of all, he told law enforcement that he was never in the military and he had no explanation for it, and he offered no explanation as to why his name was found in this book following this attack on the terrorist camp.  We certainly submit that that information, given the nature of the scheme in this case, will be very strong evidence of predisposition as to defendant Aref.

There is additional evidence that we would offer to a jury and argue to a jury to show predisposition as to both defendant Aref and defendant Hossain, including, amongst other things, the readiness in which they accept the proposition to launder, which the Second Circuit has said, accepting a criminal proposition without any hesitation is alone sufficient to show predisposition to support a jury

verdict.  We submit that certainly the evidence in this case will show that these defendants didn't show hesitation when they knew what was going to happen in this case.  And as they learn more about the particular use to which the missile would be put, they in fact continued on and laundered more and more money.  In addition to that, we would argue about the repetitive nature of the conduct, the number of the transactions, the advice that Aref offered to the cooperating witness about moving secretly and hiddenly and other factors as described in the complaint that we think would show that a reasonable person in this case would not have acted as these defendants did and accepted this proposition but, instead, certainly would have run the other way.  We submit that all of that is sufficient to rebut an entrapment defense in this case.

All of that information bears strongly on the third factor as well that this Court must consider in this case, which is the history and characteristics of the person involved.  As the Court is well aware, there's a number of different subsets of information that it may consider under that factor.  And going first with defendant Aref, he's not a lawful permanent resident or citizen of the United States. He has refugee status in the United States.  He has significant ties to foreign countries.  He was born and raised in Iraq as reflected in the pretrial services report

and spent 26 of his 34 years there.  He has a number of family members in Iraq as shown in the PSR, a third brother in Holland.  He spent four years in Syria.  During the execution of the search warrant, searching agents found a Syrian ID card in his name which was valid through the Year 2007.  There are financial resources that we submit defendant Aref has access to, at least past conduct suggests he would have access to, that would assist him in fleeing should he have the opportunity to.  There are wire transfers that are outlined in the search warrant affidavits that defendant Aref appears to have engaged in.  During the month -- or excuse me -- during the Year 2001, as set forth in the search warrant application, the defendant Aref, according to an individual down in Georgia, wired between -- or excuse me -- transferred, not wired, but transferred between $15,000 and $18,000 to Iraq.  He also -- and this occurred as set forth in the affidavit during a time when he was telling Albany County Department of Social Services that he was making $200 a month and that was his sole source of income.  He also wired, as set forth in the search warrant affidavit, another, I think, $1,300 to an individual in Greece.  This person, as set forth in the search warrant affidavit, was arrested six months after the wire transfer by Greek police in connection with what sounds like a fraudulent document possession and manufacturing operation.

And I don't have further information on that individual, but we submit that all of that information indicates that he has these ties to foreign countries as well as an ability to marshal resources, it would appear, to flee if given the opportunity. The camp information that I described already in response to the entrapment question, we submit, shows that this defendant presents a danger to the community if released. That sort of personal history and characteristic would suggest that his release could pose a danger to the community.

One of the factors the Court can consider under this element is the character of the defendant, and we submit that the investigation and take-down has yielded evidence suggesting that the Court should have concern about defendant Aref's character in this case. He was asked multiple questions during the course of a post-arrest interview. One of the questions he was asked was whether he had ever heard of or knew about a group called Jaish-E-Mohammed, JEM. As the Court will recall, that is the group that the cooperating witness told Aref on tape recorded English language conversations and communications, the CW told Aref that that was the group that he was working with and that was the group that was essentially behind this missile importation. Aref told Special Agent Timothy Coll during the post-arrest interview the other night that he had

never heard of that group, contrary to what he had told the cooperating witness on the tape recording, which is that he had heard of the group, that he knew they were on the Government's list of terrorists group. JEM is, in fact, on the State Department's list of foreign terrorist organizations. We submit that's not the type of lie that's simply a claim by the Government that he defrauded somebody. It's -- he's on the tape saying it, and he denied it to Special Agent Coll the other night. We submit that bears on his character. In a similar vein, he was asked about money transfers to foreign countries and told interviewing agents the other night that he sent a total of $600 to $700 to Iraq, when, in fact, at least we submit, as set forth in the complaint, it appears he sent in one year alone between $15,000 and $18,000 with the help of an individual in Georgia and other money to Greece and perhaps other money to other places. He was asked by agents during the course of his post-arrest interview whether he had ever heard of the name Lahlo Garan (phonetic) or had ever used or went by that name. And Special Agent Rudd during the course of that line of questioning, I believe, wrote down the name for the translator who was there for -- the translator who was there to ensure that there was no miscommunication, and Aref answered no, he had never heard of that name and had never used that name. In August of 2003, Aref was observed going

into a post office in the Capital District, and we've reviewed still photos of that date, and these still photos, approximately five of them, capture Aref walking up to a certain -- one desk or teller in the post office, obtaining a money order for a thousand dollars, walking back, doing what looks like completing an express mail envelope package, walking up to a different person and mailing that package or conducting another transaction. We -- the Government has acquired the money order that was completed by or appears to have been completed by Aref in that case, along with the express mail envelope. It appears to have been completed by him in that case. It was a thousand dollar money order, and the person who was allegedly sending it was named Lahlo Garan, the same name that the defendant Aref told Special Agent Rudd he never heard of, he had never used before. The address on the money order and the address on the return -- excuse me -- on the envelope that mailed the money order was the address of the Masjid as-Salam mosque, 278, I believe, Central Avenue. We submit that, again, this piece of information provides the Court with evidence showing that there's reason to have concern about the veracity of the defendant Aref and his willingness and ability to abide by any conditions of release.

                And just to close that up, FBI agents did a search of a number of different data bases for the name

Lahlo Garan and couldn't find it anywhere. This was back in August 2003; choice Point, DMV, State Department, LexisNexis; nowhere, but it appears to be on that money order in Mr. Aref's handwriting, and Mr. Aref told the agents he never heard of it before.

Finally, bearing on the character of defendant Aref, the fraud scheme is alleged in this case. The facts associated with a fraud scheme, the Government submits Aref engaged in, are alleged in the search warrant affidavit for the mosque and Aref's residence. The facts contained in the affidavits describe how Aref, it appears, hid his income from Albany County Department of Social Services, both employment income and rental income, in order to be able to obtain benefits to which it appears he wasn't entitled. So we submit that also bears on his character.

All of those factors and all of those circumstances take into concert, we submit, show that this defendant's history, character and other factors strongly favor detention in this case.

Moving on to defendant Hossain's personal characteristics, we submit that those also --

THE COURT: Well, before we do, as to Mr. Aref, is there any evidence or intelligence upon which the Government relies which links, other than the notebook found in northern Iraq, which links Mr. Aref to any

UNITED STATES v AREF and HOSSAIN                           37

terrorism or foreign organizations?

MR. GRABLE:  If I could have a moment, your Honor.

THE COURT:  Yes.

(Pause.)

MR. GRABLE:  At this point, your Honor, we're not offering anything else on that score.

THE COURT:  As to Mr. Hossain.

MR. GRABLE:  As to Mr. Hossain, the personal characteristics and history of defendant Hossain also favor detention in this case, we submit.  Although he has many ties to the United States, he has significant ties to Bangladesh, his country of origin, and there are various indicators that he was planning -- just before the take-down in this case, he was making plans and doing things to prepare for a trip to Bangladesh with his entire family.  On the day of his arrest, he was heading back up from New York City and he had in his possession updated passports for himself, his wife and three of his children, all of which contained visa -- or excuse me -- stamps in the passport section which appeared to be essentially a visa substitution saying that he would not need a visa, neither would any of the holders of the passports.  Passport holders need visas in order to gain access to Bangladesh.  Hossain told the cooperating witness before the case was taken down that

Hossain's mother-in-law and two of his other children intended to travel to Bangladesh on August 17th, and during the execution of the search warrant one-way airline tickets for a trip to Bangladesh were found. Hossain told the cooperating witness that he was going to go back to Bangladesh as soon as he could or as soon as he sold his pizza parlor, and if he couldn't sell it, he would simply close the pizza parlor and leave. In addition to that, I think the search warrant and again the complaint affidavits --

THE COURT: Is it your interpretation that he intended to leave the United States for good?

MR. GRABLE: I don't have a clear picture of that, your Honor. I do know he has some real estate properties here, but we do submit that closing up his pizza business at least would -- you know, could support an inference that he was intending to leave for a while. And we certainly submit whether he was intending to leave for a while or not, this information shows he has an inclination and is ready, willing and able to leave the country; and now that he's charged with a crime carrying these types of penalties, he would take advantage of that if he could.

In addition, your Honor, we've spoken with -- or we've determined that it appears that the United States has no extradition treaty with Bangladesh, so that in the

event that the defendant were released and did flee, there would be -- it appears there would be little chance of ever having him face these charges in a court in this country.

There's some other past conduct of defendant Hossain which is set forth in the complaint, the document fraud that was the sort of beginning of the relationship between the cooperating witness and defendant Hossain in this case.  Hossain admits to tax evasion during the course of this scheme, during the early portions of it in December, January 2003, 2004.  In recorded conversations Hossain talks about not recording approximately $500 to $800 worth of cash proceeds from his pizza business and not reporting them so that he didn't have to pay taxes on them -- excuse me -- taxes on those funds.  We submit that that at least to some degree bears on the nature and characteristics of the person involved.

And, again, as is the case with Aref, we submit that the post-arrest interview of defendant Hossain yielded some information that this Court should consider when addressing this detention question.  During recorded conversations during the course of this scheme, the defendant Hossain told the cooperating witness that he was a member of a group called Jamaat-e-Islami, and I think it's identified in the complaint affidavit and search warrant affidavit by the letters JEI.  He even went so far as to

UNITED STATES v AREF and HOSSAIN                    40

tell the cooperating witness that he was a person of authority or at least somewhat of a higher-up in the group, and I've heard that term referred to as a Nasam or Naseem, but in any event, Hossain represented to the cooperating witness on tape membership in this group and a particular position in this group.  When interviewed by Special Agent Coll the night of the arrest and asked about JEI, Hossain denied that he was a member of JEI, and we submit that, once again, this isn't a case of interpretation of actions or deeds; you've got a recorded conversation in which he represents one thing and a simple flat out question in an interview where he represents exactly the opposite.

THE COURT:  Maybe you said this earlier. What's the significance of JEI?

MR. GRABLE:  JEI is -- it's a group that public -- well, in the course of the case here, JEI comes up, it's my recollection, when the cooperating witness is having a conversation with Hossain somewhere, I guess you would say, in the middle of the scheme or so, February or so, or maybe even March, but I think it's probably February, and the cooperating witness makes a comment about the martyr's blood being spilled, and Hossain says in response, amongst other things, I told you before -- I believe he said I told you before, I told you I'm a member of the Jamaat-e-Islami and my wife is a member as well; and then

later in a conversation he says he's the Naseem.  It's alleged in the complaint affidavit that JEI, by public source information, is an Islamic fundamentalist political party in Pakistani with chapters in Bangladesh.  That's what's alleged in the complaint affidavit.  The Government has seen a various range of, I think, public source information; some public source information may link this group with extremists, some public source information may say they're a political party.  The Government submits though that perhaps most importantly for your Honor's decision is the fact that the defendant obviously saw it not to his advantage to admit what he had told the cooperating witness before and lied about that during the interview.

Real brief issue, your Honor, on Hossain's character, he told Probation in the presentence interview that he owned four properties; West Street, Alexander Street, Elk Street, and Clinton Avenue.  The pretrial services report on page 2 indicates that a Westlaw check confirms that he owns the Alexander Street and West Street properties, but has nothing for Elk Street, it looks like, or for Clinton Street.  And checks that the Government performed with Albany County indicate that he's not the owner of the Elk Street or the Clinton Avenue properties.

THE COURT:  I was advised today by pretrial, it may not be unusual for a delay to occur in transfer of

title at an auction hearing.

MR. GRABLE: Okay. We were wondering that as well, your Honor, but that's another piece of information that we had.

The last factor the Court has to consider is the nature and seriousness of the danger posed by the defendants, and we certainly submit that this factor in particular with defendant Aref strongly favors detention. Here, you have an individual whose name was recovered from an address book following a raid in a terrorist training camp -- or excuse me -- a terrorist camp in northern Iraq in June of 2003, who appears to have been willing to serve as a witness and guarantor and participant in a money laundering sting transaction in which he understood that a missile was being sent down to New York City to commit a terrorist attack. We submit that that type of individual poses a risk to the community in part and in particular because he has now been identified in terms of what the investigation has revealed about him.

We submit that the nature of the crime in this case also demonstrates that Hossain, particularly because of his willingness to commit this offense, is a danger to the community.

And for all of those reasons, we ask that the Court detain both of these defendants pending trial.

THE COURT: As to Mr. Hossain, I'll ask you the same as to Mr. Aref, other than the circumstances of this case and what you previously referred to about the membership in a political or other kind of party, is there any evidence or intelligence upon which the Government wishes to rely to establish any ties of Mr. Hossain to any terrorist or foreign organizations?

MR. GRABLE: No, there are not.

THE COURT: Thank you.

MR. GRABLE: We would point out defendant Hossain is the one who recommended Aref as a guarantor in this transaction and Aref has that connection to the camp.

THE COURT: Thank you.

MR. GRABLE: Thanks.

THE COURT: Mr. Kindlon.

MR. KINDLON: Thank you very much, your Honor. May it please the Court. Mr. Grable. And Mr. Aref. And Mr. Luibrand.

Judge, in listening to what was concededly a brilliant presentation by the Assistant U.S. Attorney, I must admit that I had the feeling I had gone through the looking glass or fallen down the rabbit hole, because what he's describing is, we must remember at all times, play acting that was performed by a governmental informant that was done very convincingly and clearly in an effort to

UNITED STATES v AREF and HOSSAIN                          44

entrap two individuals into the appearance of criminal conduct.

Now, 3142 does set forth the factors that need to be taken into account when the Court is considering the question of whether or not a person accused should be released pending trial either on bond or on conditions. And I would submit, your Honor, that an examination of those factors in this case strongly urges the conclusion that my client Yassin Aref poses no risk of flight and is no danger to the community.

Now, let me just talk briefly about the nature and the circumstances of the offense. A person in a much higher pay grade than mine, James Comey, who's second in command at the Justice Department, has unequivocally stated that this is not the case of the century, and when you take a magnifying glass and hold it over this Indictment and think about the words and the content that it contains, that's the only conclusion you can draw. And rather than go through the search warrant application paragraph by paragraph or the Indictment paragraph by paragraph, let me just summarize this as far as my client Mr. Aref is concerned.

This man, Judge, this 34 year old father of three, sitting here -- that's okay, sit down -- he's accused of money laundering, and as part of that money laundering,

one of the things that's held forth as evidence of this complicity of money laundering is the fact that he gave receipts in triplicate. What kind of a money launderer gives receipts? Any superficial knowledge of how Muslim men conduct financial transactions with each other tells us that, first, when money is borrowed or lent, interest is not to be charged. And secondly, these, these folks, unlike the Government, they don't -- they can't do Westlaw searches and Lexis searches. They're still in the pencil and paper era. What they do is bring a witness in and request a witness to come in and say please watch this transaction and make a record of it, so that if I die, my son will get the money that I'm owed. Because they can't go to Surrogate's Court, they don't have one in their culture, and they haven't really fully acclimated to ours yet.

Also, in this money laundering scheme that my client has been accused of participating in, it's very significant, the Government never says he made a dime. Doesn't make a nickel. Doesn't make a penny. And in sum and in substance, your Honor, clearly what we're dealing with here is a situation in which my client, Imam Aref, a holy man, fulfills a role of nothing more than what we call a notary public. He comes in, he's somebody you can trust, he's somebody who's got the ability to look and to perceive and to confirm these facts and to write them down, which is

something else that's done in their tradition, and to give everybody, everybody a receipt so that it's unequivocally established that the money which was borrowed and lent was involved in that -- in those transactions.

As to the weapons offense, Mr. Grable has given these photographs, and my clients says to me, never I saw this tube, this weapon, which is set forth in Government Exhibit 2. And there's no claim that he did. There's no claim that he did. And also he says, and again I quote him, never I saw this thing, which I perceive to be a triggering mechanism for a RPG or a SAM missile; it looks like the back end of a 45 caliber pistol handle and the front end is a pelican beak; I don't know how better to describe it; that's Government Exhibit 4. "Never I saw that" confirms my -- okay, okay, calm down -- Judge, it's really critically important to remember, your Honor, when dealing with circumstances of the offense charged here that the offense charged here arises out of a and rests exclusively on a foundation of lies and deceit engineered by the Government and recorded through what we're told as much as a two-year intensive FBI investigation. And if this is the best they can do, then we know that Mr. Comey was quite correct when he said this is not the case of the century. In fact, they may not even be the case of the weekend. There's just not anything to it of any real substance.

Now, I think that also covers the weight of the evidence.

THE COURT: Well, before you get off the weight of the evidence, Mr. Kindlon, do you care to comment on the statement, this was not a sting operation involving a trip to Disneyland or a pound of cocaine, it was a surface to air missile to be used to assassinate somebody in New York City?

MR. KINDLON: My client never heard anything of that sort, your Honor. And the Court, by that question, raises a very good point, because if, if the confidential informant came into my client's life and said that he was engaged in a drug transaction, would my client be charged with a drug offense? If he was to say he was engaged in a bank robbery, would my client be charged with a bank robbery? This is a fictitious, utterly fictitious story which was made up in an effort to entrap my client into some sort of criminal conduct.

And, your Honor, I submit that at this juncture, while entrapment is an attractive word to use in defense, I submit that my client never even engaged in any activity that could be called in any objective fashion criminal. So, accordingly, if you don't engage in any criminal activity, you don't need the defense of entrapment to show your lack of guilt.

UNITED STATES v AREF and HOSSAIN                    48

The weight of the evidence in this case is such that when it's fully run out in front of a jury, I respectfully submit the charge will be rejected out of hand.

As to my client's personal characteristics, I think -- I submit that they're terribly significant, your Honor.  Yassin Aref has no prior criminal history.  None.  He is married.  His wife has some health problems.  I think it would be fair to say his wife has some fairly significant health problems, which, of course, is very significant in light of the fact that they are the parents of three young children between the ages of 5 and 9, three young children who, like all other young children in America, are probably worried about having to go back, be back to school in three weeks, probably worried about the fact that summer vacation is almost over, and probably need to get ready for the coming school year.  And, obviously, they are gonna have a much harder time if their father is locked up on these charges.

My client's home is in this country.  He is here -- Mr. Grable said not lawfully, and I respectfully disagree with that.  My client is here as a refugee from Iraq.  And he fled Iraq, where he lived in that part of Iraq called Kurdistan back in about 1995, and he fled to Syria where he married and he and his wife brought into this world the three children of whom they are the parents.  He's an

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

educated man, your Honor. He has studied history, he studied comparative religion in college. I had the opportunity -- I say this as an officer of the Court -- to have extended conservations with my client. I find him to be -- and I think the Court should be aware of this -- a sensitive, intelligent, thoughtful, philosophical and deeply devout individual.

Again, in this connection I have to get back to the fact that these charges are based on a concocted story. And my client's participation in the events that arose as a consequence of that concoction are really limited to being nothing more than a notary public type participant.

What I think should be called the extraneous stuff, the other information that Mr. Grable has shared with the Court, this business about my client's name and address being written in an address book which was apparently seized in December of 2000 -- excuse me -- which was apparently seized last year from what is described as a terrorist camp, now, the Government says it's a terrorist camp, I guess we have to take their word for it right now; there's really been no proof other than that conclusory statement. We have not had the benefit of seeing any such notebook or piece of paper or anything. For all we know, it's a notebook containing the names of 100 Imam. For all we know, it's an address book that was stolen from one of my client's many

relatives still living in Iraq. For all we know, it could mean almost anything. Nobody I've heard here today is suggesting that my client was a terrorist in Iraq. I mean if that's what we're supposed to infer from this, let's say it, let's prove it. But to say the name of an individual appears on a piece of paper found by a soldier in a blown up pile of sand somewhere in the Middle East, that it proves anything; it doesn't, Judge; it doesn't prove a thing. I'm told also that the camp was a place where a group called Ansar al-Islam was located and the Human Rights Watch tells us that that group never came into existence in Pakistan -- or in Kurdistan until December of 2001, which was six years after my client left Iraq and a couple years after he left Syria for the United States as a refugee brought here by the United Nations High Commission for Refugees.

THE COURT: That fact may cut both ways, Mr. Kindlon. The notebook had his Albany address, not his north Iraqi address.

MR. KINDLON: Well, again, your Honor, we don't know what that means. We don't know what that means. It could be -- and I know that Mr. -- excuse me.

(Pause.)

MR. KINDLON: Mr. Aref asked me to point out that the address they say was in that book was his address of five years ago. And, again, your Honor, I do know from

conversations with my client that he has many relatives who are still in Iraq, living there, including brothers and nephews and other, other family members.

THE COURT: Which brings out the significance of the word "commander" written next to it.

MR. KINDLON: Yes.

THE COURT: Any comments on that?

MR. KINDLON: Okay. And you know, your Honor, who says that the word "commander" is the proper translation. It could be leader. It could be Imam. It could be father. It could be almost anything. And, you know, the wisdom of our being able to confront the witnesses against us is pretty clear right now, because all I can do is speculate, and all any of us can do is speculate, and I would respectfully submit if all we can do is speculate in a court of law, then we ought not to consider the information to have any significance whatsoever.

The fact that money was sent by my client to his brother -- actually to his brothers, three, three brothers in Iraq, there's a -- there is, believe me, a significant dispute over the amount, but there was some money sent to Iraq to his brothers overseas, they were in desperate straits there. There was also some mention of a wire transfer to some character in Greece. The fact of the matter is the -- and understand, your Honor, I mean, we all

understand, we're dealing here with a very dangerous set of circumstances across the waters. Imam Aref was told one day that a nephew of his had been kidnapped and would be executed unless he sent money. And that's what he did. Basically he paid a ransom to some unseen, unknown to him kidnapper in response to a kidnapping threat to save a life.

Now, it has also been said in considerable detail and at some length that certain facts demonstrate that my client, Imam Aref, is a danger to the community. I respectfully submit, your Honor, that any objective view of the circumstances of this man's life lead to the exact opposite conclusion. Imam Aref is a leader of a small religious group in a mosque in Albany. Now, again, as an officer of the Court, I say to you I've been to that mosque, I went there last Friday afternoon, in time to arrive there at the conclusion of Friday afternoon prayer, and met there with about a hundred people, a hundred thoughtful, calm, solemn and devout people; and they all came to me and told me how important the Imam was to them and to their mosque; they told me what a good person he was; they told me what a good father he was; they told me what a good leader he was; they told me what a holy man he is. And that's the reality, Judge. And no Lexis search, no call to the county clerk's office is gonna come up with any better information than that. This is a good and moral man, a religious leader.

And last but not least, the question has to be asked, is he a risk of flight?

Again, he's the exact opposite of a risk of flight. You know, the Statute of Liberty, the engraving on it talks about the huddled masses. And I met my client and his family, and I thought, my God, this is what we're talking about; these people are huddled masses; they came here to get away from a terrible, terrible world; they came here as refugees, came here for a better life. They're huddled down, hunkered down. Aref and his wife and their three children are really for the first time feeling, until last week, perfectly safe in their lives. Risk of flight? Far from it. He's got no place to go, Judge. He's here as a refugee. He can't go to any other country. He doesn't have a passport. He hasn't got a bus fare to Colonie right now. There's nothing he can do except stay here.

This Court can fashion conditions which will protect the community, to the extent that it needs to be protected, which I respectfully submit is to no extent at all, but this Court can fashion conditions to satisfy itself that any protection the community needs, it will have, and also to ensure my client's appearance at future proceedings in this case.

There can hardly be a doubt, Judge, but that this case is going to go to trial. There can't be a doubt

UNITED STATES v AREF and HOSSAIN                54

that that's where this matter is headed.  And we know from our experience in the system of justice over the years that if we move at the speed of light, if we go at flank speed, we're still talking six to eight months from now before jury selection can be commenced.  And my client's family needs him back.  My client's -- only word I know is as a westerner -- my client's congregation needs him back; his people need him back; his people want him here.  And under all the circumstances, your Honor -- and I recognize that pretrial services has recommended otherwise, and I recognize that there are some very dramatic claims here, but nonetheless, the reality is that the factual basis for these charges is simply insufficient to support the conclusions that you're being asked to draw about my client's risk of flight and danger to the community.  I respectfully ask you, Judge, please, exercise your discretion and release my client, if need be, on conditions; home confinement, electronic monitoring; GPS, whatever it takes, so that he can take care of his wife and take care of his children and serve his congregants and live his life until such time as we can go to trial and I submit secure a not guilty determination of this charge.

THE COURT:  Mr. Kindlon, do you dispute the Government's assertion that Counts 11 through 19 raise a presumption?

MR. KINDLON:  I don't, your Honor.  I think that all the facts and circumstances rebut that predisposition to leave this Court to release my client.

THE COURT:  As to their sentencing guidelines calculation?

MR. KINDLON:  Well, Judge, the last time I checked, there are no sentencing guidelines.  I think Blakely obliterated them.  It gives me the greatest pleasure to agree with Justice Scalia about something after all these years.  The fact is, that it's -- really, it takes a real leap of faith to get us to a level 36 under these circumstances, and I think basically what we're dealing with here is just a regular old money laundering case, Judge, at best.

THE COURT:  Well, one thing we're not going to decide today is the meaning of Blakely.

Mr. Luibrand.

MR. LUIBRAND:  Thank you, your Honor.  After about 20 years in these courtrooms, I can read the tea leaves and I can tell how proceedings of this nature are going.  Let me point out one critical point and that is that the proof that there was not an entrapment, the proof of Mr. Hossain's predisposition to committing these crimes is at that table (indicating), it's at that table in determining and calculating the weight of the evidence and

in determining the strength of their case.  1985 he came to the United States.  He worked as a dishwasher, worked his way up to a cook to chief cook, to owning a pizzeria with a partner, to owning a pizzeria on his own.  He's been here over 20 years and he's been a United States citizen for ten years.  He has five children.  He has a wife.  He is the guy that takes the orders on the pizzas, he's the guy that puts them in the boxes, he's the guy that runs out to State Street and Lark Street delivering the pizzas.  That's what he does.  If he ain't there, they ain't getting delivered, and there's no business and there's no income in this household.

The predisposition that's been articulated by the Government with respect to Mr. Hossain is zero, absolutely zero.  No prior criminal record.  No prior engagement, involvement, in any terrorist organizations or anything even associated with terrorism.  The organization identified by Mr. Grable, Jamaat-e-Islam, is a political party in Pakistan of which substantial members of the population are members.  It's not a terrorist organization. And they use words like they're linked to extremists.  These words that mean nothing.  That's how you ruin somebody, by using language like that.  That's how you destroy a person's ability to make a living, by using these words.  Their case, if they can't establish a predisposition by this man to

commit these crimes, is dead. It goes no place. He will walk out of the courtroom with that. And there's no reason he should spend the next eight months in jail waiting for them to come up with a predisposition that they're not capable of doing today. They're not able to articulate one. If you go to their affidavit, they have nothing as a predisposition, up until the point they met, and they got this confidential informant out there, pedaling, pedaling, selling licenses and permits. He's selling them. He didn't go to them. Mr. Hossain didn't go to this guy. This guy is out on Central Avenue hitting up Muslims, trying to sell them licenses. That's what he does. And that's how he walks into my client's business. According to the complaint, that's how he walks into the business. Selling licenses. No predisposition. No prior criminal involvement. No involvement in terrorism. Barely knows the guy. And he's pedaling a permit for his retarded brother -- I know that's not a politically correct term -- for his retarded brother so that he has an ID. He can't drive. He doesn't want to drive, but he needs an ID. Can't even get into the building without an ID. The kid wanted an ID. From that, they begin this process of trying to invite these people to commit crimes. The Government does. The Government organized, ran, financed and employed the people to run a criminal conspiracy. And they wanted to find

UNITED STATES v AREF and HOSSAIN                    58

somebody.  And, you know, they didn't go to St. Mary's Church and they didn't go to the Jewish synagogue.  They went to the Muslims.  That's where they went.  And that's wrong.  This case rises and falls on entrapment.  And I'm not telling -- everybody in this courtroom knows entrapment is the central issue in this case, and it's their burden, and they can't articulate today, today they can't articulate his predisposition.  He should be able to walk out of here and help me with his defense because I don't have a battalion of people, lawyers, government, Washington, D.C. He knows it's me and him, and that's it, and I need his help.  And he needs to get out of here with conditions, whatever conditions the Court can impose or find reasonable. He surrendered his passport.  The tickets that they claim that he went and bought weren't even his tickets.  They weren't his wife's tickets.  They were for his mother-in-law and his kids to go to Bangladesh to visit their relatives. And somehow that's a crime.  Somehow the Government is able to portray that as a crime.

THE COURT:  As to predisposition, Mr. Luibrand, the Government articulates reliance upon the interactions in the course of the offense alleged here, the ready acceptance and other matters.

MR. LUIBRAND:  I would -- yes, your Honor.  I would invite your Honor to page 10 and thereafter of their

affidavit.  It took this seller, their person, apparently five meetings t4o try to get a deal together to do this so-called money laundering.  It wasn't like he walked in and said let's launder money.  According to the complaint, Mr. Hossain asked this guy for a loan.  That's according to the complaint.  And there was no exchange, well, how about this, we launder money.  That didn't occur for almost three more meetings.  They started this thing; you need money, I'll get you money, I'll show you how to get money.  That's what the complaint alleges.  I'm relying on what they present, not what our defense is, but what they present is what I'm relying on in the complaint.  We haven't cross-examined anybody.  You know, we're taking everything they say at face value.  Taking these grainy pictures at face value.  Everything taken at face value.  And I'm asking for the Court to take at face value that this guy is an American citizen who works like a dog, who has a family that occupies every waking minute, that and his business, and he could give a darn about terrorism, he could give a darn about what happens overseas.  He's a regular guy.  But he's got a Muslim last name, and that's the only reason we're here.  That's what started this whole process.  And that's not right.  They can't prove a predisposition.  And for that reason, they can't meet that burden today, they're not going to meet it in six months, and he shouldn't have to wait in

the can for the next six months for that day to arrive.

THE COURT:  Mr. Grable, anything further?

MR. GRABLE:  Yes, your Honor, thanks, just very briefly.

Going in reverse order, just on the chronology of the events, as laid out in the complaint affidavit, and we submit the evidence will bear out, the defendant Hossain requested a loan from the cooperating witness before the missile was displayed, and then, after the missile was displayed, he reiterated his request for a loan.  Didn't have any concern about the fact that this guy had just shown him a missile that was going down to the mujahid brothers in New York City to be used and it's used to shoot down airplanes.  We submit that there's more than sufficient evidence upon which we're going to be able to rest on that score.  Very briefly --

THE COURT:  Speaking of that photograph, does the Government's evidence include any evidence that the missile itself was ever shown to Mr. Aref?

MR. GRABLE:  I was going to move to him right now.  No, there won't be any evidence that the missile was shown to Aref, although we submit that the evidence will show the trigger mechanism to the missile was shown to Aref which has been offered for purposes of this hearing as Government's Exhibit 2, which shows Hossain in the white hat

in sort of a middle of the picture, Aref to the right of him, and the cooperating witness on the other side of the table. This was January 2nd; this was the day they consummated this first transaction. And if I could have an exhibit sticker, I would just like to mark this for purposes of identification.

THE COURT: Have Mr. Kindlon and Mr. Luibrand seen this?

MR. GRABLE: No, but I'll show it to them right now, and I'll call it 2-A if that's okay with the Court.

(Pause.)

MR. GRABLE: Judge, if you take a look at Government's Exhibit 2, and I'll hand this up for the Court's examination, Government's Exhibit 2, it's a grainy picture, but the cooperating witness is holding something, and the proof is going to show he's holding what you have in your hand right now, the trigger mechanism, and it's described as part of -- during the conversation as the part of the missile by the cooperating witness as going down to New York City and we'll bring up another $45,000. Aref wasn't shown the missile, but we submit he was shown and told quite enough to impart knowledge to him as to what was going to happen.

Very briefly on the personal characteristics,

if I said that he was here illegally, I didn't mean to say that. I thought I said he's not a lawful permanent resident. My understanding is Mr. Aref's status is as a refugee in the United States. What I did want to point out is sometime in the recent past, according to folks from the Immigration and Customs Enforcement Service, Aref went in and requested and completed an application for a travel document in which he indicated that he intended in part to travel to Iraq in December 2004 for three weeks. We submit that this shows his status as a refugee doesn't imperil his act to travel and shows he's willing to travel and we submit under the circumstances he's got great reason to travel.

THE COURT: Thank you.

MR. GRABLE: Thanks.

THE COURT: Mr. Kindlon, anything further?

MR. KINDLON: If I may just have a moment, your Honor. My client is saying something to me.

(Pause.)

MR. KINDLON: My client says that he understands that we have liberated Iraq, and he and his wife wanted to go back there to see a sick relative, and as you can see there by the documentation that Mr. Grable showed, he was taking the appropriate steps and advising this country of his intent to do so. Again, I think that that reinforces our position that my client is here to stay, does

not pose any risk of flight.  Thank you.

THE COURT:  Mr. Luibrand, anything further?

MR. LUIBRAND:  Nothing, your Honor.

THE COURT:  Stand in recess for 15 minutes.

(Brief recess at 3:35 PM.)

(Court reconvened at 4:00 PM.)

THE COURT:  There are times, and this is one, when relatively new matters come before the Court.  This is new because the spector of terrorism in the country is new.  And this case raises legal issues which must be decided on legally competent evidence before the Court, setting aside passion and the occasional prejudices which occur from time to time.  I'm rewarded that counsel appear to have done that in their exceptionally well prepared arguments and presentations.  I hope to do the same.

I've considered the arguments and presentations of counsel.  The factors I must consider are set forth in 18 USC Section 3142(g).  Those factors are four, and the first is the nature and circumstances of the offense.  Here, the offense charged is a mixed charge. First it's money laundering, which, by its nature, is not necessarily a crime of violence, but it also includes the charges in counts, I believe it's 11 through 19, which involves providing material support to terrorist organization and, therefore, for purposes of bail, creates a

presumption that both defendants would pose a risk of flight and danger to the community if released.  That presumption there raises a burden of production but not persuasion on the defense.  The burden of persuasion remains with the Government, although persuasion remains a part of its case.

The second factor is the weight of the evidence.  The weight of the evidence in this case is much in dispute.  It appears from the proffer of the United States that the offenses in this case involved a government informant who made contact with Mr. Hossain and, through a series of transactions, to use the Government's words, presented him with an opportunity to participate in the obtaining and delivery of a weapon of mass destruction, a surface to air missile.

It further appears from the evidence that Mr. Hossain obtained the participation of Mr. Aref to witness the transaction in part at least in Mr. Aref's capacity as the Imam of Mr. Hossain's mosque.

There is no question, as defense counsel state, that the offense in this case, it appears, was suggested by the government informant and not by either defendant.  This bears on several other factors I must consider.  There's also no dispute from what the evidence appears that it was clear to both defendants that the transaction in question concerned a surface to air missile.

The missile itself was shown personally to Mr. Hossain. The trigger mechanism was shown to Mr. Aref; and the fact that it was a trigger mechanism for a surface to air missile was known to Mr. Aref. Upon reading the complaint, the description of the trigger mechanism could create a number of images. When you see a trigger mechanism, there's no doubt as to what its purpose is and to what the destructive capability in the context of the conversations is. So while it is true that the offense in this case was conjured by the government and presented by a government informant, the nature of the crime with which the defendants apparently associated themselves was clearly one of violence and one of massive proportions.

Whether or not they were predisposed to that will ultimately be a question of fact for the jury, and I find it difficult to assess that aspect of the case in an affirmative defense such as entrapment or the claim of Mr. Aref that he never even knew what the contract was about without hearing the testimony, but I'm satisfied from the evidence presented by the Government in its complaint and search warrant affidavits and here in Court today that the evidence is at least sufficient. Whether I would describe it as less than overwhelming because these cases, by their nature, raise significant questions of fact for resolution by the jury, sting operations have been ongoing for decades

in the country, going back to before Abscam, but certainly during Abscam, DeLorean, and a number of other cases. So they're not unprecedented. But, certainly, the evidence in those cases generally, and in this case as well, is less than overwhelming.

The third factor is the history and characteristics of the defendants. As to this factor, the matters are -- the evidence is somewhat different for the two defendants. Mr. Aref is a native of Iraq, a resident for four or five years in Syria, a resident in the United States for five years. I would describe the refugee status as a legal resident but of undetermined duration. And certainly a conviction in this case for Mr. Aref creates a certainty of deportation. Mr. Aref is, as far as family ties goes, is married and has three children in the area. It appears he enjoys the support and respect of the people in his community, particularly as the head of his mosque. He has maintained steady employment and residence in the United States. It also appears as to Mr. Aref, however, that there are a number of other factors which do not support his claim for release on conditions. Among other things, his name with his Albany address and telephone number were found in a notebook at a -- what is represented to be a terrorist camp in northern Iraq within the last year with what is represented to be the word "commander" written

next to it.  If true, that evidence carries significant weight for Mr. Aref's connection to other terrorist organizations.  I note that it is -- the Government's attorneys as well rely on representations of others as to what is contained in the notebook page.  Unless you are unable to do so, I would direct you to provide a copy of the page in question to Mr. Kindlon within seven days.  In addition, however, as to Mr. Aref, it appears that he has within the last year used a false name in sending out a mailing from the post office.  It further appears that he had a Syrian identification card which was good through 2007 in his possession at the time of the search of him and his arrest.

As to Mr. Hossain, Mr. Hossain is a United States citizen and has resided in the United States for approximately 20 years.  He's married with five children with whom he lives, has -- operates a business, owns rental property and has otherwise done what anyone would expect and hope that someone moving to this country would do to root themselves in the life of this country and contribute to the community.  As a matter of fact, if it were not for the spector of terrorism, which hovers over this case, there would probably -- and if this case involved what the original plan was, for the purchase of false driver's licenses, there would not even be a dispute about the

release of Mr. Hossain.

The final factor is whether or not the release of any defendant would pose a danger to a particular individual or to the community. This is also one of the bases on which the Government seeks detention. The danger to the community from both defendants arises, according to the Government, first from the nature of the offense charged here and from the fact that the offense charged here includes laundering money to obtain a weapon of mass destruction. On the one hand, neither defendant suggested the idea for that offense. It came from the Government. That, in itself, suggests to me that the danger to the community, while it exists, may be addressable if that were the only factor to consider. The rest of it, however, is that, as I noted before, the weapon of mass destruction, the object of the conspiracy here was clearly known to both defendants from the evidence proffered here, and as I noted as to Mr. Aref, there is the connection to -- of some sort to the terrorist camp in Iraq, his use of a false name and his connections to foreign countries.

Having identified and articulated the factors I must consider, I must now consider the grounds on which the Government seeks detention of the two defendants. The first is danger to the community, and the second is risk of flight. And I must determine whether there are any

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

conditions which could be imposed which would address the dangers which I have previously identified.  The options include personal recognisance bonds, secured bonds, home detention, electronic monitoring and other things identified in 18 USC Section 3142.

I will address the matter with respect to Mr. Aref first.  As to danger to the community, there is clearly a danger to the community which would arise from Mr. Aref's release.  That danger arises not only from the circumstances of this offense but from Mr. -- the fact of the name in the notebook at a terrorist camp with the word "commander" next to it, the willingness to use false names, the relatively short duration of his life in the United States, and his connection with foreign countries.

For all of those reasons, I find that Mr. Aref's release would pose a significant danger to the community and that the conditions which could be used to address that are limited.  The property available is, in the circumstances of this case, easily considered a cost of doing business and, therefore, insufficient.  Electronic monitoring is useful in certain cases, but in most instances electronic monitoring is available only to tell us when someone has left.  Someone with a mind to leave would have no difficulty defeating electronic monitoring or home detention.

So I find with respect to dangerousness, that the Government has sustained its burden of proof as to Mr. Aref and that there are no conditions which would address that.

As to risk of flight with respect to Mr. Aref, there is a similar significant danger of flight as to him. He faces the likelihood of deportation; probably a certainty if he's convicted. The evidence in this case is strong, although not overwhelming, and given the penalty the Government will seek based on its sentencing guidelines computation, if Mr. Aref is found guilty, the motive to flee is substantial and perhaps overwhelming in the circumstances of this case. For the same reason, therefore, the conditions that are available to ensure against that danger are insufficient to address the risk of flight as to Mr. Aref in this case as well. And I find that as to that basis as well, the Government has sustained its burden.

As to Mr. Hossain, danger to the community, the danger to the community articulated by the Government arises solely from the circumstances of this case. Mr. Hossain -- there is no evidence presented that Mr. Hossain had any connection to any foreign terrorist organization. There's some evidence that he stated that he belonged to a political party of some kind that is in a foreign country, but that by itself would be insufficient to

UNITED STATES v AREF and HOSSAIN                    71

support any claim of danger.  In the circumstances of this case, the danger arises from his joining in an offense suggested by the Government, his failure to turn away from it; that not just a failure to turn away from it, but willfully joining in it and continuing in it as suggested by the Government.  There may be defenses to that.  That depends on the evidence presented at trial.  And since Mr. Hossain's counsel has been in this case for less than 24 hours, it's impossible for him to articulate at this point all of the evidence that will be offered in support of that defense.  Based on the record before me, I recognize that there is a defense to the charge on that basis, but as to danger to the community, that danger arises solely from a crime which was suggested by the Government agent in this case.  Mr. Hossain's crime, if any, was the agreement to accept money from that person, put it through his own account and give it back to that person in a different form.  That is an offense, but the danger was suggested by the Government agent, not by Mr. Hossain, and he joined in it.  There is a danger to the community as to Mr. Hossain, I find, but I also find that there would be conditions which would adequately address that danger.  The risk of flight is another matter, however.

As I noted with Mr. Aref, the charge in this case is serious and carries with it a substantial penalty.

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

UNITED STATES v AREF and HOSSAIN                72

If the Government is correct, that penalty would include imprisonment for 20 years or more upon conviction after trial.  The evidence in the case is certainly sufficient to present to a jury and a defense articulated by Mr. Hossain's counsel is an affirmative defense which, by its nature, no doubt requires resolution by a jury.  So the risks are great for conviction.  Given those risks, the motive to flee is substantial.  I also consider in this the fact that while Mr. Hossain -- the offense charged against Mr. Hossain was somewhat suggested by the Government agent, the nature of the offense, one of the factors I must consider, was one which involved a weapon of mass destruction.  Mr. Hossain was not asked to turn away from, as I put it earlier, a trip to Disneyland or a pound of cocaine, marijuana or a driver's license.  This was a weapon of mass destruction which was clearly presented to him and in which he clearly joined.  So with respect to -- I do find that the nature of the offense here supports the Government's claim as well that Mr. Hossain would pose a danger to the community because it strengthens the Government's case and, therefore, provides motive.

On that basis, therefore, alone, I do find that the Government has sustained its motion and an order as to that effect as to both defendants will be entered.

Anything further, Mr. Grable?

MR. GRABLE:  Nothing on behalf of the Government, your Honor.  Thank you.

THE COURT:  Mr. Kindlon?

MR. KINDLON:  No, thank you, Judge.

THE COURT:  Mr. Luibrand?

MR. LUIBRAND:  Nothing further, your Honor.

THE COURT:  Both defendants are remanded to the custody of the United States Marshal.

THE CLERK:  Court stands in recess.

(Court adjourned at 4:15 PM.)

- - - - -

74

# C E R T I F I C A T I O N

I, BONNIE J. BUCKLEY, RPR, Official Court Reporter in and for the United States District Court, Northern District of New York, do hereby certify that I attended at the time and place set forth in the heading hereof; that I did make a stenographic record of the proceedings held in this matter and caused the same to be transcribed; that the foregoing is a true and correct transcript of the same and whole thereof.

BONNIE J. BUCKLEY, RPR

USDC Court Reporter - NDNY

DATED:  AUGUST 17, 2004

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR