UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

       -vs-

YASSIN AREF and
MOHAMMAD HOSSAIN

Crim. No. 04-CR-402
(Hon. Thomas J. McAvoy)

---

Government's In Camera, Ex Parte, Under Seal
Memorandum in Support of Motion for a Protective Order
Pursuant to CIPA § 4 and Fed. R. Crim. P. 16(d)(1)
[Redacted]

# TABLE OF CONTENTS

(U) I. Introduction and Summary .................................................................... 1

(U) II. Background ........................................................................................... 2

        A.       [Redacted] ............................................................................... 2

(U)  B.     The Sting ................................................................................ 2

      (U)  1.     SA Coll Initiates a Criminal Investigation ...................... 2

      (U)  2.     The CW Approaches Hossain and Helps Fraudulently
                   Procure a Driver's Permit for Hossain's Brother .......... 3

      (U)  3.     The CW's Discussions With Hossain of Religion,
                   Politics, Jihad and Martyrdom ............................ 4

      (U)  4.     Hossain Asks for a Loan; Plans for a Sting ................... 5

      (U)  5.     The CW Displays the Surface to Air Missile (SAM)
                   to Hossain ................................................................. 5

      (U)  6.     "The Walls Have Ears;" Hossain Reiterates His
                   Request For a Loan ............................................. 6

      (U)  7.     The Money Laundering Proposal; Hossain Insists On
                   Documenting the Transaction And A Witness..... 6

      (U)  8.     Hossain Warns the CW About FBI Special Agent Coll
                   and Promises to Die Before Revealing
                   the CW's Secret ...................................................... 7

      (U)  9.     "He's Not Afraid of Anything. He's Only Afraid of
                   God." Hossain Proposes Aref As A Witness ....... 8

          10.     [Redacted] ............................................................... 9

(U)    11.    The CW Describes the Money Laundering Scheme
           to Aref ................................................................ 9

(U)    12.    Hossain and Aref Complete the First Money Laundering
           Transaction With the CW - Receiving $5,000 In
           Cash and Laundering $2,000 By Check ............. 10

(U)    13.    Aref Understands "you . . . legal your money" ............ 11

(U)    14.    Aref Recognizes JEM -"they classificate that
           organization with the group which is they call
           terrorist group;" be "very, very careful" ......... 12

(U)    15.    Hossain and Aref Complete the Second Money
           Laundering Transaction With the CW
           - Receiving $10,000 In Cash and Laundering
           $2,000 Back By Check .......................................... 13

(U)    16.    Code Word for the SAM - "Chaudry;" the CW Warns
           Hossain of an Attack Next Week in NYC ...................... 15

(U)    17.    Hossain and Aref Complete the Third Money
           Laundering Transaction With the CW
           - Receiving $10,000 In Cash and Laundering
           $2,000 Back By Check .......................................... 15

(U)    18.    "Something Big Is Going to Happen;" The CW Warns
           Aref to Stay Away From NYC Next Week ........ 16

(U)    19.    Hossain Launders Another $6,000 Check to the CW .. 17

(U)    20.    Hossain Declines to Transport a SAM to NYC ............ 17

(U)    21.    "I am going to get my degree;" Aref Warns the CW
           That A Suicide Bomber Doesn't Even Tell His
           Own Mother His Plan .......................................... 18

ii

(U)    22.    Hossain and Aref Complete More Money Laundering Transactions With the CW - Receiving $15,000 In Cash and Laundering Back $13,000 By Check ....................... 19

(U)    23.    The "Silent Partner;" Aref Invites the CW to Put Up Money to Buy Hossain's Pizza Shop .................... 19

(U)    24.    Aref Presents the CW a "Different Opportunity" ....... 20

(U) III. Charges and Defenses ..................................................... 21

(U) A. The Money Laundering Charges ......................................... 21

(U) B. The 2339A Charges ...................................................... 23

(U) C. Impossibility Is Not A Defense ................................... 24

(U) D. Discriminatory Targeting and Entrapment ........................ 25

(U) IV. Discovery Standards ..................................................... 31

(U) A. Rule 16 Materials and CIPA ................................................. 32

(U) 1. To Be Relevant, A Defendant's Written or Recorded Statement Must Either Be Incriminating or Exculpatory; A Statement That May Be Used To Impeach the Defendant Is Not "Relevant" Within The Meaning of Fed. R. Crim. P. 16 (a)(1)(B) .............. 33

(U) 2. Under Settled Case Law, Classified Recorded Statements Which Are Otherwise Discoverable Under Rule 16 Need Not Be Disclosed Unless They Also Are "Helpful" to the Defendant ............................................ 36

(U) 3. Evidence is Material to Preparing the Defense If It Could Be Used to Counter the Government's Case, Or Bolster A Defense, But Not If It Can Be Used To Rebut A Defense or Impeach .......................................... 37

**(U) 4. Availability of a Rule 16(d)(1) Protective Order** ...................... **38**

**V.**    **[Redacted]** ............................................................................................... **39**

**VI. Conclusion** ........................................................................................ **40**

## (U)    I.    Introduction and Summary

(U) This Memorandum is filed *ex parte, in camera* and under seal, in support of the Government's Motion for a Protective Order pursuant to § 4 of the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3, and Fed. R. Crim. P. 16(d)(1).[1]

[Redacted]

(U) This is a money laundering sting case in which defendants Aref and Mohammad Hossain (Hossain) participated in laundering $50,000 provided by a Cooperating Witness (CW).  Aref and Hossain were told by the CW, and believed, that the $50,000 was proceeds from a sale to jihadists of a Surface to Air Missile (SAM) that was to be used in a terrorist attack in New York City.

(U) In discovery, the defense has requested all Rule 16 materials.  September 14, 2004 Notice to Produce.  Substantial Rule 16 discovery materials already have been

---

[1]    (U) An *ex parte, in camera* procedure is appropriate under CIPA to protect classified information.  See United States v. Sattar, 2003 WL 22137012 (S.D.N.Y. 2003) (government opposes suppression motion, asks Court to conduct *ex parte, in camera* review of relevant classified documents, and to order, *inter alia*, that no classified documents or classified information contained therein be disclosed to defendants); see also United States v. Klimavicius-Viloria, 144 F.3d 1249, 1261 (9th Cir. 1998) (*ex parte, in camera* hearings with government and excluding defense counsel are part of process district court may use to decide relevancy of information); United States v. Yunis, 867 F.2d 617, 620 (D.C. Cir. 1989); United States v. Sarkissian, 841 F.2d 959, 965-66 (9th Cir. 1988).  Rule 16 similarly contemplates *ex parte, in camera* proceedings.  See United States v. Simms, 385 F.3d 1347, 1352 (11th Cir. 2004) (*ex parte* communications appropriate to protect continuing criminal investigation and safety of persons placed at risk by those investigations).

made available to the defense, including audio and video tapes (and draft transcripts) of conversations between the CW and one or both of defendants, copies of the checks and receipts evidencing the money laundering activities, the substance of defendants' post-arrest statements, the fact that defendants have no known prior criminal record, and items obtained in execution of search warrants.  See Rule 16(a)(1)(A), (B), (D), (E)(iii).

(U) In addition to Rule 16 materials, the defense has requested "copies of all wiretap applications and recordings involving defendants' telephones or computers, or that captured either defendant's voice."  September 14, 2004 Notice to Produce.

[Redacted]

**(U)    II.    Background**

**A.    [Redacted]**

**(U)    B.    The Sting**

**(U)    1.    SA Coll Initiates a Criminal Investigation**

(U) During the summer of 2003, FBI SA Coll initiated a separate criminal investigation which initially targeted Hossain, but had Aref as its ultimate target.  SA Coll tasked a Cooperating Witness ("CW") with meeting Hossain and engaging him in conversation intended to determine, *inter alia*, if Hossain was involved in terrorist or criminal activity.  SA Coll's goal was to have Hossain introduce the CW to Aref, and for the CW similarly to engage Aref in conversation intended to determine if Aref was

2

involved in terrorist or criminal activity.  No specific plan for a sting was contemplated at that time.

### (U)    2.    The CW Approaches Hossain and Helps Fraudulently Procure a Driver's Permit for Hossain's Brother

(U) Before cooperating with the Government, the CW, a native and citizen of Pakistan, and a lawful permanent resident, had been involved in a criminal enterprise involving obtaining fraudulent DMV documents and bribing a DMV employee.  The CW has pled guilty to a single document fraud charge arising from that scheme, faces 0-6 months incarceration, and is awaiting sentencing.  The CW has been informed that at the conclusion of his cooperation, the government will make known to immigration officials the nature and extent of his cooperation.

(U) One of the CW's customers for fraudulent DMV documents was a person who operated a business near Hossain's pizzeria.  The CW had assisted this person in fraudulently obtaining driver's licenses for himself and a relative.  In late July 2003 the CW approached this person, who directed the CW to Hossain.  The cover story was that the CW wanted to open a pizzeria and was seeking advice from Hossain.

(U) At that first meeting, apparently aware of the CW's involvement in DMV fraud, Hossain sought the CW's assistance in fraudulently obtaining a New York State driver's permit for Hossain's brother.  Following subsequent meetings and discussions about the plan, the CW helped Hossain's brother, who could not speak English, obtain

3

the permit by (1) serving as a translator during the brother's written permit test; and (2) providing the correct answers to the questions to the brother while rendering the translating services. Hossain paid the CW $75 for this service.

**(U)    3.    The CW's Discussions With Hossain of Religion, Politics, Jihad and Martyrdom**

(U) During multiple audio and video-recorded meetings occurring before and after the CW acquired a driver's permit for Hossain's brother, Hossain and the CW discussed topics such as religion, politics, different types of jihad,[2] Osama bin Laden,[3] al Qaeda,[4] and martyrdom.[5] Hossain once asserted to the CW, "We don't follow non-Muslims

---

[2]    (U) Criminal Complaint, United States v. Aref & Hussain, ¶ 7. On one occasion Hossain told the CW that there were multiple types of jihad, including an inner jihad and an outer, violent jihad, but that now was not the time for violent jihad. Hossain also told the CW that he did not believe that Muslims now need to fight. Transcript (Draft), September 30, 2003.

[3]    (U) When the CW mentioned that bin Laden had killed three thousand people, Hossain responded, "Of course, kill and be killed, that's what said." When the CW asks, isn't that against Muslim law, Hossain says no, and explains "if you try to kill me I have the right to kill you to protect myself. ... Islam never teaches cowardliness. If you want to fight me, then take it." Transcript (Draft), August 7, 2003.

[4]    (U) The CW asked, "What are we going to do with al-Qaeda?" Hossain responded, "Well Allah or Allah's messenger, you know, created that al-Qaeda." The CW stated, "Are we not going to help them?" Hossain responded, "Of course! We gonna help them in some degree and point. Not in a way by helping them damage our Islam more than they do..." Transcript (Draft), November 20, 2003.

[5]    (U) Hossain told the CW that "Martyrdom is one of the sweetest things." Transcript (Draft), September 30, 2003.

4

laws."[6]

## (U)    4.    Hossain Asks for a Loan; Plans for a Sting

(U) During a discussion on October 20, 2003, the CW asked Hossain if it was possible to make money through jihad, and Hossain first opined that it was not, but then suggested it might be under certain circumstances.  During the same conversation, Hossain asked the CW for a loan.  This request, together with Hossain's prior expressions supportive of terrorists, led to formulation of a plan for a sting.

## (U)    5.    The CW Displays the Surface to Air Missile (SAM) to Hossain

(U) On November 20, 2003, the CW met Hossain inside the CW's office, which FBI had outfitted with videotape and audiotape equipment.  During the meeting, the CW referenced the earlier conversation about making money through jihad. The CW then showed Hossain a shoulder-fired, surface-to-air missile (SAM) and told Hossain, *inter alia*, that: (1) he imports weapons and ammunition from China; (2) he ships that equipment to New York City; (3) the Mujahid brothers use the equipment to shoot down airplanes; and (4) the CW gets $50,000 for the SAM importation.  In response, Hossain: (1) smiled when he first saw the missile; (2) said that he had never seen such a weapon before, except on television; and (3) acknowledged that a lot of money can be made from such importation, although it is not legal, to which the CW responded, "What's legal?"

---

[6]    (U) Transcript (Draft), August 19, 2003.

**(U)    6.    "The Walls Have Ears;" Hossain Reiterates His Request For a Loan**

(U) On or about December 2, 2003, the CW again met with Hossain, during which the CW told Hossain that he was the only other person around who knew about the SAM. Hossain told the CW "the walls have ears too. It's an old proverb that the walls have ears too." Hossain later continued, "they install micro devices in the walls? Do you understand? They can see through the wall from outside and take an x-ray." Hossain also reiterated his request for a loan, reproaching the CW, "I asked you to give me some money but you showed me such an aspect that." The CW protested, "When did I show you that?" but later asked, "When do you need the money?"

**(U)    7.    The Money Laundering Proposal; Hossain Insists On Documenting the Transaction And A Witness**

(U) On December 3, 2003, the CW met with Hossain inside his Little Italy Pizzeria, and again explained to Hossain that: (1) he made a lot of cash smuggling ammunition and missiles from China for jihadists; and (2) he used to spend the proceeds of the missile importation on goods in Chinatown, but, as recently reported in the news, Chinatown was now being raided. The CW proposed that Hossain take the $50,000 cash proceeds from the SAM importation, repay $45,000 of the $50,000 by writing the CW monthly $2,000 checks, and keep $5,000 for himself. The CW further stated that he would give Hossain a receipt to make it appear as though the CW had worked for

6

Hossain. After initially indicating that he did not need that much money, Hossain agreed to the proposal, telling the CW, *inter alia*, that Hossain could, if someone asked, make it appear that the proceeds came from Hossain's rental properties.[7]

(U) In a development that led to Aref becoming involved in the case, Hossain also recommended that somebody serve as a witness to the transactions. Hossain told the CW, "We'll draw up a document. ... Have a person as a witness." The CW responded, "A person one witness. We'll put up somebody, a witness in there, and no document. I don't need any paper. Just a witness is good enough for me." After further discussion the CW said, " There will be no paper involved in this deal." but Hossain responded, "No sir."[8] As a result, receipts were generated for each transaction.

### (U)    8.    Hossain Warns the CW About FBI Special Agent Coll and Promises to Die Before Revealing the CW's Secret

(U) In a December 5, 2003 conversation, the CW asked Hossain, "Is everything going well?" Hossain responded:

---

[7]    (U) The CW asked, "how you gonna justify it to the IRS?" Hossain responded, "IRS, I have a lot of, I have a lot of expenses." The CW continued, "How you gonna justify where the money came from?" Hossain responded, "Justify, I, sir, my, I tell you, my income from my real estate." Hossain further described that he sent cash income from his rental properties back to a madrassah in Bangladesh and that there "is no accounting, etc., for this. . . . Do you understand? All this is transferred in cash." Transcript (Draft), December 3, 2003.

[8]    (U) Transcript (Draft), December 3, 2003

7

Fine. I told you the other day not to talk a lot because the Prophet didn't speak much, he did more. He worshiped a lot, and talked less. . . . As I told you earlier, even the walls have ears. In connection with this, there is something - you know all this t- this man's name is Timothy Coll" ... Special Agent FBI.[9]

(U) After Hossain described questioning by SA Coll about people in Albany, Hossain said, "If the whole world were handed to me in one of my hands and I were asked to hand over my brother with the other hand, I would die, . . . If you say a cat is a dog, I will say this cat is a dog -even if it's cat, Do you understand?" Hossain also said, "Sometimes I think, Sometimes I think that, God willing, I should crush this snake."[10]

### (U)    9.    "He's Not Afraid of Anything. He's Only Afraid of God." Hossain Proposes Aref As A Witness

(U) Also during the December 5, 2003 meeting, Hossain and the CW again discussed having a witness for the transaction. The CW said he did not want a Pakistani, Bangladeshi, or Indian individual to serve as the witness. Hossain recommended Imam

---

[9]    (U) Transcript (Draft), December 5, 2003.

[10]    (U) Transcript (Draft), December 5, 2003. During this conversation, the CW stated "What happens to me tomorrow, whether I go to jail or am hanged, God only knows. . . . I am not selling any kind of drug, nor am I selling any kind of weapon that can cause a man to be killed. I am just delivering all this so that the Muslims can protect themselves, from nonbelievers. . . . If this is a sin, I'm doing it hundreds of times. Not once, but hundreds of times." Hossain responds, "No, this is good. What you are saying now . . . this is good." Later, Hossain comments, "Now I've understood the point you were making in your discussion of this subject. Kill the murderer, death for death. God's doing is also here. But it doesn't mean you ... This has stipulations also. But as you say, infidels are killing Muslims and Muslims have no weapons . . . It is in connection with this process, for our protection that we should have something. This was also the Prophet's position because he had a sword." Id.

8

Aref as the witness, assuring the CW that "he's not afraid of anything. He's only afraid of God." The CW agreed to Aref witnessing the transactions.

(U) On December 9, 2003, Hossain told the CW that he had spoken to Aref, and the two agreed to meet with and explain the transaction to Aref the following day.

**10.**   [Redacted]

**(U)   11.   The CW Describes the Money Laundering Scheme to Aref**

(U) On December 10, 2003, the CW met with Aref and Hossain inside the Little Italy Pizzeria on Central Avenue. Since Aref did not speak Urdu, conversations with Aref were in English. The CW again explained that he brings "ammunitions" from China that he provides to his "brother mujahideen." He further described how this generated a significant amount of cash and that "[b]efore [he] used to invest all the money in the China market in New York City [but][n]ow it is so tight I can't do it." The CW then described his offer to give Hossain $50,000, have Hossain pay him back in monthly $2,000 payments, and allow Hossain to keep $5,000 of the original $50,000 in return. The CW also indicated that he believed that although he may be breaking American laws, he was not breaking Allah's laws. Aref agreed to witness the transactions, and advised that they make a written record of the transactions in accordance with the laws of Allah. The CW initially resisted, saying that nobody in government or the IRS knew "that this money comes like that and goes like that so I

don't want to write on piece of paper." Ultimately, the CW agreed that written receipts for the transactions would be prepared. Near the end of the conversation, Aref said that whatever the CW and Hossain decided, "20, 40, 50," they should write that amount down and how it would be paid back.

**(U)    12.    Hossain and Aref Complete the First Money Laundering Transaction With the CW - Receiving $5,000 In Cash and Laundering $2,000 By Check**

(U) On January 2, 2004, the CW met Aref and Hossain.  After some small talk, the CW said, "OK, let's do some business."  The CW then attempted to hand $5,000 to Hossain, who instructed the CW to give the money directly to Aref.  As Aref counted the money, the CW displayed the trigger mechanism for the SAM, which he described as part of the "missile" he had shown Hossain.  The CW said that he would get the remaining $45,000 after he sent the mechanism.  The CW asked Aref if he wanted to write out the receipt and Aref responded that he could not write English.  Hossain then wrote down on a piece of paper that Hossain owed the CW $5,000.  Aref signed the paper next to the word witness.  The parties then discussed Hossain's first payment back to the CW.  Hossain asked the CW how he wanted the check written, and the CW responded that the checks should be made payable to the CW's company.  The CW then gave Hossain a business card.  Since Hossain did not bring his checkbook to the meeting, the parties agreed that the CW would pick up the check from Aref later.  The CW and

10

Hossain also discussed hiding income to avoid taxes, and Hossain said that he did not report $500-800 of daily income earned from deliveries in his pizza business. Aref confirmed Hossain's opinion that it is not a sin to do so, so long as the individual continues to make payments to charities.

(U) Later on January 2, 2004, the CW met with Aref, who provided the CW with a $2,000 check signed by Hossain as well as a copy of the written receipt from the transaction. During the course of the conversation, Aref indicated that he had told Hossain only to take as much money as Hossain needed. The CW reiterated that Hossain had come to the CW looking for money, and that the transaction was helping the CW "to legalize the money" that the CW had made "on the black market." Aref observed that he had "wondered about that point for you, I say why you want that check, because that check, especially in his name, business . . . mean he sell something."[11]

**(U)    13.    Aref Understands "you . . . legal your money"**

(U) At a meeting on January 14, 2004, the CW told Aref that he was very concerned about Aref's earlier comments about Hossain only taking as much money as he needed. The CW also told Aref that Aref was the spiritual leader and that the CW was looking for advice. Aref stated that Muslims need to keep their commitments, and that

---

[11]    (U) Transcript (Draft), January 2, 2004. During the earlier January 2, 2004 meeting of Aref, Hossain and the CW, Aref asked "is it better for you by check or by ... " to which the CW responded, "The check, just write the check."

11

the CW should try his best to fulfill his promise to Hossain, although Aref said that he would tell Hossain only to take from the CW as much money as Hossain needed. The CW told Aref that he intended to give Hossain $10,000 next week, and Aref stated that whatever money the CW gave to Hossain, Hossain would pay back as agreed upon, in part because Aref was in the middle of the transaction, and Hossain respects Aref. Aref further stated, "But what I understood that's good for you too because sometimes you with, what you say, legal your money in the business. . . . ."

**(U)    14.    Aref Recognizes JEM -"they classificate that organization with the group which is they call terrorist group;" be "very, very careful"**

(U) During the January 14, 2004 meeting, the CW told Aref that Pakistani President Musharraf was helping the "mushriq," and that the purpose of the SAM going to New York City was "to teach . . . President Musharraf, the lesson to not fight with us." The CW also told Aref that the CW was working with a group called Jaish-e-Mohammed ("JEM").[12] The CW then asked Aref whether such conduct was acceptable in the eyes of

---

[12]    (U) Jaish-e-Mohammed is an Islamic extremist group based in Pakistan that is on the State Department's list of designated foreign terrorist organizations. JEM has been implicated in terrorist acts, including an October 1, 2001 suicide attack that killed 31 persons in Sringara, and an attack on the Indian Parliament on December 13, 2001 that killed nine persons. United States Department of State, Office of the Coordinator for Counterterrorism, Country Reports on Terrorism 2004 at 100 (April 2005). On July 15, 2002, JEM terrorist Ahmed Omar Saeed Sheikh was sentenced to death for his role in the abduction/murder of Wall Street Journal Reporter Daniel Pearl.

Allah. In response, Aref stated that: (1) it is the right of every Muslim to work for the Islamic state of law (and used examples of Palestinians and Kashmirians fighting for their respective lands); (2) Aref knew that JEM was on the government's list of terrorist groups (they "classificate that organization with the group which is they call terrorist group"); (3) Aref did not know enough about the group to tell the CW not to support them, but, if the CW knew them, trusted them, and believed they were doing right and that they "are working for Allah," then "it is wise for you to help if you can;" and (4) the CW should be cautious because, "And now if they know any person, he have link with those people by giving them money especial ... even if they give the Zakat for these organization, they take them to the jail and they say they support the what, the terrorism. ... [W]ith that you should be very, very careful about this point. I don't say don't help, and I don't say stop your help." The CW and Aref then engaged in additional discussion about religious and political issues.[13]

### (U)    15.    Hossain and Aref Complete the Second Money Laundering Transaction With the CW - Receiving $10,000 In Cash and Laundering $2,000 Back By Check

(U) On January 21, 2004, the CW met with Aref and Hossain. The CW gave $10,000 cash to Aref, who counted the money and then gave it to Hossain. The CW

---

[13]    (U) Criminal Complaint, United States v. Aref & Hussain, ¶ 18; Transcript (Draft), January 14, 2004.

13

again explained that: (1) he would give Hossain a total of $50,000; (2) the CW would make the payments as the money came in from New York City; and (3) Hossain could keep $5,000, and repay the remainder of the money in monthly checks. Hossain reiterated that he would give the CW a $2,000 check every month, and added that if the CW needed to accelerate the repayment schedule, Hossain would get a bank check. Hossain then gave the CW a $2,000 check made payable to the CW's business. The CW provided Hossain with a piece of paper and Hossain wrote down that he owed the CW $10,000. The CW, Aref, and Hossain signed the receipt. Aref took the receipt and agreed to make a photocopy to give to the CW at a later date. The CW, Aref, and Hossain then discussed various political and religious matters, during which Aref appeared to become angry. Near the end of the conversation, Aref stood up and told the CW that he hoped that the CW was not recording their conversation. The CW stated that he was not.

(U) On January 29, 2004, the CW met with Aref, who told the CW that he just made photocopies of the receipt, provided the CW with the original written receipt for the January 21, 2004 transaction, and kept two copies, one for himself and one for Hossain.

14

(U)   16.   **Code Word for the SAM - "Chaudry;" the CW Warns Hossain of an Attack Next Week in NYC**

(U) At a meeting on February 3, 2004, the CW told Hossain that they should use the code word "chaudry" when referring to the SAM. The CW further: (1) told Hossain, as he had earlier told Aref (on January 14, 2004), that he was affiliated with JEM (Hossain indicated he was not familiar with JEM); (2) described Pakistani President Musharraf as a "son of a bitch" for having jailed Qadir Khan (father of Pakistan's atomic bomb); and (3) stated, that the chaudhry was going to be used next week in New York City against the Ambassador of Pakistan in retaliation against the Pakistani government. Hossain referred to Musharraf as an "idiot" and "bastard." The CW and Hossain then engaged in additional political and religious discussion.

(U)   17.   **Hossain and Aref Complete the Third Money Laundering Transaction With the CW - Receiving $10,000 In Cash and Laundering $2,000 Back By Check**

(U) On February 12, 2004, the CW met with Hossain and Aref at Aref's residence. As the CW was exiting his vehicle, the concealed recording device fell off his body and into his car, although the hidden transmitting device continued to transmit, and SA Coll continued to listen to the conversation during the meeting remotely through the receiving device. During the meeting, the CW attempted to give $10,000 to Hossain, who pointed in the direction of Aref. The CW gave the $10,000 to Aref who counted it and passed it to Hossain. Hossain then memorialized the transaction on a piece of paper

15

and the CW, Aref, and Hossain signed the paper, a copy of which Aref gave to the CW a few days later. Hossain then provided the CW with a $2,000 check payable to the CW's business. This transaction occurred in front of a friend of Aref's.

(U) **18.** **"Something Big Is Going to Happen;" The CW Warns Aref to Stay Away From NYC Next Week**

(U) Following the transaction, still in the presence of Aref's friend, the CW asked Hossain if he told Aref what the term "chaudhry" meant, and Hossain responded "yeah, yeah, yeah." The CW repeated that the term "chaudhry" referred to the missile. The CW then said that you, my brothers, should not go to New York City next week. Both Aref and Hossain asked "why" in response. The CW responded that something big is going to happen to teach the Pakistan Consulate a lesson on 1 and 44 (referring to the location of U.N. headquarters at 44th Street and First Avenue, NY, NY). Hossain responded that he did not go there, and Aref said not to talk politics in his house since there are cameras in there. After Hossain walked away, Aref asked the CW where he got his information about New York City. The CW told Aref that Aref knows about JEM and knows that the CW works with them. The CW reiterated that he is a supplier of ammunition for them. Aref responded by asking "Are you sure?" to which the CW responded, "You'll see." Aref then said he hoped that the CW was not recording this. In response, the CW opened his shirt, and they both started to laugh.

16

(U)    19.    **Hossain Launders Another $6,000 Check to the CW**

(U) The next day, on February 13, 2004, the CW met with Hossain, who gave the CW a $6,000 check payable to the CW's company. During the meeting, the CW got angry with Hossain for causing the previous day's transaction to occur in front of Aref's friend. Hossain apologized, and said that "even the most illiterate people" would not "open their mouths about this." Hossain and the CW further discussed concerns over detection, and during this discussion Hossain told the CW that the CIA has cameras behind walls, Hossain had himself been visited by the FBI twice, and Aref had been visited by the FBI five times. At one point, the CW and Hossain tallied the money that had been moved back and forth during the scheme. In response to the CW talking about martyrs having spilled their blood, Hossain told the CW that he was a member of Jamaat-e-Islami ("JEI"), a group identified by public source information as an Islamic fundamentalist political party in Pakistan, with chapters in Bangladesh.

(U)    20.    **Hossain Declines to Transport a SAM to NYC**

(U) On February 25, 2004, the CW told Hossain that the predicted terrorist attack in New York City had been postponed because the target had not shown up. The CW told Hossain that it costs him $10,000 to transport a missile to Kingston, NY, and that the CW would be willing to pay Hossain if he would help transport the missile, or would find two individuals to help, with the transportation. Hossain expressed reluctance,

17

stating that he feared the technology of the CIA. Hossain later asked the CW to give Hossain additional money to invest. When a third party joined the conversation, the three discussed politics. During the conversation, Hossain stated that he was a "Nazim," or administrator, for JEI.

### (U)    21.    "I am going to get my degree;" Aref Warns the CW That A Suicide Bomber Doesn't Even Tell His Own Mother His Plan

(U) On March 2, 2004, the CW met with Aref and told him that the attack did not occur in New York City, as the CW had warned it would, because the target had not shown up. The CW further told Aref that he felt bad about Aref not trusting him (as evidenced by Aref's queries about the CW recording conversations with him). Aref apologized, and told the CW that people who do things like CW was doing should not discuss it with others. Aref cited the example of a suicide bomber whose mother is unaware, on the morning of the bombing, that the young man would leave his house to become a martyr.[14] Aref further explained that he had asked about being recorded at the end of the February 12, 2004 meeting because he wanted to give his friend, who was present at the meeting, the impression that the CW was joking about the impending terrorist attack in New York City. Aref also said that he believed his home, car, and the

---

[14]    (U) Transcript (Draft), March 2, 2004. Aref stated, "There's a person who society says he bomb somebody. After that (UI), his mom came out crying, she say this morning, he told me, my mom, I'm going to my coach and I am going today to get my degree, he mean degree, he mean something else, he mean he became martyr."

18

mosque were being electronically monitored by law enforcement.

### (U)   22.   Hossain and Aref Complete More Money Laundering Transactions With the CW - Receiving $15,000 In Cash and Laundering Back $13,000 By Check

(U) Following Aref's March 2, 2004 advice that the CW not talk about the impending terrorist attack, during subsequent meetings with Aref and/or Hossain, the CW for the most part did not mention the SAM, JEM, or the attack.  On April 15, 2004 the CW provided $10,000 to Aref and Hossain, and on June 9, 2004, the CW provided another $5,000.  On each occasion Aref counted the cash, and all three parties signed written receipts.  The CW received checks payable to CW's business on March 31 ($2,000), April 16 ($5,000), May 4 ($2,000), June 1 ($2,000), July 1, 2004 ($2,000),[15] and August 1, ($2,000).

### (U)   23.   The "Silent Partner;" Aref Invites the CW to Put Up Money to Buy Hossain's Pizza Shop

(U) In early June 2004, Aref approached the CW about partnering with Aref to purchase Hossain's pizza shop, and met at the CW's office on June 10, 2004 to discuss the possible purchase.  During the meeting, the CW told Aref that in about one month his ammunition importation operation would generate additional money that would allow the

---

[15]   (U) Criminal Complaint, United States v. Aref & Hussain, ¶ 28.  Over the course of the sting, the CW gave defendants $40,000 in cash represented to be proceeds of the missile importation, and received $27,000 in checks payable to CW's business. See Criminal Complaint, United States v. Aref & Hussain, ¶ 30.

CW to give Aref $50,000.  Aref proposed that the CW could contribute his share of a down payment for the pizza business by allowing Hossain to keep $10,000 of the remaining money that Hossain owed the CW from previous cash payments.  The CW told Aref that: (1) he could only be a silent partner in the pizza business; and (2) the chaudhry would be used in New York City soon, requiring the CW to leave the country for a few months.  Aref said that this was not a problem.

[Redacted]

### (U)    24.    Aref Presents the CW a "Different Opportunity"

(U) On July 26, 2004, Aref made an unannounced visit to the CW's office (the CW was able to activate the video/audio recording device near the beginning of the conversation).  During this meeting, Aref gave the CW a $9,200 check from Mir Saadi, and told the CW he had intended to run it through his own checking account, but had thought that it presented a "different opportunity" for the CW.  Aref then asked the CW if he would be willing to cash the check, send $8,000 overseas back to London on Aref's behalf, and give Aref the remaining $1,200 in cash, minus $200 to cover the cost of the transfer.  Aref said that the money would go on from London to his sister in Iraq.[16]

(U) The CW told Aref that he would be willing to help, and obtained Mir Saadi's telephone number.  The check was written on Mir Saadi's account at an Albany-area

---

[16]    (U) Transcript (Draft), July 26, 2004.

bank. (Mir Saadi formerly lived in the Albany area, but was then living in London.) The "payable to" portion of the check was left blank. On a later occasion, the CW explained that conducting the transaction in this way would create questions for Saadi, so Aref took the check back because he did not want any "headaches" for Saadi.[17]

**(U)    III.    Charges and Defenses**

**(U)    A.    The Money Laundering Charges**

(U) The money laundering "sting" provision located at 18 U.S.C. § 1956(a)(3)(B) makes it a crime when a person

> . . . with the intent . . . to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . . conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity . . . .

Section 1956(h) makes it a crime to conspire to violate any of the substantive provisions of that section.

(U) Count 1, which charges conspiracy, requires the government to prove that the defendant under consideration:

> (1) knowingly and willfully agreed with his co-defendant to conduct a financial transaction affecting commerce;

> (2) with what was represented to be, and which the defendant believed to be, the proceeds of unlawful activity; and

---

[17]    (U) Transcript (Draft), July 27, 2004.

21

(3) specifically intending to conceal or disguise the nature, location, source, ownership, or control of such proceeds of unlawful activity.

See United States v. LaSpina, 299 F.3d 165, 182 (2d Cir. 2002) (conspiracy to violate 18 U.S.C. § 1957); Eleventh Circuit Pattern Jury Instructions, § 70.5 at 384-85, "Money Laundering Conspiracy 18 U.S.C. § 1956(h)" (2003); United States v. Castellini, 392 F.3d 35, 45 (1st Cir. 2004); United States v. Arditti, 955 F.2d 331, 340-41 (5th Cir. 1992). The circuits are divided over whether proof of an overt act is required by this statute. Compare, e.g. United States v. Hall, 349 F.3d 1320, 1323-34 (11th Cir. 2003) (overt act not required) with United States v. Wilson, 249 F.3d 366, 379 (5th Cir. 2001) (overt act required). The Second Circuit has not yet ruled on this issue. See United States v. Laspina, 299 F.3d at 173 n. 2 (reserving question).

(U) The first element is satisfied because the laundering activities involved the use of checks drawn on and deposited in accounts in a federally-insured financial institution. See United States v. Leslie, 103 F.3d 1093, 1103 (2d Cir. 1997) (activities of federally insured bank affect commerce).[18]

(U) The second element is satisfied because the CW represented, *inter alia*, that the proceeds were the result of his smuggling the SAM from China into the U.S., conduct which would violate 18 U.S.C. § 922(a)(1)(A) (unlicensed importation and

---

[18]    (U) For conspiracy, the government may prove defendants believed there was an interstate nexus. United States v. Leslie, 103 F.3d 1093, 1101 (2d Cir. 1997).

22

dealing in firearms). The CW's representation about the intended use of the SAM described conduct that would violate both 18 U.S.C. § 2339B (providing material support to a designated terrorist organization) and 18 U.S.C. § 2339A (providing material support for a specified terrorism crime). All three are money laundering predicates. See 18 U.S.C. § 1956(c)(7)(D).

(U) Third, the conversations between the CW and Hossain, the CW and Aref, and the three of them together provide proof that the financial transactions were conducted with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity. The property is the $50,000 proceeds from the SAM sale, and the entire purpose of the scheme was to conceal or disguise the source of the money and make it appear as though the CW had earned it through legitimate business with Hossain.

## (U)    B.    The 2339A Charges

(U) Section 2339A of Title 18 provides:

> Whoever provides material support or resources or *conceals or disguises the nature, location, source, or ownership of material support or resources,* knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various enumerated criminal provisions of the U.S. Code] . . . or attempts or conspires to do such an act . . . .

is guilty of an offense. 18 U.S.C. § 2339A (emphasis added). The conversations between the CW and the defendants, and the defendants' conduct, support the conclusion

23

that the defendants attempted and conspired to "conceal or disguise . . . the source . . . of material support or resources." The "material support or resources" was the SAM, and the "source" of that material support was the CW. See 18 U.S.C. § 2339A(b) (defining the term "material support or resources" to include "weapons" and "explosives"). By assisting the CW in laundering proceeds of what they believed was a SAM sale, the targets were attempting to conceal the fact (as they believed it) that the CW was a source of material support for a prohibited act, that is, use of the SAM in a terrorist attack in New York City.

(U) Once the CW represented to Aref and Hossain that he was affiliated with JEM and that the missile was to be used in an attack in New York City to teach Pakistani President Musharraf a lesson, the money laundering transactions "involved, or w[ere] intended to promote" federal crimes of terrorism, namely the CW's providing of material support in violation of 18 U.S.C. §§ 2339A and 2339B.

**(U)    C.    Impossibility Is Not A Defense**

(U) In a sting operation, by definition, it is impossible for the object of the conspiracy to be realized, or for the substantive crime to be completed. Nevertheless, impossibility is not a defense to these charges. The elements of knowledge and intent are satisfied if, under the circumstances as the defendant believed them to be, the defendant agreed to, or took a substantial step planned to culminate in, the crime charged in the

24

indictment. United States v. Wallace, 85 F.3d 1063, 1068 (2d Cir. 1992) (impossibility no defense to conspiracy); United States v. Marin, 513 F.2d 974, 976 (2d Cir. 1975) (impossibility no defense to attempt); see United States v. Rodriguez, 360 F.3d 949, 957 (1st Cir. 2004) (impossibility no defense to conspiracy arising out of government sting).

**(U)    D.    Discriminatory Targeting and Entrapment**

(U) As noted above, defendants claim they were invidiously targeted because they are Muslim[19] and were entrapped.[20] Entrapment is an affirmative defense with two elements, "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." Matthews v. United States, 485 U.S. 58, 63 (1988); United States v. Damblu, 134 F.3d 490, 495 (2d Cir. 1998); United States v. Salerno, 66 F.3d 544, 547 (2d Cir. 1995). When a defendant presents credible evidence of inducement, the Government must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. Id.

---

[19]    (U) Hossain's counsel has argued: "[T]hey wanted to find somebody. And, you know, they didn't go to St. Mary's Church and they didn't go to the Jewish synagogue They went to the Muslims. That's where they went. And that's wrong. ... He's a regular guy. But he's got a Muslim last name, and that's the only reason we're here." Detention Hearing, August 10, 2004 at 57-58, 59. Aref has alleged: "I am innocent," said Aref. "That drama against me was because I was speaking in a mosque because I am Muslim." Schenectady Daily Gazette, August 26, 2004.

[20]    (U) Transcript of August 10, 2004 Detention Hearing at 43-44, 58.

25

(U) Although in other circuits, mere solicitation does not constitute inducement, e.g., United States v. Marino, 868 F.2d 549, 552-53 & n. 6 (3d Cir. 1989) (citing cases), the Second Circuit follows a minority approach in holding that the threshold for finding inducement is quite low: "[S]oliciting, proposing, initiating, broaching or suggesting the commission of the charged offense *does* constitute inducement." United States v. Dunn, 779 F.2d 157, 158 (2d Cir. 1985). Indeed, unlike most other circuits, the Second Circuit "has consistently held that inducement refers to 'the Government's initiation of the crime and not the degree of pressure exerted.'" Id. As a result of following this approach, "in most cases in this circuit, the element of inducement properly defined, i.e., initiation or solicitation, is not a major issue for the jury since a government undercover agent is admittedly involved" in sting operations. Id. at 159. Given the low threshold established by the Second Circuit, the Government intends to propose jury instructions which concede inducement and move the jury directly to predisposition.

(U) Once a defendant raises an entrapment defense, "[H]e cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." United States v. Harvey, 991 F.2d 981, 994 (2d Cir. 1993) (quoting Sorrels v. United States, 287 U.S. 435, 451 (1932)). A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so. United States v. Russell, 411

26

U.S. 423, 433 (1977) (the "principal element in the defense of entrapment [is] the defendant's predisposition to commit the crime."); United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000)(predisposition to engage in money laundering shown).

(U) The defendant need not have consciously considered committing the crime before the opportunity arose, but the government must show that he was predisposed to accept the opportunity presented to him, that is, of a frame of mind that made him ready and willing to commit a crime, even on the first occasion that he may have considered it. United States v. Myers, 692 F.2d 823, 849 (2d Cir. 1982) (Abscam sting). Ready and willing refers to a defendant's frame of mind being such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preferences and not the product of government persuasion. United States v. Williams, 705 F.2d 603, 618 (2d Cir. 1983).

(U) Predisposition may be established by evidence of:

(1) the accused's willingness to commit the crime, as evidenced by his ready response to the inducement, or prompt acceptance of a government-sponsored invitation, United States v. Myers, 692 F.2d at 836 (videotape showing defendant responded with alacrity establishes predisposition); United States v. Silvestri, 719 F.2d 577, 582 (2d Cir. 1983) (evidence of prompt and unhesitating acceptance of invitation to join bribery conspiracy and eager pursuit of its objectives "overwhelmingly" established predisposition); see United States v. Rodriguez, 43 F.3d 117, 126-27 (5th Cir. 1995) ("active, enthusiastic participation" shows predisposition); United States v. Harvey, 991 F.2d at 991 (prompt acceptance);

27

(2) a pattern of episodes of criminal activity (as opposed to a single criminal episode), <u>United States v. Jackson</u>, 345 F.3d 59, 66 (2d Cir. 2003); <u>United States v. Brunshtein</u>, 344 F.3d 91, 102-03 (2d Cir. 2003); <u>United States v. Roland</u>, 748 F.2d 1321, 1326 (2d Cir. 1984);

(3) an existing course of conduct similar to the crime charged, <u>United States v. Bala</u>, 236 F.3d at 94; <u>United States v. Harvey</u>, 991 F.2d at 994-95; <u>United States v. Anzalone</u>, 626 F.2d 239, 246 (2d Cir. 1980); <u>United States v. Viviano</u>, 437 F.2d 295, 299 n. 3 (2d Cir. 1971) ("morally indistinguishable" standard); or

(4) a design to commit the offense formed prior to any inducement.  <u>United States v. Williams</u>, 705 F.2d at 619.

(U) The degree of pressure exerted by the government is properly considered, as it has a direct bearing on the accused's willingness to respond to the inducement. <u>United States v. Viviano</u>, 437 F.2d at 299 n. 1.

(U) Predisposition must be determined with respect to each count of the indictment, for a defendant who was not initially predisposed to commit an offense might well have found his crime so profitable and easy that he thereafter willingly continued it, regardless of the original inducement.  <u>See United States v. Khubani</u>, 791 F.2d 260, 264 (2d Cir. 1986).  "Limiting examination of defendant's state of mind to the period prior to any governmental contact ignores the possibility that the defendant could have become predisposed to commit the crime after the government's first contact."  <u>Id</u>.  For this reason, a finding of entrapment as to one count does not preclude a finding of guilt as to other counts which charge subsequent acts.  <u>Id</u>.

28

(U) Where evidence of past conduct is offered to show predisposition, that past conduct need not be criminal to be admissible. United States v. Gantzer, 810 F.2d 349, 352 (2d Cir.1987) (propensity to receive pornographic -although not necessarily legally obscene- materials through mail is probative of predisposition to send legally obscene photographs); United States v. Williams, 705 F.2d 603, 623 (2d Cir. 1983) (evidence that Senator exerted influence on behalf of self and wife, even if such conduct did not violate law, probative of Senator's willingness to agree to take similar action that did violate federal law).

(U) In United States v. Cohen, 489 F.2d 945 (2d Cir. 1973), defendant was charged with conspiracy, making false statements in connection with acquisition of firearms, and of falsifying federal forms. Id. at 947. In response to defendant's claim of entrapment, the Government introduced evidence about the Jewish Defense League (JDL) and its members, as well as three categories of evidence about JDL's firearms training at a summer camp: (1) "evidence that directly tied Cohen to active participation in the JDL by linking him to meetings at JDL headquarters . . . and the activities of the summer training camp;" (2) "evidence that the JDL was involved in the acquisition of arms and ammunition;" and (3) "evidence that the JDL was involved in a program of training for violent action." Id. at 948-49. The Court held that such evidence was admissible on the issue of predisposition as "evidence of prior similar acts and

29

involvement on appellant's part in allegedly illegal JDL activities." Id. at 950.

(U) The government expects to show both defendants' predisposition by offering evidence, *inter alia*, of their accepting, without hesitation, the proposal to launder what were represented to be the proceeds of a SAM sale to terrorists in New York City, their willingness to conduct multiple laundering transactions without hesitation, Hossain's introduction of Aref into criminal activity, Aref's and Hossain's own words regarding the morality and propriety of the CW's actions in providing a SAM to terrorists, Aref's speeches, sermons and affiliations, Aref's and Hossain's cautioning the CW about law enforcement, Hossain's admissions to the CW of hiding income from the IRS and Aref's opinion that this was not a sin, Aref's June 2004 expression of a desire to take on the CW as a silent partner in the purchase of Hossain's pizzeria, Aref's presenting to the CW a "different opportunity" to negotiate the $9,200 check, Aref's misreporting of his income and resources to obtain public benefits, and Hossain's solicitation of the CW to assist Hossain's brother in fraudulently obtaining a permit for a New York State Driver's License.[21]

---

[21]    (U) This last transaction also is admissible to show the initiation and development of Hossain's relationship with the CW.

30

**(U)    IV. Discovery Standards**

(U) Discoverability is governed by <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972), Fed. R. Crim. P. 16, the Jencks Act, 18 U.S.C. § 3500, and, where classified information is involved, the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3.  Each of these authorities defines and limits the scope of discoverable matter. For example, the Second Circuit has pointed out that the term "<u>Brady</u> material" does not refer to all exculpatory evidence; the term "<u>Giglio</u> material" does not refer to all impeachment evidence; and the case law does not require immediate production of such materials.  <u>In re United States</u>, 267 F.3d 132, 142 (2d Cir. 2001).  Rather, <u>Brady</u> and <u>Giglio</u> require disclosure of information only in time for its effective use at trial, and the information must be material, that is, its non-disclosure must create a reasonable probability of altering the outcome.  <u>Id</u>. at 142, 146.

(U) Among other things, Rule 16 requires disclosure of "relevant" recorded statements.  Fed. R. Crim. P. 16(a)(1)(B).  Rule 16 also permits a court, for good cause, to deny, restrict or defer discovery or inspection, or grant other appropriate relief.  Fed. R. Crim. P. 16(d).  The Jencks Act requires production of witness statements only for witnesses who testify, and even then, permits excision of any portion of a statement which does not relate to the subject matter of the witness's testimony.  18 U.S.C. § 3500.

31

(U) In numerous cases involving classified information, courts have limited discovery of classified matter, otherwise discoverable under Rule 16, by imposing the additional requirement that it be "helpful" to the accused. United States v. Yunis, 867 F.2d 617, 623 (D.C. Cir. 1989); United States v. Pringle, 751 F.2d 419, 427 (1st Cir. 1984); see United States v. Klimavicius-Viloria, 144 F.3d 1249, 1261 (9th Cir. 1998) (to determine whether the government must disclose classified information, court must determine whether information is "relevant and helpful to the defense.")

[Redacted]

## (U)    A.    Rule 16 Materials and CIPA

(U) Three subparts of Rule 16 are implicated by defendants' discovery requests: Rule 16(a)(1)(B) (government "must disclose to the defendant . . . (i) any relevant written or recorded statement by the defendant . . . ."); Rule 16(a)(1)(E)(i) (government "must permit the defendant to inspect and copy . . . items, if . . . (i) the item is material to preparing the defense"); and Rule 16(a)(1)(E)(ii) (government "must permit the defendant to inspect and copy . . . items, if . . . (ii) the government intends to use the item in its case-in-chief at trial . . . .").

**(U)    1.    To Be Relevant, A Defendant's Written or Recorded Statement Must Either Be Incriminating or Exculpatory; A Statement That May Be Used To Impeach the Defendant Is Not "Relevant" Within The Meaning of Fed. R. Crim. P. 16 (a)(1)(B)**

(U) Although the defense requests all wiretap applications and recordings that captured either defendant's voice, see September 14, 2004 Notice to Produce, it is well settled that a defendant is entitled to discovery of his own written or recorded statement only to the extent that the statement is "relevant." Fed. R. Crim. P. 16(a)(1)(B). The term "relevant" in the context of a defendant's own written or recorded statement is normally to be interpreted broadly, United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993), but recordings which reveal neither incriminating nor exculpatory evidence are not relevant within the meaning of Rule 16. United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990) (under Rule 16, TIII recordings of a defendant which reveal neither incriminating nor exculpatory evidence are not relevant, and not discoverable); United States v. Gambino, 818 F. Supp. 541, 552 (E.D.N.Y. 1993); see also United States v. Gambino, 838 F. Supp. 744, 748 (S.D.N.Y. 1993).

(U) In Scarpa, where defendant was charged with RICO and narcotics violations, the government learned that for a period of four months, the Brooklyn District Attorney's Office had placed a TIII "bug" in a club frequented by defendant, and that his voice was on the tapes. 897 F.2d at 67. The district court, based on a government affidavit, ruled

33

that since the tapes contained no incriminating or exculpatory statements relevant to the

case, the government need not disclose them to Scarpa. Id. On appeal, Scarpa argued

that "the absence of incriminating statements on the tapes is relevant in the sense that it

tends to disprove the government's theory that the defendants congregated at the Wimpy

Boys Club to discuss the marijuana business." Id. The Court of Appeals ruled that the

district court "appropriately refused to order disclosure of the tapes" because the

conversations were "'either wholly innocuous or involve[d] criminality that has nothing

to do with the crimes charged in this case.'" Id. at 70 (quoting district court).

(U) The term "relevant" in Rule 16 is further limited, by excluding a defendant's

recorded statements which may be used to impeach him. In United States v. Gleason,

616 F.2d 2, 24 (2d Cir. 1979), the Second Circuit held that a letter written by the

defendant, and notations made by him on various financial statements and agenda, which

ultimately were used to impeach the defendant, were not "relevant written or recorded

statements made by the defendant" within the meaning of Rule 16. The Court reasoned

as follows:

> Gleason's 1965 letter, which predated by almost 10 years the events in
> issue, and his mere notations on agenda and financial statements, were hardly
> "relevant" to the crimes charged against him; they did not tend to show that he had
> participated in any falsification of the bank's earnings statement for the first
> quarter of 1974. The fact that a bank officer once believed that its president
> should follow its earnings statements does not implicate him in any dishonest
> underlying transaction that is not in the bank's earnings report. The Government
> was not therefore required by Rule 16(a) to disclose the documents because they

34

were not "relevant . . . statements" within the meaning of that Rule. The documents became relevant for impeachment purposes only after Gleason testified on direct that he did not personally keep acquainted with the bank's day-to-day operations, thus seeking to corroborate his denials of involvement in the transactions at issue. [citations omitted].

616 F.2d at 24. The Court concluded: "The Government is not obligated by Rule 16(a) to anticipate every possible defense, assume what the defendant's trial testimony (if he decides to testify) will be, and then furnish him with otherwise irrelevant material that might conflict with his testimony." Id. at 25;[22] see also United States v. Gonzalez-Rincon, 36 F.3d 859, 865 (9th Cir. 1994) ("Because the declaration form was offered only as impeaching evidence after Gonzalez testified, it was not a 'relevant statement' within the meaning of Rule 16."); United States v. Sheppard, 621 F. Supp. 698, 705 (S.D.N.Y. 1985) ("There was no obligation on the part of the government to anticipate Sheppard's testimony and then furnish him with otherwise irrelevant material that might conflict with that testimony.")

---

[22]    (U) The Court added: "With respect to such material, if any obligation to disclose existed under Rule 16(a), it was satisfied by making the underlying files available to the defendant prior to trial." 616 F.2d at 25. Here, the Government relies on the Court's principal holding that evidence usable for impeachment is not "relevant" under Rule 16, rather than its alternative holding that any obligation to provide such material was satisfied by making the underlying files available.

**(U)    2.    Under Settled Case Law, Classified Recorded Statements Which Are Otherwise Discoverable Under Rule 16 Need Not Be Disclosed Unless They Also Are "Helpful" to the Defendant**

(U) Severe restrictions are placed on the scope of discovery of classified material, limiting it to what is required by due process. As the court observed in United States v. Thomson, 752 F. Supp. 75, 82-83 (W.D.N.Y 1990), "[T]o the extent that Rule 16 allows discovery beyond that constitutionally mandated by Brady, it is inapplicable to discovery of intelligence information collected under FISA." See also United States v. Spanjol, 720 F. Supp. 55, 59 (E.D. Pa. 1989) (same). Thus, the threshold showing to obtain discovery of classified materials is much higher than that required by Rule 16.

(U) For example, a defendant is entitled to recordings of his own statements made pursuant to FISA only if the information is at least "helpful" to the defense of the accused. United States v. Yunis, 867 F.2d 617, 623 (D.C. Cir. 1989). In Yunis, the Court of Appeals reversed a district court order requiring the government to turn over fourteen transcripts of tapes between defendant and an informant, since the content of the tapes was "on the whole not relevant to defendant's guilt or innocence and the few statements that were even marginally relevant were not sufficiently helpful or beneficial to the defense to overcome the classified information privilege." Id. at 618. The Court of Appeals further observed that the district court "abused its discretion in ordering the disclosure of classified information to a defendant where the statements in question were

36

no more than theoretically relevant and were not helpful to the presentation of the defense or essential to the fair resolution of the cause." Id. at 625.

(U) Even where otherwise discoverable information is found, the government's interest in avoiding disclosure of such matters as the time, place and nature of the government's ability to intercept conversations at all justifies withholding such matter from discovery. Moreover, in the event that an obligation to provide some discovery exists, it may be satisfied by various alternatives, for example, by substituting for the discovery a statement admitting relevant facts that the classified information tends to prove. United States v. Rezaq, 134 F.3d 1121, 1142 (D.C. Cir.1998); see also United States v. Yousef, 327 F.3d 56, 166-69 (2d Cir. 2003) ("The Government, in *ex parte* affirmations that we reviewed *in camera*, has provided various reasons why the Scarpa materials should continue to be sealed, including the protection of confidential informants and the need for secrecy about how it investigates and responds to terrorist threats.") (district court did not err in issuing protective orders as requested).

**(U)    3.    Evidence is Material to Preparing the Defense If It Could Be Used to Counter the Government's Case, Or Bolster A Defense, But Not If It Can Be Used To Rebut A Defense or Impeach**

(U) Case law has examined and analyzed various categories of information in determining whether items are material to preparing the defense under Rule 16(a)(1)(E)(i). This analysis concludes that evidence is material if it could be used to

37

counter the government's case or bolster a defense, but it is not material if it can be used

by the government to rebut a defense or to impeach the defendant:

> Evidence that the government does not intend to use in its case-in-chief is material if it could be used to counter the government's case or to bolster a defense; information not meeting either of those criteria is not to be deemed material within the meaning of the Rule merely because the government may be able to use it to rebut a defense position. See, e.g., United States v. Delia, 944 F.2d 1010, 1018 (2d Cir. 1991). Nor is it to be deemed material merely because it would have dissuaded the defendant from proffering easily impeached testimony. See United States v. Gleason, 616 F.2d 2, 24 (2d Cir. 1979).

United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993)(telephone records were not

material since they did not bolster defense or counter government's case, and were used

only to rebut defendant's testimony that he was with Perez on night of crime).

## (U)    4.    Availability of a Rule 16(d)(1) Protective Order

(U) Setting aside CIPA, Fed. R. Crim. P. 16(d)(1) permits the court, for good

cause, to deny, restrict or defer discovery or inspection, or grant other appropriate relief.

Under this provision and related principles, sensitive law enforcement information may

properly never be disclosed to the defense. See United States v. Toner, 728 F.2d 115,

122 (2d Cir. 1984) (district court at trial "properly barred inquiry into Kail's [the

informant's] reasons for first coming to the FBI, since such inquiry apparently would

have jeopardized other ongoing FBI investigations."); cf. United States v. Simms, 385

F.3d 1347, 1352 (11th Cir. 2004) (recognizing propriety of protecting continuing

criminal investigation and safety of persons placed at risk by those investigations).

38

**V.**    [Redacted]

[Redacted]

(U) Notwithstanding the foregoing, the defendants' discovery requests are extraordinarily broad and range far beyond the allegations of the indictment and the requirements of the Constitution and discovery-related caselaw, statutes and rules. The information set forth below represents part of the Government's ongoing good faith effort to comply with its legal obligations, as well as respond to the defendants' broad request.[23]

[Redacted]

(U) Because Aref was recruited by Hossain, and not the CW, Aref may not be entitled to an entrapment instruction. See United States v. Toner, 728 F.2d 115, 126-27 (2d Cir. 1984) (where defendant alleges that inducement communicated by Government agent to co-defendant was, in turn, communicated to him by co-defendant, "there *is* a burden of showing that the government's inducement was directly communicated to the person seeking an entrapment charge, and Toner's evidence does not meet this requirement."). In Toner, the defendant argued that he was induced by one Murphy, and that since Murphy was induced by government agents, he was entitled to an entrapment charge. The Second Circuit rejected this contention, ruling that:

---

[23]    [Redacted]

39

> The most that can be said from the evidence on the record is that the FBI was interested in knowing whether Murphy was involved with others, which is quite different from saying that the FBI consciously recruited someone to help Murphy commit the crimes. It was Murphy himself who first raised the fact that he would be accompanied by someone else and who persisted in the plan even when DeVecchio suggested to him that he would rather do the deal alone. The fact that Murphy and Toner socialized at a bar is simply not sufficient evidence of direct communication of the inducement to permit the question even to go to the jury.

728 F.2d at 127. Here, Hossain proposed to the CW that there be a witness, and that

Aref be that witness. And, it was Hossain who first contacted Aref.

[Redacted]

**(U)    VI.    Conclusion**

[Redacted]

Respectfully submitted,

GLENN T. SUDDABY
UNITED STATES ATTORNEY

by

William C. Pericak
Assistant U.S. Attorney

Gregg N. Sofer
Trial Attorney
Counterterrorism Section
United States Department of Justice

40