UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**UNITED STATES OF AMERICA,**

        Plaintiff,                 **MEMORANDUM OF LAW**

        **v.**                   **04-CR-402 TJM**

**YASSIN AREF and
MOHAMMED HUSSAIN,**

        Defendants.

---

Yassin Aref, through his attorney, Terence L. Kindlon, respectfully submits:

First, it is submitted that a motion for reconsideration is appropriate where there is new evidence - the motion is made pursuant to Local Rule 7.1(g). *United States v. Bocio*, 105 F. Supp.2d 1 (NDNY 2000); *United States v. Cady*, 955 F. Supp. 164 (NDNY 1997).

The government engaged in illegal electronic surveillance of thousands of US persons, including Yassin Aref, then instigated a sting operation to attempt to entrap Mr. Aref into supporting a non-existent terrorist plot, then dared to claim that the illegal NSA operation was justified because it was the only way to catch Mr. Aref. That sequence of events is truly breathtaking as it shows the Administration's arrogant dismissal of our Constitution and of everything that makes it worthwhile to be an American.

**I.     MOTION TO SUPPRESS ALL EVIDENCE IN THE CASE AS THE POISONOUS FRUIT OF ILLEGAL ELECTRONIC SURVEILLANCE**

On or about December 17, 2005 the New York Times (NYT) reported that warrantless electronic surveillance authorized by the Bush Administration and carried out by the National Security Agency (NSA), which is illegal according to a widespread consensus of legal

scholars, was performed within the United States since 2001 in connection with investigations of alleged "terrorist" activities within the United States.

On December 23, 2005 defense counsel wrote to the prosecutor herein, Assistant United States Attorney William C. Pericak, with reference to warrantless electronic surveillance, and asked him to immediately "affirm or deny the occurrence of (any such) alleged unlawful act [as defined in 18 USC 2510]" pursuant to 18 USC 3504(a). No response has been forthcoming.

On or about January 11, 2006 defense counsel again wrote to Assistant United States Attorney William C. Pericak and included a copy of a letter by Harvard Law Professor Laurence H. Tribe explaining his "inescapable conclusion" that the above mentioned surveillance program is illegal. Defense counsel asked Mr. Pericak again to respond and to provide a summary of the dates and times of any and all warrantless electronic surveillance of Yassin Aref, together with a statement concerning any and all information so gathered.

As of yet defense counsel has received no response from Mr. Pericak to either of the above requests.

Then on January 17, 2006 the New York Times printed a photograph of Yassin Aref, on Page A14, and reported that General Michael V. Hayden, who was NSA director when the program began, stated, "*I can say unequivocally that we have gotten information through this program that would not otherwise have been available.*" (NYT, January 17, 2006, Page A14)

The NYT article went on to say, "Some of the officials said the eavesdropping program might have helped uncover people with ties to Al Qaeda in Albany, Portland, Ore.; and Minneapolis." (NYT, January 17, 2006, at A14)

Very significantly, the article further stated:

"By contrast [to cases where the NSA surveillance played only a minimal role], *different officials agree that the N.S.A.'s domestic operations played a role in the arrest in Albany of an imam and another man* who were taken into custody in August 2004 as part of an F.B.I. counterterrorism sting operation.

The men, Yassin Aref, 35, and Mohammed Hossain, 49, are awaiting trial on charges that they attempted to engineer the sale of missile launchers to an F.B.I. undercover informant." (NYT, January 17, 2006, at A14)

## A.    THE NSA WARRANTLESS SURVEILLANCE PROGRAM IS CLEARLY ILLEGAL AND UNCONSTITUTIONAL

Congress enacted two statutes [18 USC 2510 *et sec.* and the Foreign Intelligence Surveillance Act] which together provide "the *exclusive* means by which electronic surveillance ... and the interception of domestic wire, oral and electronic communications my be conducted." 18 USC 2511(2)(f), emphasis supplied.

If an electronic intercept is part of a criminal investigation, it is supposed to be governed by 18 USC 2510 *et seq.*, which provide for prior judicial approval of such surveillance upon a showing of probable cause, and a showing that normal investigative procedures have failed or are reasonably expected to fail. 18 USC 2518

If an electronic intercept is for "national security purposes," it is supposed to be governed by the Foreign Intelligence Surveillance Act (FISA), passed in 1978 and codified at 50 USC 1801 *et seq.*, which also requires prior judicial approval of the surveillance.

President George W. Bush, however, has recently conceded that under the NSA surveillance program as it has been conducted since 2001, no warrants were obtained.

While the President claims the NSA program is legal, that claim is entirely specious, as shown by the plain language of the above mentioned statutes, the overwhelming consensus of legal scholars, two Congressional reports and case law.

3

Harvard Law School Professor Laurence H. Tribe, a noted legal scholar, was asked by Congressman John Conyers, Jr., to write an opinion of the legality of the NSA warrantless surveillance program, and on January 6, 2006, Professor Tribe called the program "as grave an abuse of executive authority as I can recall ever having studied," stating:

"... [T]he [NSA surveillance] scheme in question, far from being *authorized* by Congress, flies in the face of an *explicit congressional prohibition* and is therefore unconstitutional without regard to the Fourth Amendment unless it belongs to that truly rare species of executive acts so central to and inherent in the power vested in the President by Article II that, like the power to propose or veto legislation or to issue pardons, its exercise cannot constitutionally be fettered in any way by the Legislative Branch.

Any such characterization would be hard to take seriously with respect to unchecked warrantless wiretapping. As the Supreme Court famously held in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579 (1952), an emergency presidential takeover for a limited time of certain critical publicly held corporations ... falls outside that tiny category of congressionally illimitable acts and is indeed unconstitutional unless affirmatively authorized by Congress. If that is so, than certainly an unchecked presidential program of secretly recording the conversations of perhaps thousands of innocent private citizens in the United States in the hopes of gathering intelligence potentially useful for the ongoing war on a global terrorist network not only falls outside that category but misses it by a mile.

\*\*\*

The presidential power at issue in this case is therefore subject to the control of Congress. And that Congress has indeed forbidden this exercise of power is clear. The Foreign Intelligence Surveillance Act of 1978 unambiguously limits warrantless domestic electronic surveillance, *even in a congressionally declared war*, to the first 15 days of that war; criminalizes any such electronic surveillance not authorized by statute; and expressly establishes FISA and two chapters of the federal criminal code, governing wiretaps for intelligence purposes and for criminal investigation, respectively, as the '*exclusive* means by which electronic surveillance ... and the interception of domestic wire, oral and electronic communications may be conducted.' 50 USC 1811, 1809, 18 USC 2511(2)(f). ...

\*\*\*

Finally [with respect to the administration claim that the warrantless surveillance was authorized by Congress when it passed the Authorization to Use Military Force (AUMF) in 2001], it is telling that Attorney General Gonzalez, when asked in his December 19 press briefing why the administration hadn't simply ...[obtained approval from Congress], replied that .... Congress most likely would have denied the authority sought! To argue that one *couldn't have gotten* congressional authorization (in late 2001,

4

when the NSA program was secretly launched) after arguing that, by the way, one *did* get congressional authorization (in late 2001, when the AUMF was enacted) takes some nerve....

The inescapable conclusion is that the AUMF did *not* implicitly authorize what the FISA expressly prohibited. It follows that the presidential program of surveillance at issue here is a violation of the separation of powers - as grave an abuse of executive authority as I can recall ever having studied." Letter of Laurence H. Tribe, emphasis in original.

On or about January 8, 2006 14 different constitutional law scholars and former government official (Curtis A. Bradley, David Cole, Walter Dellinger, Ronald Dworkin, Richard Epstein, Harold Hongju Koh, Philip B. Heymann, Martin S. Lederman, Beth Nolan, William S. Sessions, Geoffrey R. Stone, Kathleen M. Sullivan, Laurence H. Tribe and William W. Van Alstyne) wrote a joint letter to Congress in which they stated unequivocally that the Administration's defense of the NSA warrantless surveillance program "fails to identify any plausible legal authority for such surveillance."

The above letter concludes by stating that it is "beyond dispute that, in such a democracy, the President cannot simply violate criminal laws behind closed doors because he deems them obsolete or impracticable." (Letter to Congress by 14 legal scholars and former government officials)

Congressional hearings are planned to investigate the illegal electronic surveillance program.

Several cases have also pointed out that electronic surveillance may not be conducted unless authorized by FISA (or 18 USC 2510 *et seq.*). *United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000); *United States v. Bin Laden*, 126 F. Supp. 2d 264, n.8 (SDNY 2000); *ACLU v. Barr,* 952 F.2d 457 (DC 1991).

It is worth looking back to see what the Supreme Court, in a pre-FISA case involving the

bombing of a CIA office, said about a similar illegal surveillance program under former

President Nixon. *United States v. United States District Court*, 407 US 297 (1972).

In that case, known as *Keith,* named for the Hon. Damon J. Keith, the District Court

judge in the case, the Supreme Court pointed out that even in a time of widespread civil disorder,

when the government claimed there were *1,562 domestic bombing incidents in one six month*

*period*, warrantless domestic surveillance was unconstitutional and unacceptable in a free

society. The Court stated:

> "The issue before us is an important one for the people of our country and their Government. It involves the delicate question of the President's power, acting through the Attorney General, to authorize electronic surveillance in internal security matters without prior judicial approval. ...
> ***
> During pretrial proceedings, the defendants moved to compel the United States to disclose certain electronic surveillance information and to conduct a hearing to determine whether this information 'tainted' the evidence on which the indictment was based or which the government intended to offer at trial. ...
> ***
> ...The District Court held that the surveillance violated the Fourth Amendment, and ordered the Government to make full disclosure to [defendant] Plamondon of his overheard conversations. ...
> The Government then filed in the Court of Appeals for the Sixth Circuit a petition for a writ of mandamus to set aside the District Court order... After concluding that it had jurisdiction, the court held that the surveillance was unlawful and that the District Court had properly required disclosure of the overheard conversations. ... We granted certiorari.
> ***
> The government asserts that there were 1,562 bombing incidents in the United States from January 1, 1971, to July 1, 1971, most of which involved Government related facilities. ...
> ***
> ...History abundantly documents the tendency of Government - however benevolent and benign its motives - to view with suspicion those who most fervently dispute its policies. Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. ...

The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power. Nor must the fear of unauthorized official eavesdropping deter vigorous citizen dissent and discussion of Government action in private conversation. For private dissent, no less than public discourse, is essential to our free society.

\*\*\*

...The warrant clause of the Fourth Amendment is not dead language. Rather, it has been 'a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases all over this country. *It is not an inconvenience to be somehow "weighed" against the claims of police efficiency.* It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the "well-intentioned but mistakenly overzealous executive officers" who are a part of any system of law enforcement.' *Coolidge v. New Hampshire*, 403 US 443, 481.

\*\*\*

Over two centuries ago, Lord Mansfield held that common law principles prohibited warrants that ordered the arrest of unnamed individuals who the *officer* might conclude were guilty of seditious libel. 'It is not fit,' said Mansfield, 'that the receiving or judging of the information should be left to the discretion of the officer.' *Leach v. Three of the King's Messengers*, 19 How. St. Tr. 1001, 1027 (1765).

Lord Mansfield's formulation touches the very heart of the Fourth Amendment directive: that ...[i]nherent in the concept of a warrant is its issuance by a 'neutral and detached magistrate.' *Coolidge v. New Hampshire*, at 453. The further requirement of 'probable cause' instructs the magistrate that baseless searches shall not proceed.

These Fourth Amendment freedoms cannot properly be guaranteed if *domestic security* [i.e. "Homeland Security"] surveillances may be conducted solely within the discretion of the Executive Branch. ...

\*\*\*

We certainly do not reject them lightly [the concerns of the President that national security was endangered], especially at a time of worldwide ferment and when civil disorders in this country are more prevalent than in the less turbulent periods of our history. ...

But we do not think a case has been made for the requested departure from Fourth Amendment standards. ... Security surveillances are especially sensitive because of the inherent vagueness of the domestic security concept, the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillances to oversee political dissent. We recognize, as we have before, the constitutional basis of the President's domestic security role, but we think it must be exercised in a manner compatible with the Fourth Amendment. In this case we hold this requires an appropriate prior warrant procedure.

...If the threat is too subtle or complex for our senior law enforcement officers to convey its significance to a court, one may question whether there is probable cause for surveillance." *Keith*, supra, at 299-301, 312(n12), 314-317, 319-320, emphasis supplied.

The *Keith* concurrence by Justice Douglas is also illuminating and timely, stating:

> "...As illustrated by the flood of cases before us this Term ... we are currently in the throes of another national seizure of paranoia, resembling the hysteria which surrounded the Alien and Sedition Acts, the Palmer Raids, and the McCarthy era. Those who register dissent or who petition their governments for redress are subjected to scrutiny by grand juries, by the FBI, or even by the military. Their associates are interrogated. Their homes are bugged and their telephones are wiretapped. They are befriended by secret government informers. ...
>
> ***
>
> When the Executive attempts to excuse these tactics as essential to its defense against internal subversion, we are obliged to remind it, without apology, of this Court's long commitment to the preservation of the Bill of Rights from the corrosive environment of precisely such expedients. As Justice Brandeis said, concurring in *Whitney v. California*, 274 US 357, 377: '*Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty.*' Chief Justice Warren put it this way in *United States v. Robel*, 389 US 258, 264: 'This concept of "national defense" cannot be deemed an end in itself, justifying any ... power designed to promote such a goal. *Implicit in the term "national defense" is the notion of defending those values and ideals which set this Nation apart... It would indeed be ironic if, in the name of national defense, we would sanction the subversion of ... those liberties... which [make] the defense of the Nation worthwhile.*'" *Keith*, concurrence of Justice Douglas, at 329, 331-332, emphasis supplied.

In two different cases decided in 1982, both involving IRA operatives who were charged with smuggling arms (including attempts to obtain SAMS) to the IRA, the District Court for the Eastern District of New York upheld the constitutionality of FISA precisely *because* the Executive Branch was not given unlimited discretion over the surveillance. The court stated:

> "...The Senate report [on FISA] notes the infringement of and chilling effect on the constitutional rights of surveillance targets and those with whom the targets communicated caused by the previously unregulated nature of national security surveillance. Thus, *FISA was 'designed ... to curb the practice by which the Executive Branch may conduct warrantless electronic surveillance* on its own unilateral determination that national security justifies it'...
>
> ***
>
> ...[T]he FISA warrant is a warrant in the meaning of the fourth amendment, since it provides for the interposition of independent judicial magistrates between the executive and the subject of the surveillance which the warrant requirement was designed to assure...." *United States v. Megahey et. al.,* 553 F. Supp. 1180, 1184, 1190 (EDNY 1982),

emphasis supplied, aff'd *United States v. Duggan, et. al*, 743 F.2d 59 (2nd Cir. 1984).

In the other 1982 case, *United States* v. *Falvey*, 540 F. Supp. 1306 (EDNY 1982), the

court, in an opinion which is especially pertinent given the facts of the instant case, and the

illegal surveillance herein, stated:

> "The defendants mount a superficially attractive First Amendment attack on FISA. They argue that another problem with FISA is that *it gives the government the opportunity to use politically-motivated surveillance of whatever group it chooses at a particular time*. According to the argument, at this time the Polish labor union, Solidarity, is in; and the IRA is out. ...
> This argument, however, ignores two things. First, *abusive political surveillance is precisely what Congress intended to control by providing that a judge - and not the Executive branch - make the finding that the target is truly the agent of a foreign power. ... Second, because one man's terrorism is another man's holy war, FISA explicitly admonishes that 'no United States person [which includes Yassin Aref, a permanent resident] may be considered... an agent of a foreign power solely on the basis of activities protected by the first amendment to the Constitution of the United States...'* 50 USC 1805(a)(3)(A).
> Hence, to obtain a FISA surveillance order, the Government *must* provide the FISA judge with something more than the target's sympathy for the goals of a particular group, in this case, the IRA [which] ...engages in international terrorism. ...
> Moreover, requiring the FISA judge to find that the target *is involved in* these acts of international terrorism as part of its finding of probable cause to believe that the target is an agent of a foreign power, serves to limit the generality of the terms 'agents of a foreign power' and 'international terrorism.'" *Falvey*, supra, at 1314-15, emphasis supplied.

It is submitted that the government could not have legitimately obtained a FISA warrant

for the surveillance of Yassin Aref because he was not ever "involved in" international terrorism.

The government engaged in illegal electronic surveillance of thousands of US persons,

including Yassin Aref, then instigated a sting operation to attempt to entrap Mr. Aref into

supporting a non-existent terrorist plot, then dared to claim that the illegal NSA operation was

justified because it was the only way to catch Mr. Aref! That sequence of events is truly

breathtaking  as it shows the Administration's arrogant dismissal of our Constitution and of

9

everything that makes it worthwhile to be an American.

### B.    ALL EVIDENCE IN THIS CASE IS THE FRUIT OF THE ILLEGAL ELECTRONIC SURVEILLANCE AND MUST BE SUPPRESSED

Evidence obtained from illegal electronic surveillance is inadmissable and must be suppressed. *See United States v. Miller*, 116 F.3d 641 (2nd Cir. 1997); *United States v. Johnson*, US Dist. LEXIS 11011 (D.MA 1990).

Therefore, because government officials have said that Yassin Aref was a subject of the NSA warrantless surveillance program, and because that surveillance was clearly illegal, as described above, all evidence obtain therefrom must be suppressed.

It is submitted in addition that because it was the illegal surveillance which led the government to investigate Mr. Aref in the first place, that *all* evidence in this case is the fruit of the poisonous tree of said illegal surveillance and must be suppressed. *See Ward v. Dretke*, 420 F.3d 479 (5th Cir. 2005); *United States v. Medearis*, 236 F. Supp.2d 977 (D. SD 2002); *Brown v. Illinois,* 422 US 590 (1975); *Alderman v. United States*, 399 US 165 (1967); *Wong Sun v. United States*, 371 US 471 (1963).

In this case the "poisonous tree" of blatantly illegal surveillance has spread its roots under the Constitution and is undermining its foundation, thereby damaging the Fourth Amendment protection against unreasonable search and seizure, the First Amendment right to free expression, and the limits on the power of the Executive Branch, not to mention other constitutional provisions, such as the Sixth Amendment right to confront evidence. The need to squarely confront this violation cannot be overemphasized.

In *Ward v. Dretke*, the Fifth Circuit Court of Appeals recently discussed the "fruit of the

10

poisonous tree" doctrine and stated:

> "[T]he 'fruit of the poisonous tree' doctrine ... provides that 'all evidence derived from the exploitation of an illegal seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.' [*United States v. Portillo-Aguirre*, 311 F.3d 647, 658 (5th Cir. 2002)."
>
> The test for determining whether evidence is inadmissible as the fruit of the poisonous tree is 'whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been *come at by exploitation of that illegality* or instead by means sufficiently distinguishable to be purged of the primary taint.' [*Wong Sun v. United States*, 371 US 471, 488 (1963)] *Ward v. Dretke*, supra, at 488, emphasis supplied.

As to whether evidence should be suppressed as the fruit of the poisonous tree, the

*Medearis* court said that depends on whether said evidence came from an independent source

untainted by the illegality. The court stated:

> "...The problem, of course, is once the cat is out of the bag, there is no way to put it back in. The question courts must wrestle with, then, is whether the entire investigation that flowed from the prior illegality is tainted or whether knowledge of the evidence was gained from an independent source that had nothing to do with the original illegality." *Medearis*, supra, at 985.

Once the defense has made a showing that some evidence was illegally obtained, and

claims that subsequently obtained evidence was tainted by the previous illegality, the government

has the burden to prove that the subsequent evidence was not tainted. *Ward v. Dretke*, 420 F.3d

479 (5th Cir. 2005) *United States v. Falley*, 489 F.2d 33 (2nd Cir. 1973); *United States v. Schipani*,

531 F.2d 63 (2nd Cir. 1976); *Alderman v. United States*, 394 US 165 (1967).

There are several cases where evidence has been suppressed because it was the fruit of

the poisonous tree of a prior illegality. *United States v. Finucan*, 708 F.2d 838 (1st Cir. 1983);

*United States v. Torres*, 274 F. Supp. 2d 146 (D.RI 2003); *United States v. Solomon*, 728 F.

Supp. 1544 (SD FL 1990).

11

It is submitted that, based on the statement by General Michael V. Hayden, cited above at Page 2, that the warrantless surveillance program provided evidence which "unequivocally" would not otherwise have been available, and by the statements by "different officials" that the illegally obtained information "played a role in the arrest" of Yassin Aref, the flagrantly illegal evidence was the cause of the entire investigation in this case.

As a result, there was no "independent source" and no "inevitable discovery" of the evidence in this case, the bulk of which was not actually "discovered," but, rather, *created* by the sting operation itself. Thus this case is distinguishable from cases where evidence is discovered subsequent to the receipt of illegally obtained evidence, and there is a question of whether the taint of the illegality is sufficiently attenuated.

Even though this case is different, in that it involves a *sting operation* which was clearly instigated as a result of illegally obtained evidence, it is still helpful to look at the case of *United States v. Schipani*, 289 F. Supp. 43 (EDNY 1968), aff'd 414 F.2d 1262 (2nd Cir. 1969). In that case the court held that where an entire investigation is initiated based on illegally obtained evidence, the subsequent evidence must be suppressed. The court stated:

> "The legal question presented is whether an entire prosecution can be vitiated if the government obtains information illegally and on the basis of that information decides to throw its weight against an individual, even though the officials in charge of the investigation are unaware of the illicit source of the data and proceed in a lawful manner. ...
> If illegally secured information leads the government to substantially intensify an investigation, all evidence subsequently uncovered has automatically 'been come at by exploitation of that illegality.' [*Wong Sun*, supra, at 488] The unlawful search has set in motion the chain of events leading to the government's evidence. ...'The road from the tap to the testimony may be long, but it is straight.' *United States v. Tane*, 329 F.2d 848, 853 (2nd Cir. 1964)." *Schipani*, supra, at 57-59

*Schipani* applies directly to the instant case in that the entire investigation herein was not

simply *intensified* as a result of the illegality, but would not have occurred at all without the illegally obtained evidence. The illegal electronic surveillance set in motion the whole chain of events leading to the charges herein. As in *Schipani*, the road may have been long, but it was straight - there were no intervening events which caused the government to focus on Mr. Aref.

When deciding whether to apply the fruit of the poisonous tree doctrine, one of the factors courts must examine is the *flagrancy* of the illegality in question. *Kaupp v.* Texas, 538 US 626, 633 (2003); *Brown v. Illinois*, supra, at 604; *United States v. Bacall,* 443 F.2d 1050 (9th Cir. 1971).

The *Bacall* court stated:

> "Finally, an operative though often unarticulated factor in the determination whether to suppress evidence discovered in part through prior unlawful action is the offensiveness of that action; 'where the conduct is particularly offensive the deterrence ought to be greater and, therefore, the scope of the exclusion broader.' Comment, [Fruit of the Poisonous Tree - A Plea for Relevant Criteria], 115 U.Pa.L.Rev. 1136, 1151 (1967) *Bacall,* supra, at 1057.

In allowing the fruit of illegally obtained evidence to be admitted, courts are legitimizing illegal conduct, as the Supreme Court pointed out in *Terry v. Ohio*, 392 US 1 (1968), stating:

> "A ruling admitting evidence in a criminal trial ... has the necessary effect of legitimizing the conduct which procured the evidence [and] ... Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens." *Terry*, supra, at 13.

As discussed above, the illegality in this case was incredibly flagrant, and it is of vital importance not only to the Fourth Amendment, but to the fundamental principle of checks and balances which *must* limit the power of the executive if our democracy is to function at all. If the President can unilaterally decide when and if he will follow the law, there is really no role for Congress or the courts.

## II.    DISMISSAL

It is submitted that while suppression, rather than outright dismissal of an indictment, is generally the remedy where the evidence before the grand jury was the poisonous fruit of illegally obtained evidence, there is some authority for the proposition that when the illegality is sufficiently blatant, the integrity of the grand jury itself is affected, and the indictment should be dismissed. *See United States v. Miller*, 116 F.3d 641, 662 (2nd Cir. 1997).

In *Miller*, the Second Circuit Court of Appeals stated:

"..A grand jury may make use of information obtained through a wiretap *unless it is clear that the wiretap was illegal*, such as when there is a government concession that the surveillance was unlawful, *or there is 'patent' illegality 'such as, for example, when no prior court order was obtained....'" Miller*, supra, at 662, emphasis supplied, quoting *In re Persico*, 491 F.2d 1156, 1161 (2nd Cir. 19740, cert. den., 419 US 924.

It is submitted that the above standard should also apply when a grand jury is presented with the fruits of illegally obtained evidence. Because there was, as mentioned in *Miller*, a "patent illegality," herein, ie. "no prior court order was obtained," the Court should hold that the integrity of the grand jury was affected by the taint of the illegal evidence, and dismiss the indictment.

While, in contrast to one of the examples mentioned in *Miller*, the Administration did not concede the illegality of the surveillance, it is submitted that here, where the violation was so blatant, as discussed above, the failure to concede it actually makes it *more egregious*. The President's claim that he can violate the law at will solely *because* he is the President is extremely dangerous and must be confronted and countered in the strongest terms possible.

## III.    DISCOVERY UNDER 18 USC 3504

18 USC 3504 provides that in any proceeding in any court of the United States "upon a

claim that evidence is inadmissible because .... it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act."

As stated above, defense counsel already wrote two letters to Assistant United States Attorney William C. Pericak, requesting that the government fulfill its obligation under 18 USC 3504 by affirming or denying the existence of the unlawfully obtained evidence. The government has failed to respond to either of the letters.

Because "different officials" have now stated  - to the New York Times - that the evidence obtained from the warrantless electronic surveillance "played a role" in the arrest of Yassin Aref, it is quite clear that the evidence in question exists. However, the government must still fulfill its obligation under 18 USC 3504 and "affirm or deny the occurrence of the alleged unlawful act."

Not only that, but the government must provide the defense with all tapes, transcripts or other records of the intercepted communications. *United States v. Apple*, 915 F.2d 899 (4th Cir. 1990); *Alderman v. United States*, 394 US 165 (1967).

The Supreme Court in *Alderman* stated:

> "....[I]f the hearings are to be more than a formality and petitioners are not left entirely to reliance on government testimony, there should be turned over to them the records of those overheard conversations which the Government was not entitled to use in building its case against them." *Alderman*, supra, at 183.

The *Apple* court followed *Alderman*, stating, "If the government affirms that illegal electronic surveillance of the claimant has taken place, the government must provide to the claimant the tapes or transcripts of the intercepted communications." *Apple*, supra, at 906.

Given that warrantless electronic surveillance of Yassin Aref took place, and led directly

to the investigation and charges herein, the application of 18 USC 3504(1) cannot depend on whether the prosecution admits that the surveillance was illegal. Clearly, if this *Court* finds the surveillance to be illegal, the Court must order the government to provide all records relating to said illegal surveillance.

Further, if the government claims, somehow, that any of the evidence is classified, that should not affect the requirement that it be provided. As pointed out in the prior omnibus motion, *defense counsel has obtained a security clearance and has the right to receive classified evidence* relevant to this case.

The Court reserved on the prior motion to gain access to said evidence, but the revelation that blatantly illegal evidence was obtained in this case makes an even stronger case for providing all the evidence to the defense. It is submitted that the evidence of illegality constitutes *Brady* material in this case, which must *certainly* be provided to the defense, regardless of whether any of it can said to be classified.

Therefore, the Court must order the prosecution to affirm under 18 USC 3504 whether evidence in this case "was obtained by the exploitation of an unlawful act," and, if it rules that occurred, must order that the defense be provided with all records relating to the warrantless surveillance.

## CONCLUSION

Based on the foregoing, this Court should find that the NSA warrantless electronic surveillance program was illegal; that all evidence derived therefrom must be provided to the defense immediately; that all evidence in this case should be suppressed as the fruit of the

16

illegality; and that the indictment should be dismissed as a result.

Dated: January 20, 2006

Respectfully submitted:
KINDLON and SHANKS, P.C.

By:_____

S/Terence L. Kindlon
Bar Roll No. 103142
*Attorney for Yassin Aref*
74 Chapel Street
Albany, New York  12207
Telephone: (518) 434-1493
Fax: (518) 432-7806
E-mail: TKindlon@aol.com