Dear Members of Congress:

We are scholars of constitutional law and former government officials. We write in our individual capacities as citizens concerned by the Bush Administration's National Security Agency domestic spying program, as reported in the New York Times, and in particular to respond to the Justice Department's December 22, 2005 letter to the majority and minority leaders of the House and Senate Intelligence Committees setting forth the administration's defense of the program. Although the program's secrecy prevents us from being privy to all of its details, the Justice Department's defense of what it concedes was secret and warrantless electronic surveillance of persons within the United States fails to identify any plausible legal authority for such surveillance. Accordingly the program appears on its face to violate existing law.

The basic legal question here is not new. In 1978, after an extensive investigation of the privacy violations associated with foreign intelligence surveillance programs, Congress and the President enacted the Foreign Intelligence Surveillance Act (FISA). Pub. L. 95-511, 92 Stat. 1783. FISA comprehensively regulates electronic surveillance within the United States, striking a careful balance between protecting civil liberties and preserving the "vitally important government purpose" of obtaining valuable intelligence in order to safeguard national security. S. Rep. No. 95-604, pt. 1, at 9 (1977).

With minor exceptions, FISA authorizes electronic surveillance only upon certain specified showings, and only if approved by a court. The statute specifically allows for warrantless wartime domestic electronic surveillance--but only for the first fifteen days of a war. 50 U.S.C. §§ 1811. It makes criminal any electronic surveillance not authorized by statute, id. §§ 1809; and it expressly establishes FISA and specified provisions of the federal criminal code (which govern wiretaps for criminal investigation) as the "exclusive means by which electronic surveillance ... may be conducted," 18 U.S.C. §§ 2511(2)(f) (emphasis added).

The Department of Justice concedes that the NSA program was not authorized by any of the above provisions. It maintains, however, that the program did not violate existing law because Congress implicitly authorized the NSA program when it enacted the Authorization for Use of Military Force (AUMF) against al Qaeda, Pub. L. No. 107-40, 115 Stat. 224 (2001). But the AUMF cannot reasonably be construed to implicitly authorize warrantless electronic surveillance in the United States during wartime, where Congress has expressly and specifically addressed that precise question in FISA and limited any such warrantless surveillance to the first fifteen days of war.

The DOJ also invokes the President's inherent constitutional authority as Commander in Chief to collect "signals intelligence" targeted at the enemy, and maintains that construing FISA to prohibit the President's actions would raise constitutional questions. But even conceding that the President in his role as Commander in Chief may generally collect signals intelligence on the enemy abroad, Congress indisputably has authority to regulate electronic surveillance within the United States, as it has done in FISA. Where Congress has so regulated, the President can act in contravention of statute only if his authority is exclusive, and not subject to the check of statutory regulation. The DOJ letter pointedly does not make that extraordinary claim.

Moreover, to construe the AUMF as the DOJ suggests would itself raise serious constitutional questions under the Fourth Amendment. The Supreme Court has never upheld warrantless wiretapping within the United States. Accordingly, the principle that statutes should be construed to avoid serious constitutional questions provides an additional reason for concluding that the AUMF does not authorize the President's actions here.

I. CONGRESS DID NOT IMPLICITLY AUTHORIZE THE NSA DOMESTIC SPYING PROGRAM IN THE AUMF, AND IN FACT EXPRESSLY PROHIBITED IT IN FISA

The DOJ concedes (Letter at 4) that the NSA program involves "electronic surveillance," which is defined in FISA to mean the interception of the contents of telephone, wire, or email communications that occur, at least in part, in the United States. 50 U.S.C. §§§§ 1801(f)(1)-(2), 1801(n). NSA engages in such surveillance without judicial approval, and apparently without the substantive showings that FISA requires--e.g., that the subject is an "agent of a foreign power." Id. §§ 1805(a). The DOJ does not argue that FISA itself authorizes such electronic surveillance; and, as the DOJ letter acknowledges, 18 U.S.C. §§ 1809 makes criminal any electronic surveillance not authorized by statute.

The DOJ nevertheless contends that the surveillance is authorized by the AUMF, signed on September 18, 2001, which empowers the President to use "all necessary and appropriate force against" al Qaeda. According to the DOJ, collecting "signals intelligence" on the enemy, even if it involves tapping U.S. phones without court approval or probable cause, is a "fundamental incident of war" authorized by the AUMF. This argument fails for four reasons.

First, and most importantly, the DOJ's argument rests on an unstated general "implication" from the AUMF that directly contradicts express and specific language in FISA. Specific and "carefully drawn" statutes prevail over general statutes where there is a conflict. Morales v. TWA, Inc., 504 U.S. 374, 384-85 (1992) (quoting International Paper Co. v. Ouelette, 479 U.S. 481, 494 (1987)). In FISA, Congress has directly and specifically spoken on the question of domestic warrantless wiretapping, including during wartime, and it could not have spoken more clearly.

As noted above, Congress has comprehensively regulated all electronic surveillance in the United States, and authorizes such surveillance only pursuant to specific statutes designated as the "exclusive means by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted." 18 U.S.C. §§ 2511(2)(f) (emphasis added). Moreover, FISA specifically addresses the question of domestic wiretapping during wartime. In a provision entitled "Authorization during time of war," FISA dictates that "[n]otwithstanding any other law, the President, through the Attorney General, may authorize electronic surveillance without a court order under this subchapter to acquire foreign intelligence information for a period not to exceed fifteen calendar days following a declaration of war by the Congress." 50 U.S.C. §§ 1811 (emphasis added). Thus, even where Congress has declared war--a more formal step than an authorization such as the AUMF--the law limits warrantless wiretapping to the first fifteen days of the conflict. Congress explained that if the President needed further warrantless surveillance during wartime, the fifteen days would be sufficient for Congress to consider and enact further authorization. Rather than follow this course, the President acted unilaterally and secretly in contravention of FISA's terms. The DOJ letter

remarkably does not even mention FISA's fifteen-day war provision, which directly refutes the President's asserted "implied" authority.

In light of the specific and comprehensive regulation of FISA, especially the fifteen-day war provision, there is no basis for finding in the AUMF's general language implicit authority for unchecked warrantless domestic wiretapping. As Justice Frankfurter stated in rejecting a similar argument by President Truman when he sought to defend the seizure of the steel mills during the Korean War on the basis of implied congressional authorization: "It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of seizure, to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld. To find authority so explicitly withheld is ... to disrespect the whole legislative process and the constitutional division of authority between President and Congress." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring).

Second, the DOJ's argument would require the conclusion that Congress implicitly and sub silentio repealed 18 U.S.C. §§ 2511(2)(f), the provision that identifies FISA and specific criminal code provisions as "the exclusive means by which electronic surveillance . . . may be conducted." Repeals by implication are strongly disfavored; they can be established only by "overwhelming evidence," J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 137 (2001), and "'the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable,'" id. at 141-142 (quoting Morton v. Mancari, 417 U.S. 535, 550 (1974)). The AUMF and §§ 2511(2)(f) are not irreconcilable, and there is no evidence, let alone overwhelming evidence, that Congress intended to repeal §§ 2511(2)(f).

Third, Attorney General Alberto Gonzales has admitted that the administration did not seek to amend FISA to authorize the NSA spying program because it was advised that Congress would reject such an amendment. The administration cannot argue on the one hand that Congress authorized the NSA program in the AUMF, and at the same time that it did not ask Congress for such authorization because it feared Congress would say no.

Finally, the DOJ's reliance upon Hamdi v. Rumsfeld, 542 U.S. 507 (2004), to support its reading of the AUMF, see DOJ Letter at 3, is misplaced. A plurality of the Court in Hamdi held that the AUMF authorized military detention of enemy combatants captured on the battlefield abroad as a "fundamental incident of waging war." Id. at 519. The plurality expressly limited this holding to individuals who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." Id. at 516 (emphasis added). It is one thing, however, to say that foreign battlefield capture of enemy combatants is an incident of waging war that Congress intended to authorize. It is another matter entirely to treat unchecked warrantless domestic spying as included in that authorization, especially where an existing statute specifies that other laws are the "exclusive means" by which electronic surveillance may be conducted and provides that even a declaration of war authorizes such spying only for a fifteen-day emergency period.

II. CONSTRUING FISA TO PROHIBIT WARRANTLESS DOMESTIC WIRETAPPING DOES NOT RAISE ANY SERIOUS CONSTITUTIONAL QUESTION, WHEREAS CONSTRUING THE AUMF TO AUTHORIZE SUCH WIRETAPPING WOULD RAISE SERIOUS QUESTIONS UNDER THE FOURTH AMENDMENT

The DOJ argues that FISA and the AUMF should be construed to permit the NSA program's domestic surveillance because otherwise there might be a "conflict between FISA and the President's Article II authority as Commander-in-Chief." DOJ Letter at 4. The statutory scheme described above is not ambiguous, and therefore the constitutional avoidance doctrine is not even implicated. See United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 494 (2001) (the "canon of constitutional avoidance has no application in the absence of statutory ambiguity"). But were it implicated, it would work against the President, not in his favor. Construing FISA and the AUMF according to their plain meanings raises no serious constitutional questions regarding the President's duties under Article II. Construing the AUMF to permit unchecked warrantless wiretapping without probable cause, however, would raise serious questions under the Fourth Amendment.

A. FISA's Limitations Are Consistent with the President's Article II Role

We do not dispute that, absent congressional action, the President might have inherent constitutional authority to collect "signals intelligence" about the enemy abroad. Nor do we dispute that, had Congress taken no action in this area, the President might well be constitutionally empowered to conduct domestic surveillance directly tied and narrowly confined to that goal--subject, of course, to Fourth Amendment limits. Indeed, in the years before FISA was enacted, the federal law involving wiretapping specifically provided that "[n]othing contained in this chapter or in section 605 of the Communications Act of 1934 shall limit the constitutional power of the President . . . to obtain foreign intelligence information deemed essential to the security of the United States." 18 U.S.C. §§ 2511(3) (1976).

But FISA specifically repealed that provision. FISA §§ 201(c), 92 Stat. 1797, and replaced it with language dictating that FISA and the criminal code are the "exclusive means" of conducting electronic surveillance. In doing so, Congress did not deny that the President has constitutional power to conduct electronic surveillance for national security purposes; rather, Congress properly concluded that "even if the President has the inherent authority in the absence of legislation to authorize warrantless electronic surveillance for foreign intelligence purposes, Congress has the power to regulate the conduct of such surveillance by legislating a reasonable procedure, which then becomes the exclusive means by which such surveillance may be conducted." H.R. Rep. No. 95-1283, pt. 1, at 24 (1978) (emphasis added). This analysis, Congress noted, was "supported by two successive Attorneys General." Id.

To say that the President has inherent authority does not mean that his authority is exclusive, or that his conduct is not subject to statutory regulations enacted (as FISA was) pursuant to Congress's Article I powers. As Justice Jackson famously explained in his influential opinion in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at 635 (Jackson, J., concurring), the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending upon their disjunction or

conjunction with those of Congress." For example, the President in his role as Commander in Chief directs military operations. But the Framers gave Congress the power to prescribe rules for the regulation of the armed and naval forces, Art. I, §§ 8, cl. 14, and if a duly enacted statute prohibits the military from engaging in torture or cruel, inhuman, and degrading treatment, the President must follow that dictate. As Justice Jackson wrote, when the President acts in defiance of "the expressed or implied will of Congress," his power is "at its lowest ebb." 343 U.S. at 637. In this setting, Jackson wrote, "Presidential power [is] most vulnerable to attack and in the least favorable of possible constitutional postures." Id. at 640.

Congress plainly has authority to regulate domestic wiretapping by federal agencies under its Article I powers, and the DOJ does not suggest otherwise. Indeed, when FISA was enacted, the Justice Department agreed that Congress had power to regulate such conduct, and could require judicial approval of foreign intelligence surveillance. FISA does not prohibit foreign intelligence surveillance, but merely imposes reasonable regulation to protect legitimate privacy rights. (For example, although FISA generally requires judicial approval for electronic surveillance of persons within the United States, it permits the executive branch to install a wiretap immediately so long as it obtains judicial approval within 72 hours. 50 U.S.C. §§ 1805(f).)

Just as the President is bound by the statutory prohibition on torture, he is bound by the statutory dictates of FISA. The DOJ once infamously argued that the President as Commander in Chief could ignore even the criminal prohibition on torture, and, more broadly still, that statutes may not "place any limits on the President's determinations as to any terrorist threat, the amount of military force to be used in response, or the method, timing, and nature of the response." But the administration withdrew the August 2002 torture memo after it was disclosed, and for good reason the DOJ does not advance these extreme arguments here. Absent a serious question about FISA's constitutionality, there is no reason even to consider construing the AUMF to have implicitly overturned the carefully designed regulatory regime that FISA establishes. See, e.g., Reno v. Flores, 507 U.S. 292, 314 n.9 (1993) (constitutional avoidance canon applicable only if the constitutional question to be avoided is a serious one, "not to eliminate all possible contentions that the statute might be unconstitutional") (emphasis in original; citation omitted).

B. Construing the AUMF to Authorize Warrantless Domestic Wiretapping Would Raise Serious Constitutional Questions

The principle that ambiguous statutes should be construed to avoid serious constitutional questions works against the administration, not in its favor. Interpreting the AUMF and FISA to permit unchecked domestic wiretapping for the duration of the conflict with al Qaeda would certainly raise serious constitutional questions. The Supreme Court has never upheld such a sweeping power to invade the privacy of Americans at home without individualized suspicion or judicial oversight.

The NSA surveillance program permits wiretapping within the United States without either of the safeguards presumptively required by the Fourth Amendment for electronic surveillance-- individualized probable cause and a warrant or other order issued by a judge or magistrate. The Court has long held that wiretaps generally require a warrant and probable cause. Katz v. United States, 389 U.S. 347 (1967). And the only time the Court considered the question of national

security wiretaps, it held that the Fourth Amendment prohibits domestic security wiretaps without those safeguards. United States v. United States Dist. Court, 407 U.S. 297 (1972). Although the Court in that case left open the question of the Fourth Amendment validity of warrantless wiretaps for foreign intelligence purposes, its precedents raise serious constitutional questions about the kind of open-ended authority the President has asserted with respect to the NSA program. See id. at 316-18 (explaining difficulty of guaranteeing Fourth Amendment freedoms if domestic surveillance can be conducted solely in the discretion of the executive branch).

Indeed, serious Fourth Amendment questions about the validity of warrantless wiretapping led Congress to enact FISA, in order to "provide the secure framework by which the executive branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this nation's commitment to privacy and individual rights." S. Rep. No. 95-604, pt. 1, at 15 (1977) (citing, inter alia, Zweibon v, Mitchell, 516 F.2d 594 (D.C. Cir. 1975), in which "the court of appeals held that a warrant must be obtained before a wiretap is installed on a domestic organization that is neither the agent of, nor acting in collaboration with, a foreign power").

Relying on In re Sealed Case No. 02-001, the DOJ argues that the NSA program falls within an exception to the warrant and probable cause requirement for reasonable searches that serve "special needs" above and beyond ordinary law enforcement. But the existence of "special needs" has never been found to permit warrantless wiretapping. "Special needs" generally excuse the warrant and individualized suspicion requirements only where those requirements are impracticable and the intrusion on privacy is minimal. See, e.g., Griffin v. Wisconsin, 483 U.S. 868, 873 (1987). Wiretapping is not a minimal intrusion on privacy, and the experience of FISA shows that foreign intelligence surveillance can be carried out through warrants based on individualized suspicion..

The court in Sealed Case upheld FISA itself, which requires warrants issued by Article III federal judges upon an individualized showing of probable cause that the subject is an "agent of a foreign power." The NSA domestic spying program, by contrast, includes none of these safeguards. It does not require individualized judicial approval, and it does not require a showing that the target is an "agent of a foreign power." According to Attorney General Gonzales, the NSA may wiretap any person in the United States who so much as receives a communication from anyone abroad, if the administration deems either of the parties to be affiliated with al Qaeda, a member of an organization affiliated with al Qaeda, "working in support of al Qaeda," or "part of" an organization or group "that is supportive of al Qaeda." Under this reasoning, a U.S. citizen living here who received a phone call from another U.S. citizen who attends a mosque that the administration believes is "supportive" of al Qaeda could be wiretapped without a warrant. The absence of meaningful safeguards on the NSA program at a minimum raises serious questions about the validity of the program under the Fourth Amendment, and therefore supports an interpretation of the AUMF that does not undercut FISA's regulation of such conduct.
* *
In conclusion, the DOJ letter fails to offer a plausible legal defense of the NSA domestic spying program. If the Administration felt that FISA was insufficient, the proper course was to seek legislative amendment, as it did with other aspects of FISA in the Patriot Act, and as Congress expressly contemplated when it enacted the wartime wiretap provision in FISA. One of the

crucial features of a constitutional democracy is that it is always open to the President--or anyone else--to seek to change the law. But it is also beyond dispute that, in such a democracy, the President cannot simply violate criminal laws behind closed doors because he deems them obsolete or impracticable.

We hope you find these views helpful to your consideration of the legality of the NSA domestic spying program.


Sincerely,

Curtis A. Bradley
Richard and Marcy Horvitz Professor of Law, Duke University*
Former Counselor on International Law in the State Department Legal Adviser's Office, 2004

David Cole
Professor of Law, Georgetown University Law Center

Walter Dellinger
Douglas Blount Maggs Professor of Law, Duke University
Former Assistant Attorney General, Office of Legal Counsel,1993-1996
Former Acting Solicitor General of the United States, 1996-97

Ronald Dworkin
Frank Henry Sommer Professor, New York University Law School

Richard Epstein
James Parker Hall Distinguished Service Professor, University of Chicago Law School
Peter and Kirsten Bedford Senior Fellow, Hoover Institution

Harold Hongju Koh
Dean and Gerard C. and Bernice Latrobe Smith Professor of International Law, Yale Law School
Former Assistant Secretary of State for Democracy, Human Rights and Labor 1998-2001
Former Attorney-Adviser, Office of Legal Counsel, DOJ, 1983-85

Philip B. Heymann
James Barr Ames Professor, Harvard Law School
Former Deputy Attorney General, 1993-94

Martin S. Lederman
Visiting Professor, Georgetown University Law Center
Former Attorney Advisor, Department of Justice Office of Legal Counsel, 1994-2002

Beth Nolan
Former Counsel to the President, 1999-2001; Deputy Assistant Attorney General, Office of Legal Counsel, 1996-1999; Associate Counsel to the President, 1993-1995; Attorney Advisor, Office of Legal Counsel, 1981-1985

William S. Sessions

Former Director, FBI
Former Chief United States District Judge, Western District of Texas

Geoffrey R. Stone
Harry Kalven, Jr. Distinguished Service Professor of Law, University of Chicago
Former Dean of the University of Chicago Law School and Provost of the University of Chicago

Kathleen M. Sullivan
Stanley Morrison Professor, Stanford Law School
Former Dean, Stanford Law School

Laurence H. Tribe
Carl M. Loeb University Professor and Professor of Constitutional Law
Harvard Law School

William W. Van Alstyne
Lee Professor, William and Mary Law School
Former Attorney, Department of Justice, 1958

* Affiliations are noted for identification purposes only.