1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

      -versus-                          04-CR-402

                                        (HEARING)

YASSIN MUHIDDIN AREF,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          TRANSCRIPT OF PROCEEDINGS held in and for the

United States District Court, Northern District of New York,

at the James T. Foley United States Courthouse, 445 Broadway,

Albany, New York 12207, on FRIDAY, FEBRUARY 10, 2006, before

the HON. DAVID R. HOMER, United States District Court

Magistrate Judge.

2

APPEARANCES:

FOR THE GOVERNMENT:

HON. GLENN T. SUDDABY, United States Attorney - NDNY

BY: WILLIAM E. PERICAK, Assistant U.S. Attorney

   -and-

   TIMOTHY COLL, FBI Agent

FOR THE DEFENDANT AREF:

TERENCE L. KINDLON, ESQ.

(Court convened at 1:50 PM.)

THE CLERK:  United States of America versus Yassin Aref, docket 04-CR-402.  Could we have appearances for the record, please?

MR. PERICAK:  William Pericak on behalf of the United States.  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. KINDLON:  Terence Kindlon, 74 Chapel Street, Albany, New York, here for Yassin Aref, who is seated in court, present at counsel table, seated to my left.

THE COURT:  Good afternoon.  The matter comes on on Mr. Aref's motion for reconsideration of an order of detention issued on September 30, 2005.

We will hear from you first, Mr. Kindlon.

MR. KINDLON:  Thank you very much, your Honor.  Very briefly, if I may summarize the events that have occurred, as far as detention is concerned, in this case to the present.

On August the 10th, 2004, after a brief hearing, Mr. Aref was order detained.  August 24, 2004, upon a re-hearing, he was ordered released on conditions, and you will recall that a number of individuals from his community came to the Court and pledged his appearance, guaranteed $250,000 bail in the event that he failed to appear, four

individuals signed as guarantors.  Thereafter, your Honor, for 13 months, 13 months, Mr. Aref lived with his wife and children at 44 West Street, which is in the City of Albany, worked at the mosque, where he is the Imam, and lived a wholesome productive life during that entire period of time, complied with each and every condition of his release.

In September of 2005, Mr. Pericak, who had been assigned to the case after the original prosecutor left the U.S. Attorney's office, sought and secured a superseding indictment, which essentially was the same as the original indictment, but with the addition of three new counts.  And the three new counts are basically false statement counts based upon two allegedly false statements.

At the time of the superseding indictment, there was a motion made under 3142 for reconsideration of release status, and Mr. Hossain, my client's co-defendant, and Yassin Aref both came before the Court and on September the 30th, 2005, the Court stated that information presented at that detention hearing, to quote your Honor, "compels the conclusion that Mr. Aref not only espouses, has adopted and believes in the goals of terrorist organizations, but that he has had an ongoing and continuing relationship with such organizations and with individuals associated with such organizations going back 10 years."

And as a result of that finding, this Court

felt it was appropriate to revoke the order on conditions of -- the order of release on conditions and to confine my client to the custody of the U.S. Marshal.

Now, Mr. Aref has been lodged, since September 30th, until this day, in the Rensselaer County Jail, a state facility, just across the river in Rensselaer County, which is really only about five minutes from here. And he has been, while in the Rensselaer County Jail, in protective custody. Now, I said in my papers he was in solitary confinement. That's not exactly accurate. He is in protective custody, which is almost exactly the same thing, he's locked down for 22 out of each 24 hours. The rationale for protective custody, however, is slightly different than the rationale would be for solitary confinement. It's not punitive; it's protective.

But the effect on my client is the same. Judge, to be isolated from every other human being, especially if you're a social person, such as my client, who has been very active in his religion, who served as an Imam, who has a large community of which he has been a very active member for his entire life, it has a devastating effect. I think it would be accurate to say that my client has, over the course of the past several months, while in protective custody in the Rensselaer County Jail, has become profoundly depressed.

THE COURT: Are there procedures within the Rensselaer County Jail for Mr. Aref to seek release from protective custody?

MR. KINDLON: To my knowledge, there are, your Honor.

THE COURT: Has he pursued them?

MR. KINDLON: This is really problematic. I understand that as recently as yesterday, some crack pot placed a telephone call to my client's mosque and made threatening statements to whoever answered the phone up there. So, it really is an impossible situation. I will discuss with my client whether or not he seeks to be released into the general population. It may or may not be the most intelligent thing to do, if he remains confined to the Rensselaer County Jail.

But the reason we are here today, of course, is to ask that he no longer be confined to the Rensselaer County Jail, and we feel that under the statute, there is new information which was not known to this Court back on September 30 which would justify the Court reopening that question and reconsidering whether or not my client should be released.

And as I've set forth in the affidavit that was filed in support of the application made by Mr. Aref, there are basically three major factors that are substantial

and which justify the Court's reconsideration of the question of release at this time.  And this would be the fourth detention hearing.

THE COURT:  Wait.  The first is this:  Mr. Pericak said, and I know he was speaking in good faith, because it was a belief shared by all the participants in this matter, that this case would be tried shortly after the 1st of the year.  He was quoting Judge McAvoy.  That's what we all expected. However, for a couple reasons, that hasn't happened.  It is now February, not January, and the case is nowhere near ready for trial.

THE COURT:  What's left to be done?  I know there was rulings on suppression hearings and the like.

MR. KINDLON:  The big problem is this, your Honor.  There is classified information at large within the four corners of this case and at the present time, I think it would be fair to say that the last of the classified information has only recently been delivered to Judge McAvoy.  As of now, there has still not been any ruling as to whether or not defense counsel can even look at it.

Now, what we had to do, what Kevin Luibrand, counsel for the co-defendant, and I had to do in order to serve as defense lawyers in this case was we had to secure -- we had to get security clearances, had to be investigated by the FBI and the IRS, the FAA and everybody

8

in the Federal Government.  And as a result of that, the Government saw fit several months ago to issue secret security clearances to me and to my co-defendant's counsel and as I understand the process, if it needs to upgrade to top secret, it can do that more or less automatically. However, as of today, we've seen no classified information whatsoever.

The Government's taken the position, I think, that they don't need to show it to us, Judge McAvoy has the whole thing under consideration.  If Judge McAvoy says we are entitled to look at some of this information, the smart money in this case is that the Government will probably appeal that determination to the Second Circuit.  Under CIPA, the Classified Information Procedures Act, they're entitled to do that in an interlocutory appeal.  Meantime, my client rots in jail, Judge.  Meantime, he is separated from his wife, his children, his new baby who has been born since he has been incarcerated, and the effect, of course, is, as the Second Circuit has recognized, that extensive pretrial delay -- and I have got this in my affidavit -- can, under some circumstances, constitute a due process denial, and I think that's what we are approaching here.

THE COURT:  What do you believe is the shortest period of time the Second Circuit has found to be too long under due process?

MR. KINDLON:  I can't answer that question with a number.

THE COURT:  All right.

MR. KINDLON:  But I can say that, you know, in federal criminal cases, things move along at a pretty good clip and it's quite possible, from what I've heard --

THE COURT:  In other federal criminal cases.

MR. KINDLON:  It's quite possible, from what I've heard, that this case may not be ready for jury selection until the year 2007, and that certainly would be an extraordinarily long period of pretrial incarceration. So, that's the first thing, the extensive period of pretrial delay.

The second thing is this, your Honor, and I don't expect this to be resolved in this courtroom at this time.  However, over the past couple of weeks, it has become clear to the people of this country, that the National Security Agency, at the direction of the Bush administration, has engaged in a program of warrantless wiretapping of American citizens who are using their telephones within the country and, of course, there is a furious political debate over whether we should call it what it is, which is warrantless wiretapping, or buy into this Orwellian phraseology that Carl Rofuss (phonetic) came up with that it's the terrorist monitoring program or whatever

they call it for political purposes.

The reality, however, is this:  It would seem that the Federal Government, and this is beyond the horizon of this U.S. Attorney's office, has engaged in conduct involving warrantless wiretaps, which may very well be determined to be illegal, unlawful and if it's the basis -- as Senator Kennedy said at the judiciary hearing last week, if such warrantless wiretaps are the basis for a criminal prosecution, then under the doctrine of fruit of the poisonous tree, everything that came from that is to be excluded from evidence, and it may very well be that if this case -- and I have to parenthetically add that the New York Times, on January the 17th, in statements attributed to General Hadley, formally of the NSA, until the end of last year, in the article in the New York Times, it stated unequivocally that the Albany prosecution arose from warrantless wiretaps, your Honor.  I mean, I don't know.  I can't get my hands on any classified information, but I know what I read in the paper and I know what I see on TV and CSpan and I know they engaged in warrantless wiretaps and I know high officials of the Federal Government says my client is being prosecuted because it began from a warrantless wiretap.

As I said, I don't expect that matter to be resolved here at this time, your Honor.  However, it's got

to be a factor, the Court has got to take it into account. I do think this impacts upon the strength of the Government's case, which Mr. Pericak described back in September as quite strong. I respectfully take issue with that.

Finally --

THE COURT: How do I assess its affect on the strength of the Government's case without knowing at this point whether or not there were even any warrantless electronic surveillances intercepting any surveillance from Mr. Aref?

MR. KINDLON: Your Honor, that's the $64,000 question. I don't know the answer to that question. I can only say that if I reconsider the history of my client prior to the time he was charged, and if I look back upon information that didn't seem terribly significant in the beginning, such as he was continuously being visited at the mosque by representatives of the FBI a long time before this prosecution ever began, if I take the knowledge that I gained from a book by New York Times reporter James Rissen (phonetic) called "State of War," in which he described, in quite graphic detail, the NSA spying program as it was directed at American citizens and people within the United States of America, citizens or not, doesn't matter, then I say it is reasonable to assume, and that's the best I can

do, Judge, because I don't have access even to the classified material I am supposed to have access to, but it is reasonable to assume that the Government, in this case, as stated by people interviewed by the New York Times in the article of January the 17th, base this case, predicated my client's arrest and prosecution on information that was secured by warrantless wiretaps.  That's the best I can do. I don't have anything more concrete than that at this time, your Honor.  I wish I did.

Because if I did, I could probably take my client in my car and drive him home to his family today, but I can't do that.  I can only tell you what I've learned from what I have been able to find.  And your Honor, granted, this is, you know, kind of a mysterious process.  This is a very peculiar spot for a defense lawyer to be in, to know that that information is out there somewhere, but that there's a curtain between it and me and I can't pierce the curtain, but I know it's out there, your Honor, I can feel it, I can hear it, it resonates, my client is in custody because of it.  I don't think -- there is nothing dispositive gonna happen today, but we are only dealing with pretrial release and I think it is a factor that needs to be taken into account.

The other factor is this, and this is a different kind of a factor, but one that's very significant,

Judge.  My client's wife has given birth to a baby in the last couple of months, a little tiny baby, who is home with his other children, they don't know where their papa is. They talk to him on the telephone once a week, they cry.

It is a heart-breaking situation that we find ourselves in.  I feel, Judge, that this combination of factors supports a material claim that there is a change of circumstances here unknown to the Court on September 30th which certainly justifies reconsideration of the issue of pretrial release.

If I may move along, probably the most significant information that was presented to the Court by Mr. Pericak on September 30th was that information which had been extracted from my client's diaries that he meticulously has kept down through the years.  And it was because of the information taken from his diaries, written in Arabic and translated between the time of the August 24, '04, hearing and the September 30, '05, hearing, that gave Mr. Pericak the ability to present to the Court information, and I was lookin' at the transcript a couple days ago and I said at the time and I say -- I reemphasize now that it was very artfully presented to the Court by Mr. Pericak on September 30th to create the illusion that my client supports terrorist activities.

Judge, first of all, let me say,

14

unequivocally, and objectively, in a simple declarative sentence:  Yassin Aref does not support terrorists.  He abhors terrorism.  He is a religious man, he is an intellectual man, he is a man of peace.  And if one were to sit down, as we have, and to listen to all of the hours of all of the tapes, then you would hear him saying over and over again to the people he's talking to that you have to be peaceful, you have to be lawful, you have to be respectful human beings.  That's the real Yassin Aref, not the person who is alleged to exist by my learned adversary, Mr. Pericak, on September the 30th.

Now, if I can speak specifically to some of the things that were put forth by Mr. Pericak on September the 30th, I would like at this time to respectfully take issue with and to dispute those things.  What you were told in a -- I think it was a 30-page affidavit that was filed with the Court around dinner time the day before the hearing, and, quite frankly, I don't think I responded to it adequately at the time.  If it's anybody's fault, it was mine, but it came on so quickly and it essentially blind-sided us.  What you were told on September 30th was that my client, back in 1999, met with some -- and I will probably mispronounce that -- mujahid, young men while he was still in Damascus in Syria.  And that information was set forth in his diary, and as was and is

his life long habit, he keeps meticulous notes about everything that happens in every day of his life. And your Honor, as we've indicated in our affidavit filed before today's proceeding, the only thing that happened back on January the 28th, 1999, is that these two guys came to my client's home -- he describes them to me as kids -- that they were kids who came to his home, and in his culture, the appropriate thing to do when somebody comes to your home is you invite them in, you feed them, you play host to them and you listen to them. And that's what he did. And these two kids, as Mr. Aref describes them, came in, and they said some wild things. They said that they wanted to move the war to America and Israel, they wanted to attack western targets so we can get people's opinion, and the only thing that happened was Mr. Aref listened to them, told them he wasn't interested in that and was polite to them and showed no further interest in them. And it's, your Honor, the only time in his life he ever had any contact with these two kids, who were represented as dangerous terrorists that he was in league with, was on that one day during that one meal. He had never seen them before that day. He didn't invite them to his house; they just showed up. He fed them, which is the polite thing to do, he listened to them, didn't agree with them, didn't ask to see them again, didn't ask for their phone number, or whatever you ask for in Damascus,

their address or, you know, anything like that.  And when the meal was over and when they were done talking, basically he said here's your hat, what's your hurry, see ya later, and never made any contact with them thereafter.  So that one meeting, that one meeting for maybe an hour, is presented as evidence of my client's support of terrorism. That is an unwarranted inference to draw from that.

He also was said to be in league with terrorists because he visited the HAMAS office in Damascus. Judge, my client was working as the, you know, the floor sweeper/pencil sharpener/tea getter for an organization in Damascus and he had to go to HAMAS because that was part of his job one day.  He didn't go there to plot the overthrow of Israel or the downfall of western civilization.  He went there as a driver.  And I said to you before, you know, this is like the PFC driving the General's car.  Just because he is working the machine doesn't mean he is participating in anything other than that.

Something else that was made much of, much dramatic presentation, was my client's supposed affiliation with a person who is now a known terrorist, a recognized terrorist, named Mullah Krekar.  Well, the fact is this, your Honor, and, again, this is very important to understand:  Mr. Aref was working for an organization called -- known as IMK, the Islamic Movement for Kurdistan.

Mullah Krekar was the leader of that organization.  The fact is it was a political nonviolent nonterrorist organization and Mullah Krekar, and this is back in the '90s, Judge, a long time ago, because don't forget, my client left Syria as a refugee to come to this country in 1999, so it was before that, Mullah Krekar was basically the big boss.  Yassin Aref was the little employee.  That's all he was.  He was not part of the intellectual process there, he was not anything other than, again, the guy who cleaned out the cups and swept up the floor and cleaned the bathroom and drove the truck when it needed to be driven.

And anyway, at that time, in 1999, Mullah Krekar was simply the head of this political organization which wanted to re-establish peaceful Government in Iraq, but not to blow up anything in the United States, not to attack anything in Israel, simply to re-establish a stable Government in his home country.  Yassin Aref left Syria in 1999 and, through the good offices of the United Nations and a church organization, he was transported, not at his choice, he just wanted to get out of there, he didn't get to pick his destination, they decided where he was gonna come, they decided the United States.  He actually thought he was goin' to Europe.  They decided the United States, and then a church organization put him in Albany, New York.  He didn't. He didn't sit around with Mullah Krekar and make a plot to

come to Albany, New York.  He had a young family, he was a refugee, just wanted to get out of there, he didn't decide. And he came here a long time before Mullah Krekar changed colors and turned dangerous and, in fact, never knew Mullah Krekar when Mullah Krekar was anything other than a spiritual leader, a big boss and a very important individual.

One of the other things -- I have to say this as an aside.  Some of the false statements are based upon claims that he denied knowing Mullah Krekar, and Mr. Aref said something, and it's an example, hypothetical example, makes it so clear I am gonna use it here.  I said to him, "What do you mean you don't know Mullah Krekar?  You worked for him, you swept his floor, drove his car.  What do you mean you don't know him?"  And he said to me this, and this helps you get inside the mind of my client because it is a very precise way of thinking and a very concrete way of thinking that he has.  He said to me, he said, "My wife, Mrs. Aref, my wife has been in Judge Homer's court three times and she has watched him speak and she has listened to him and if I said to her, 'Do you know Judge Homer,' she would say to me, 'No, I don't,' because she wouldn't.  I mean, you would have been in the same room with her, she would have seen you, you her, she would have listened to you speak, but, in the world of Mr. Aref and the way that he

thinks, that doesn't mean that you and Mrs. Aref know each other or that she knows you.

And that's exactly his take on the Mullah Krekar.  He doesn't say he knows him because in his culture -- and I say it for what it's worth -- he says in his culture, you cannot say you know a person unless you do one of three things:  You travel with him, you do business with him, or you eat with him.  And that -- Judge, from time to time, we Americans, I guess everybody in every culture have difficulty bridging cultural gaps and understanding what other people -- how they deal with reality, how they deal with the world.  But the fact is in the mind of my client, in order to say you know a person, you need to have done one of those three things, and he has done none of those things.  Mullah Krekar never said, "Yassin, let's have lunch together."  Just never happened.  It wouldn't.

Ansar al-Islam is the terrorist organization that Mullah Krekar created sometime after he and Yassin Aref were no longer in the same place, sometime after Yassin Aref was living in this country.  And to listen to Mr. Pericak speak the last time, you would almost have the impression that Yassin Aref somehow set up Ansar al-Islam.  He no more set up Ansar al-Islam than the New York Yankees baseball franchise.  He might know it's out there, but that's it.

Same things goes for GEM, a terrorist

organization.  On one of the tapes, he says, "I know who they are, they are a terrorist organization."  Okay, so do we.  Doesn't make anybody in this room a terrorist or supporter of them.

Also, much was made of the fact that my client was affiliated with a Dr. Dhafir in Syracuse, New York.  Dr. Dhafir has been convicted of funneling $4 million illegally to Iraq in violation of the Iraqi embargo which previously existed.  But we have to be so careful about guilt by association.  When my client came to this country, he was given a letter of introduction, he went to important -- it was to important Iraqi ex-pats in this country, he was sent -- put into contact with Dr. Rafil Dhafir, your Honor, and as I understand it, the sum total of their contact consisted of a total of telephone calls from a doctor in Syracuse to an Imam in Albany -- I don't think he was an Imam yet, still cleaning bathrooms in Albany Medical Center.  Just "how you doin', how's it going, can I do anything for you," which any immigrant group is gonna do for new members of its group.  I am sure when my grandfather came from Ireland in 1912, a couple O'Learys said to him, "Frank, anything we can get you?  Do you need anything?" Probably the beginning, middle and end of it, but it certainly doesn't indicate my grandfather was a member of the IRA even if they were.  It's just normal human conduct.

There is one more thing.  There was some real confusion here the last time we were in this courtroom on this case about the Islamic Movement for Kurdistan. Mr. Aref was carrying a letter of introduction from the Islamic Center for Kurdistan and much talk was made about the Islamic Movement for Kurdistan.  They are two different things, and the Islamic Center for Kurdistan is not a movement, it's just an organization, much like the Polish Community Center, or Friendly Sons of St. Patrick, and his letter of introduction was nothing more than that.

Also, before I sit down, your Honor, my client has asked me, I guess this is more on a personal note to tell you, to tell you this:  And these are some notes that I took when he said these things to me over in the Rensselaer County Jail a couple nights ago.  He says to me, "bin Laden is not my leader, bin Laden is from Syria."  He said, "There are 40 million people there.  How many followers does he have?  400.  What kind of a leader is that?"  Good question.

He said suicide bomb is not allowed in his religion as he understands his religion.  There may be extremists out there who feel differently, but as this man of peace feels about things, suicide bombs are not allowed. Innocent killing, 9/11, he's appalled by that, Judge.

This is a devoted father, a religious leader

with a very loyal following of people who clearly love him. I have been to the mosque, your Honor, I've seen -- I've seen the love for this man that these people have. And it's a moving experience. From time to time in the tapes, and I know that Mr. Pericak made mention of this, there's -- their undercover operatives would say things, suggestive things like, "Well, you don't believe in American law, what about Muslim law, how do these things stack up?" And my client said, and if you listen to all the tapes, if you want me to play them all, my client has said, "When we came to this country, we had to agree to abide by American law, and that's what I do." While acknowledging that religious law is a higher law, a higher power, I think all of us, all of us, any religious person would certainly agree with that as a general proposition, but the essential thing to take from it is that my client says over and over and over again on the tapes, to his friends, to his followers that "we have to obey American law, that's what we agreed to do before we came here."

Judge, I am about to sit down. Let me please emphasize this: Yassin Aref was, for 13 months, a model pretrial releasee. Never attempted to flee, never did anything that indicated to anybody that he was other than fully compliant with the terms and conditions of his release. Now I know that in the last couple of weeks before

he was placed back into custody, representatives of the Federal Bureau of Investigation went into a real display of surveillance, I don't know how -- quite how to describe it. The funny thing is I was about to contact your Honor and/or Judge McAvoy to complain that the guys from the FBI, God love 'em, that they were tailgating my client every place and makin' a big, you know, boo-ga boo-ga show (phonetic) out of the fact they were surveilling him and we couldn't understand what their problem was, didn't make any sense. When I got here for the September 30th detention hearing, I found out what their problem was, they wanted to be able to say of course he didn't run away because he knew we were following him.  And I don't know what the English word is to describe that phenomenon, but kind of a disingenuous thing to do.

He behaved himself perfectly, perfectly, absolutely perfectly for all the time he was out and for a couple weeks before the detention hearing of September the 30th, the FBI made a big show out of following him and the only real impact that it had on my client was that I think he got a uniform traffic ticket because it turned out the inspection sticker on his car had expired unbeknownst to him.  Otherwise, didn't change anything about the way he was living his life.

Your Honor, my client's wife is in desperate

straits, desperate straits.  She's not well.  In her culture, there is no such thing as a single mother.  They don't exist.  The woman is an extension of the man.  That's the way it is there.  And this woman is adrift in a country where she doesn't understand the culture that well, her English is not that good, she has these four -- I just know three of them -- delightful, energetic young children.  The person who supports her emotionally, financially, spiritually and culturally, the person she loves, who loves her, is taken away from her.  It is killing her, Judge.

We have a concern -- I know we have a concern here, that a person released pretrial might be a danger to the community.  This is a man of peace.  In his previous 13 months of release, he demonstrated conclusively that he is no danger to the community.  We have a concern here that a person released pretrial might flee the jurisdiction. Judge, this man has got no place to go except 44 West street, Albany, New York, and no desire to go any place.  He wants to be with his children, wants to be with his wife.

Since we don't know when this case is going to trial, since there is no reasonable prospect of flight, since Yassin Aref poses no danger to this community, your Honor, I respectfully, and from the bottom of my heart pray, your Honor, that you will consider releasing Yassin Aref on conditions, the same conditions as he was released on

August 24th, more onerous, more confining, we don't care. But he needs to be with his family, he needs to be out of that jail and he needs to be back in his mosque.

Thank you very much, your Honor.

THE COURT:  Thank you Mr. Kindlon. Mr. Pericak.

MR. PERICAK:  Thank you, your Honor.  This is a motion to reopen pursuant to 3142(f), and it's absolutely clear that only new information which is material to either dangerousness or risk of flight may be considered in determining whether or not to reopen.  I do want to start with the journal, even though it's not new evidence, and I do want to respond to the allegation by Mr. Kindlon that he was blind-sided, and I want to represent to the Court two weeks prior to the detention hearing, I had Mr. Kindlon and Mr. Aref come into my office with Agent Coll, we sat down with the pages of the journal that we had at that point translated, including the particular one Mr. Kindlon keeps referring to, as well as some other significant entries, showed him those entries.  In fact, asked him if there were any issues with the interpretation or translation 'cause I knew that was an issue from the last one.  So the suggestion that there was some blind-siding from the journal is not at all warranted.  That was -- I made that known to Mr. Kindlon two weeks before this hearing -- that hearing in September,

that we were gonna move for detention, we were gonna rely, in part, on the journal and brought that to his attention.

I don't think there is anything new here Mr. Kindlon has argued.  Some the same arguments we heard the last time.  I could repeat the arguments I made.  I think a fair reading of the journal shows, as your Honor found in the hearing, at the conclusion of the hearing, that Mr. Aref does support, does espouse terrorist views.

I do want to respond to the IMK organization. The IMK, self-described by Mullah Krekar in 1997, was an armed movement in Kurdistan and had a -- there were history of violent clashes, armed clashes with the PUK, another organization in Kurdistan, in which people were killed. It's not just a political organization.  It's an armed violent movement.  I agree, Mullah Krekar, an IMK person, took a large segment of the IMK and formed a new organization, but the IMK itself always was an armed movement dedicated to armed struggle.  Again, I don't think it's productive and I don't want to get into the arguments we made before.  I think the arguments we made before establish the dangerousness of Mr. Aref.

With respect to his family, we can all sympathize with his wife and their plight.  It's not new. His wife had the baby recently; obviously, she was pregnant the last time of the hearing.  Obviously, that was known to

everyone at the time.  Obviously, there is no new information there.

Mr. Kindlon has filed a motion to dismiss the indictment and to suppress all the evidence based on the NSA wire-tapping allegation that he's made.  That motion is pending.  Judge McAvoy scheduled a hearing for March 13th on that.

THE COURT:  As part of that motion, will the Government be required to affirm or deny the existence of any such interceptions?

MR. PERICAK:  That's an issue of -- that's one of the items of relief that he asks for.  And that issue, I can say, is not on my desk right now.  That is on somebody else's desk in Washington in connection with that response.  But a presentation is gonna be made to Judge McAvoy with respect to that issue.

THE COURT:  And that's scheduled for March?

MR. PERICAK:  March 13th I believe is the schedule hearing date.

MR. KINDLON:  Correct.

MR. PERICAK:  But I do want to point out that Mr. Kindlon and Mr. Luibrand both filed all their pretrial motions, those were heard, those were decided, some were reserved.  His motions to dismiss were denied, motion to suppress were denied and there is no reason to expect that

there's gonna be any difference when this motion to dismiss and suppress is decided.

I want to address two other matters, your Honor. I'll ask this question: Suppress what? This is a sting. This is a case where the Government informant went to Mr. Hossain, proposed a criminal activity, made it all up, and got him on board and Mr. Hossain --

THE COURT: Let me suggest an answer to your question. Evidence of predisposition.

MR. PERICAK: Your Honor, again, I'm talking about the case-in-chief. To dismiss the indictment, okay, what we're talking about here is a sting case and, therefore, to think that the indictment is gonna get dismissed, I just -- I don't see the logic, don't see the logic behind it at all.

But in any event, moving on, really, to, I think, the most serious point that Mr. Kindlon tries to make is when is the case going to be tried? And honestly, I don't know.

THE COURT: What's your best guess?

MR. PERICAK: I think it's gonna be tried this year. I think it will be tried long before January. The Government is working right now, we have been workin' on the transcripts, selecting the portions of the tapes that we intend to play, tryin' to finalize the transcripts of those

so that we can be ready, and we're waitin' for Judge McAvoy to set the date.  Is he gonna set it for April at the earliest?  For the summer?  I am not gonna predict that. But the Government will be ready and ready to go much earlier than January 2007.

I think, your Honor, that with respect to the Classified Information Act, the Government made two filings with respect to that and those were our two -- I will call them -- complete filings.  Now, under the Act, there is interaction that goes on, we have a further filing that's due on Wednesday, which we intend to make that on or before Wednesday, and then, of course, we have the hearing in March with respect to Mr. Kindlon's motion.  I don't think that there's that much work left to be done in the case.  I think there are issues that need to be decided, but as far as the amount of work left to be done in the case, I don't think it's that much.

THE COURT:  The unknown factor is the Government appeal of any ruling under the Classified Information Procedures Act, isn't it?

MR. PERICAK:  Again, at this moment, I don't anticipate appealing anything, I do not anticipate a ruling so adverse we would want to appeal.  Who knows.  I am not going to predict that.

THE COURT:  Judges do strange things

sometimes.

MR. PERICAK:  You can't always predict.  I will say the cases are unclear.  Pretrial detention is not a factor on dangerousness or risk of flight.  It only becomes a factor when it has become so long that due process is implicated.  Your Honor asked Mr. Kindlon a question and I was scratching my head.  I cited cases in here where 18 months and 33 months were not too long.  I realize there are cases I saw where 16 months, I think, is the shortest that I recall, and I can't even swear to that.  But we're at four-and-a-half months, almost at five months.  We are not near that.  If the case doesn't go to trial by the fall, then we are in a new ball game.  But, at this point, the prediction about when the trial is gonna occur I think should not be a consideration here.  The consideration is it's been four-and-a-half months and that's not a due process violation and that's where we stand with respect to that.

So, all in all, your Honor, I would say that we could have a hearing every week and we could rehash all the evidence and try to convince you that a particular finding that you made was wrong or you should change your mind, but that's not the procedure envisioned by the statute.

The journal, that's old news.

The family situation, that's old news.  The when the case is gonna go to trial and his new motion is new news, but it's not enough in order for you to make a decision that Mr. Aref ought to be released in the meantime. It just doesn't meet the statutory standard.

Thank you.

THE COURT:  Thank you, Mr. Pericak.

Mr. Kindlon, anything further?

(Pause in proceedings.)

MR. KINDLON:  Judge, one thing which probably should be put on the table is this:  You know IMK was affiliated with the CIA in Syria, it's being described as an armed movement for the overthrow of the Government.  But the fact of the matter is, I think we were payin' for it, Mr. Pericak, I and everybody who pays taxes in this country, so we probably shouldn't get too upset by 'em.

THE COURT:  Thank you.  Stand in recess ten minutes.

(Short recess taken at 2:36 PM.)

(Court reconvened at 2:48 PM.)

THE COURT:  What follows will constitute my findings and conclusions on Mr. Aref's motion for reconsideration of the order of detention entered on September 30, 2005:  In connection with these rulings, I incorporate, by reference, the decision, findings and

32

conclusions reached on the record at the hearing on September 30, 2005.

On this motion, Mr. Aref bears the burden of showing under 18 USC Section 3142(f) that there is, first, new evidence not previously considered and, secondly, that the new evidence is material to the determination of bail or detention in this case.

In this regard, Mr. Aref offers three, essentially, new pieces of evidence:  The first is that the trial date is now not going to be, obviously, after the first of 2006 and, according to Mr. Aref, is not likely reasonably to take place until after the first of the year 2007; the second is that Mr. Aref believes that he has been the subject of the interception of electronic communications without a warrant which will lead to the suppression of evidence and the dismissal of the indictment here; and the third is the effect of his continued incarceration on his family.

I find that each of these, of course, constitutes new evidence.  The question is whether it is material.

With respect to the first, the trial date, the length of a pretrial detention, as the Government has pointed out in its memorandum of law, becomes material when it violates -- can be found to violate the defendant's right

to due process of law.  The Second Circuit decisions appear to have held in different instances that pretrial detentions exceeding two years even then do not yet approach a violation of due process.

I am aware of pretrial detentions in this district in other cases where the defendants have been held for up to 18 months before trial without any finding of a violation of due process.  Mr. Aref has presently been confined for approximately five months in pretrial detention and, therefore, the five-month period does not even begin to approach yet a violation of due process which would make material the contention that the trial date and the adjournment of the trial date is a material factor.

The second is the wiretap evidence.  As to the wiretap evidence, what is present on this record is that the defendant has reason to believe from public reports that he has been the subject of warrantless national security electronic surveillance and has filed a motion with respect to that.  There is no indication, first of all, as to whether or not he has, in fact, been the subject of such electronic surveillance and, secondly, whether any such electronic surveillance was illegal and would lead to the suppression of evidence.  The further question is even if Mr. Aref establishes both of those, whether suppression of any such evidence significantly would affect the strength of

the Government's case in that regard.  These are unknowns.

The motion has been filed by Mr. Aref, it is presently scheduled for hearing in March.  Whether it's resolved in March or thereafter, I don't know, but it is headed towards resolution.  On the record before we, however, there is no evidence based on this that would lead me to conclude that the Government's case is likely to be seriously weakened or dismissed based on the motion that's been filed so far.  If there is a determination hereafter with respect to any such evidence, that might present a different record for me to consider.  But based on the record before me now, the fact of the motion with respect to national security wiretaps is not material to the determination of bail here.

The final factor asserted by Mr. Aref is the affect of his continued incarceration on his wife and children.  As the Government has agreed, there is, as always in these circumstances, a tragic element to the effect of detention, whether pretrial or post-sentence, on the spouse and children of an individual.  And in another circumstance, another Judge has described this as a surcharge on the judicial conscience.  In the circumstances, however, it is the judicial function not to be affected by the tragedy of this, but to make determinations based on the facts and the law that are relevant to the case here and, therefore, the

effect of his incarceration on Mrs. Aref and their children is not a material factor.

In sum, then, the three bases of new evidence offered by Mr. Aref seeking reconsideration are insufficient to establish material evidence under 3142(f) and, accordingly, Mr. Aref's motion for reconsideration of the order of detention is denied.

In the alternative, assuming for the sake of argument that I were to consider -- reconsider the order of detention, my ruling would nevertheless be the same. The arguments presented by Mr. Aref concerning the strength of the Government's case raise the same matters that were raised by me on September 30, 2005, and I disagree with Mr. Kindlon that he was unable adequately to address those matters at that time. I found his presentation at that time to be thorough and compelling as I did here today.

Considering the matters asserted by the Government as establishing terrorist connections individually, there may well be innocent explanations for each of those, but, as I found on September 30, 2005, when you consider that evidence, together and in context, the conclusion is compelled then as it is now that Mr. Aref has and has had substantial ties to terrorist organizations which make him both a danger to the community and a substantial risk of flight as to which there are no

conditions which will adequately address those.

Accordingly, in the alternative, were I to reconsider the order, the conclusion would be the same and remand is the same.

Anything further, Mr. Pericak?

MR. PERICAK:  No, your Honor.

THE COURT:  Anything further, Mr. Kindlon?

MR. KINDLON:  Thank you, no, Judge.

THE COURT:  Mr. Aref is remanded to the custody of the United States Marshal.

THE CLERK:  Court is adjourned.

(This matter adjourned at 2:53 PM.)

- - - - -

37

CERTIFICATION:

I, THERESA J. CASAL, RPR, CRR, Official Court Reporter in and for the United States District Court, Northern District of New York, do hereby certify that I attended at the time and place set forth in the heading hereof; that I did make a stenographic record of the proceedings held in this matter and cause the same to be transcribed; that the foregoing is a true and correct transcript of the same and the whole thereof.

_____

THERESA J. CASAL, RPR, CRR

Official Court Reporter

DATE: