1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

    -versus-                     04-CR-402

                                (SENTENCING)

YASSIN MUHIDDIN AREF,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS held in and for the United States District Court, Northern District of New York, at the James T. Foley United States Courthouse, 445 Broadway, Albany, New York 12207, on THURSDAY, MARCH 8, 2007, before the HON. THOMAS J. McAVOY, Senior United States District Court Judge.

2

APPEARANCES:

FOR THE GOVERNMENT:

HON. GLENN T. SUDDABY, United States Attorney - NDNY

BY:  WILLIAM C. PERICAK, Assistant U.S. Attorney

     -and-

     ELIZABETH C. COOMBE, Assistant U.S. Attorney

FOR THE DEFENDANT AREF:

KINDLON & SHANKS

BY:  TERENCE L. KINDLON, ESQ.

ALSO PRESENT:  EDWARD M. COX, U.S. Probation Officer

(Court commenced at 9:31 AM.)

THE CLERK:  United States of America versus Yassin Muhiddin Aref, 04-CR-402.

May I have the appearance for the Government?

MR. PERICAK:  William Pericak, on behalf of the United States.  Good morning, your Honor.  Elizabeth Coombe with me.

THE COURT:  Good morning.

THE CLERK:  On behalf of the defendant, please.

MR. KINDLON:  Terence Kindlon, on behalf of Mr. Aref, your Honor, sitting at counsel table with Kathy Manley from my office.  Mr. Sprotbery, who was engaged in trial, is in jury selection in County Court and can't be here this morning.

THE COURT:  All right.  Are you ready to proceed with sentencing?

MR. KINDLON:  Yes, sir.

THE COURT:  Why don't you come up and stand before the Court so I can dialogue with you.  Mr. Aref, if you would come up, sir.  Good morning.

THE DEFENDANT:  Good morning, sir.

THE COURT:  All right.  Well, there is a lot of information that's been presented to the Court in this case, and some of it's been very helpful.  There has been a

USA v. Aref - 04-CR-402                                                  4

lot of input from the public, I received petitions, I've received many, many letters on behalf of your client, some -- a couple of them not so complementary, but the vast majority of them said a lot of nice things about him, and the Court will certainly take that into consideration. Of course, I have received and gone over the presentence investigation report and the addendums and all the briefs and submissions by counsel, which, again, have helped the Court in reaching a sentence that it will pronounce this morning.

So, to begin with, I know the answer to this question, Mr. Kindlon, but for the record, you have had an opportunity, have you not, to go over the contents of the presentence report with your client, Mr. Aref?

MR. KINDLON:  Yes, sir.

THE COURT:  And Mr. Aref, has somebody gone over in detail -- namely, Mr. Kindlon or Mr. Sprotbery or somebody from the office -- gone over the entire contents of the presentence report with you?

THE DEFENDANT:  Mrs. Kathy.

THE COURT:  All right.  My question goes to do you understand what's in that report?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  I thought you might.  All right.  Is there anything you wanted to tell me about the

USA v. Aref - 04-CR-402                                                    5

report, Mr. Kindlon?

MR. KINDLON:  Anything that I have to say about the report, your Honor, with the Court's permission, I will incorporate into the remarks addressed to the subject of sentencing.

THE COURT:  All right.  Would you take the same stand, Mr. Aref?

(Discussion between defendant and counsel.)

MR. KINDLON:  I know that my client has a statement that he's given a great deal of thought to that he would like to address to the Court.  In response to your question, "Do you take issue with anything in the report," what Mr. Aref has told me is that he takes issue, to use his words, with everything in the report.  I have suggested to him, and with the Court's leave would ask that he be permitted, to incorporate any reservations he has about the information contained in the report into his remarks that I'm anticipating he is about to address to the Court.

THE COURT:  Well, yeah, that's all right, I have no problem with that.  But I think everybody knows here that whatever I do is gonna be appealed to the Second Circuit, and that's fine, that's what they're there for. And this is laying the groundwork for that.  So, to make it easier for defense, I will give you an exception to every word in the presentence report that was said about Mr. Aref.

Now there can be no doubt, when it gets to the Circuit, that you've got the foundation and the groundwork to argue anything you want about the contents of that report.

MR. KINDLON:  Thank you, Judge.  I think that's a perfect response to that.  Mr. Aref likes to make detailed notes on each and every word.

THE COURT:  Sure.  That's okay.

(Discussion between defendant and counsel.)

MR. KINDLON:  I think we're ready to proceed, Judge.

THE COURT:  All right.  What would you like to say on behalf of your client before I sentence him?

MR. KINDLON:  Mr. Aref has requested the opportunity to speak himself and I have assured him that, in due course, he will be given that opportunity.

THE COURT:  Absolutely.  It is his right under the law, and he will be given that opportunity.

THE DEFENDANT:  Thank you.

MR. KINDLON:  And the custom and tradition and the law provides that counsel is permitted the opportunity to speak first, so I have some things I will say on your behalf and then you'll be able to speak on your own behalf.

THE DEFENDANT:  Thank you.

MR. KINDLON:  Okay?

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                                7

THE DEFENDANT:  Thank you.

MR. KINDLON:  Judge, I had hoped we would never come to this day.  It was my fond hope my client would be found not guilty of all 30 counts in the indictment.  But, unfortunately, we do find ourselves here today, confronted by the stark reality of Mr. Aref's conviction on 10 out of the 30 counts that he went to trial with, and what I'd like to do is put this in the context of 18 USC 3553(a) and advise the Court concerning some of the factors I would like to amplify that the Court should take into consideration.

Now, as you know, the defense lawyers who worked on this case, myself, Mr. Sprotbery, Kathy Manley, Steve Downes, everybody, devoted a considerable amount of time and effort to presenting as full and complete a picture of Mr. Yassin Aref to this Court as we possibly could.  So, I don't certainly want to repeat all of that stuff.  I think the record is more than complete.

But I do want to just emphasize some things about the nature and the circumstances of the offense and the history and the characteristics of my client.  First of all, the nature and circumstances of the offense.  When the FBI came into Yassin's life, he was not in violation of any law, he was going along, he was serving as an Imam, he was the head of a family, he was, essentially, minding his own

USA v. Aref - 04-CR-402                                        8

business.  This was not a crime that was initiated by Mr. Yassin or by his co-defendant.  It was a sting, a sting that was based on a fantasy, and involved a crime that was really the creation of the Government.  And unfortunately, this occurred at a time when there was a climate of the greatest fear in this country, fear that was, quite frankly, and I say this with all due respect to the current administration, fear that was flogged by the administration.  And this pretend plot was carried forward by the most despicable snitch, undercover informant known as Malik, that we found in an American courtroom.  It's really important to remember that Yassin Aref was not a terrorist, not even a radical and, in fact, he never posed any threat whatsoever on national security.  I am not gonna reargue the motion to set aside the verdict or reargue the motion to dismiss, but I have to emphasize that the only thing that he was found guilty of was witnessing two money laundering transactions at the end of this long conspiracy that involved a grand total of $4,000.  That's it.  That's all that there is to this conviction.

The nature and the circumstances of the offender are also required to be taken into account under 3553.  It's important to remember, and the Court listened to my client's testimony over a couple of days, that he's had a life that's as difficult as it is fascinating.  He lived

USA v. Aref - 04-CR-402                                                 9

under Saddam Hussain for a period of time.  He lived in a country where anarchy was the only rule for a period of time.  He came to this country, ultimately, as a refugee.  He is a refugee, he is a man of God, he is a poet, he is a scholar, and I submit to your Honor that the record is replete with evidence of the fact that he had the greatest respect for the law.  In fact, on at least one occasion when we were listening to tapes, when my client ended up lecturing Malik on the subject of morality, I had the sense I was listening to the TV character "Church Lady."  He was actually telling, actually instructing Malik on ethics, honesty and concern for his fellow human.

Yassin Aref had a sterling reputation for honesty and courage in his community.  He has been described, over and over and over again, by people who know him, by those who have submitted letters, as a loving, caring, involved head of his family.  We know that his wife has been profoundly depressed by this and he is the father, loving father of four rambunctious and fully Americanized children.

We have to stand in awe of his scholarship, your Honor.  As the Court will recall from his testimony, it was shown that when he was a young man, in order to secure his college diploma, he had to travel through war-torn, ungoverned country to attend classes, and it's only because

of this insatiable thirst for knowledge and the incredibly hard work he was willing to put forth that he was able to secure his Bachelor's degree and, by and by, move to Syria and start his family.

Your Honor, around here, a decade or so ago, we used to listen to the stories of Governor Cuomo's family and how hard his immigrant father worked at his little grocery store in Brooklyn to get the family started. And when I learned the story of Yassin Aref, I thought "my God, this is the same story, just being repeated again."

When this man was evacuated to this country by the United Nations as a refugee -- and it's important to remember, he didn't come to this country to be a terrorist, he was evacuated by the United Nations Commission on Refugees -- he didn't pick the United States. He could have gone to South America, Great Britain.

When he got here, he didn't speak the language. What did he do when he first arrived? He went out and got a job, and the only job he could get was cleaning bathrooms at the Albany Medical Center Hospital. That's how this educated poet, scholar and man of God began his life in the United States, cleaning filthy bathrooms at Albany Medical Center Hospital. I said, "How many did you clean every day?" He said, "Twenty-eight. And when I was done, they sparkled," he said proudly. Because of his hard

USA v. Aref - 04-CR-402                                                11

work and his dedication, he learned our language, he established himself in the community, he, by and by, became an Imam at a new mosque, and it was because of his fine qualities that he was drawn into this sting.  It was because he was known as such an ethical and honest individual that he was turned to to witness the financial transactions which were an integral part of the sting.

Now, under 3553, the Court, and I quote from the statute, "is required to impose a sentence that is sufficient, but not greater than necessary."

THE COURT:  That's right.

MR. KINDLON:  And in order to calculate or to determine what that sentence should be, it is required that the Court take into account the seriousness of the offense and recognize that purposes of sentencing are to establish respect for law and to provide just punishment.

Again, your Honor, I have to emphasize that this offense was a fantasy created by the Government and that my client was drawn into it, that he thought, at all times, and I am not here to argue the question of guilt or innocence, and I don't want to give you that impression, your Honor, because that has been in the record of this case already established, but it's my position that my client firmly and sincerely believed at all times that he was doing the right thing, he was honoring the command, he was

USA v. Aref - 04-CR-402                                    12

witnessing a financial transaction between two Muslim men.

It is so important when imposing a sentence that we promote respect for the law, and as this Court can see from the outpouring of community support, that has continued right up until this morning's Times Union, which I don't know if you've seen it, but it contains a very compelling editorial addressed to this Court that says, in sum and substance, temper justice with mercy, that a lengthy prison sentence will achieve nothing here. And I think that this Court can rightly, under the strict terms of 3553, can rightly take into account what the public and the community perception is about the sentence.

Now, we do have to address the issue of the Guidelines, and the fact is that because of the law under which we're operating, this -- these offenses or this offense carries a guideline sentence of 360 months to life. But in this post-Booker era, any sentence is available to the Court, we are not bound by the Guidelines. And the question remains: What sentence is reasonable? And I would submit, your Honor, that a sentence that was well below the guideline range is that which is reasonable here. And I would further submit that pursuant to 5K2.0, a downward departure, based upon a combination of factors, is certainly the most appropriate.

We cited, in our extensive brief, we cited a

USA v. Aref - 04-CR-402                                            13

couple of significant examples, a case called Blake, from the Second Circuit, where a 21-level downward departure was appropriate; a case called Gamez, where a 10-level downward departure was appropriate. And we feel that under the circumstances here, the combination of factors compels the conclusion that a downward departure would be most appropriate.

Some of those factors, and they're all set forth at length, but some of the factors are the extraordinary family responsibilities that my client has; the fact that he is an Imam, a man of God; that he has -- he began his time in this country with a history of low-paying jobs; and that he has managed just the most incredibly impressive array of achievements in his life up to this tragic event.

Finally, your Honor, I have to emphasize one last time that out of the 30 counts that were contained in the indictment, my client was convicted of only 10 out of the 30. Or turn that around, he was acquitted of 20 out of the 30. And I looked through these papers and through the petitions and through the letters for one thought that captures the essence of what it is that -- what message I would like to leave with this Court, and I found it in a letter from Sarah Burn (phonetic), who is a retired lawyer, who has been closely following this case from its inception.

USA v. Aref - 04-CR-402                                       14

And I quoted this in the papers, but I would like to repeat these words of wisdom here in this courtroom and, again, humbly request that this Court take these words to heart. Sarah Burn writes, "The terrorists are weakened when our system works the way it is supposed to.  Granting leniency in sentencing the Imam is just and it is vital to show the integrity of our system."

Thank you, Judge.

THE COURT:  Thank you, Mr. Kindlon. Mr. Pericak, Miss Coombe?

MR. PERICAK:  Yes, your Honor.  Your Honor, I don't intend to repeat everything that's in the papers, but I want to highlight a couple of important points.

The charge which carries the most severe guideline, 2339B, is providing material support to a Foreign Terrorist Organization, and it is crystal clear from the evidence, the operative facts show that Mr. Aref engaged in conduct that was exactly the kind of conduct that Congress and the Sentencing Commission contemplated when they enacted the severe guideline.  And that conduct was when Mr. Aref was told by the informant that he worked for Jaish-e-Mohammad, Mr. Aref recognized them immediately as being on the list as a terrorist organization.  And we've quoted in our memo and quoted to the Court before and Mr. Aref's conclusion with respect to this was two-fold:

One is, "Should I help them," that was the informant's question. And he said, "It is wise for you to help them if you can." That was his advice. "Should I help this Foreign Terrorist Organization?" "It is wise for you to help them if you can. But be very careful, because if they find a link, if they find a link, you're gonna go to jail." That was his advice, your Honor, and that's exactly the kind of conduct in the context of which this guideline was enacted.

And we all know, and Mr. Kindlon readily pointed out, it's a sting. But a conspiracy, by definition, usually is prosecuted before any harm is committed, before the final act. And so there's no question that conspiracies are punished based on the intent and the belief of the person engaged in it. And in this case, it's very clear that Mr. Aref knew exactly what this organization was and what was involved.

And I do want to emphasize something else. In the contacts that Mr. Aref had with the FBI, especially Agent Hoover, the Court will recall he told him that he would definitely bring any suspicious activities or individuals to the FBI's attention if he -- if they came to his attention. Definitely. He used that word "definitely." And I submit to the Court that when he's told, "I work for JEM," and he not only doesn't bring it to the FBI's attention, but says, "Be very careful," and when he's later

told in February, February 12th, there's gonna be a missile attack next week, and instead of bringing it to the attention of the FBI, as he promised Agent Hoover he would, he said, "Don't talk about that kind of thing," and told the suicide bomber story.  "Even the suicide bomber doesn't tell his own mother when he's about to engage in that conduct." And this is the type of conduct that the Court should take into consideration when deciding that this is a truly appropriate guideline range.

Just to address the suggestion that Mr. Aref was minding his own business, I just want to remind the Court, and I'm sure the Court is aware, that the FBI had the reasons for looking at Mr. Aref -- his name and phone number found in those camps in Iraq, including one camp where 80 insurgents were killed, and we had the list of "missiles" and things.

So, there is no question the FBI appropriately, and it would have been utterly irresponsible not to, involved Mr. Aref.  What did they do?  A very simple thing.  "Let's talk to him, say some things and see how he reacts.  Tell 'em you work for JEM, see how he reacts.  Tell him about a missile attack in New York and see how he reacts."

I submit to the Court, based on his own conduct, based on how he reacted, based on what he did, it's

USA v. Aref - 04-CR-402                                    17

totally appropriate to sentence him within the guideline range.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Pericak.

Mr. Aref.

THE DEFENDANT:  Yes.

THE COURT:  You may be heard, sir.

THE DEFENDANT:  Thank you, your Honor.  Thank you very much, Honor, for to me to speak.  And I like first to thank this Court for all for the time I spend here and whoever involve in this case in any way.  And I start with marshal officer here, which brought me continuously one month for the trial.  I did not see from them only respect and only they deal with me not even as a criminal, as a guest, and I'm very thankful for that and I believe they was shocked by the verdict more than me.

The same thing about the Rensselaer County Jail, which is my home for last almost 18 months, and most of them, the officers there, they are shocked and they tell me it's no way for us in whatever to believe you are bad man, you are danger, you are terrorist, you are -- they tell me that they believe it is wrong and they don't understand why I must to sleep in the cell alot.

And I thank after that these people in the back, which I believe they supported in many ways.  Without

USA v. Aref - 04-CR-402                                    18

their support, my children, now they used to be on the street homeless because I was only the person I work and taking care of them; my wife, she have the new baby, she have three young children, she had health problem, she was not able to work.  If not the support from these people (indicating), my children now they used to be on the street. For no any reason, for no any crime.  If it's coming to commit the crime in this country, why I bring the sick wife and three young children with me to suffer?  To be arrested after my crime?  Why I bring them with me if I'm coming to commit any crime?  I'm very thankful for these people in the back and I believe they must to stand up and they must to come in front and these people should to lead this country and to stop these people from making story, from taking this country toward the hell.  These are the same people, Honor, they destroyed my country, Iraq, they killed seven hundred thousands innocent because they say we have the map, we have the video, we have the evidence, Iraq have the weapon of mass destruction.  And they went to United Nation, they showed to all the universe this is our evidence, this is our map, this is our proof.  Where it is now?

The same they did for me.  I did not hear to answer anything about my case because they told me don't do it.  But prosecutor, Mr. Pericak, now he say we give him the opportunity to do the crime.  I knew my crime -- I knew JEM,

USA v. Aref - 04-CR-402                                                    19

it is the terrorist.  If anyone asks me, "Do you know Osama Bin Laden?"  Yes, I hear about him in the TV, but that's mean I am with Osama Bin Laden because I hear in the TV about him?  That's all I say about JEM.  He ask me, "Do you know that?"  I say, "I hear, I hear about them in the TV," because I cannot lie to say never I heard about them.  I'm the person daily I listen to the news, because every week I must to preach in the mosque.  How I can to preach every week if I don't know what's going on in the universe?  So, all my crime, I say I hear about that group on the TV.  He say for helping them.  At least ten time in the same meeting, continuously I say I don't know them, I don't know anything about them, I don't know who's leading them, I don't know who's (sic) their purpose, I don't know who's (sic) their goal.  I cannot trust any politic organization. More than ten time continuously he try to make me emotional and say support them.

After he misguide me, he describe them not by terrorist group, by freedom fighter, they are working for their freedom.  If best of for information he gave to me I say to support them, I must not to be criminal because he told me they are freedom fighter.  For 40 years their land has been occupied and they work for their freedom.  I am Kurdish, I knew the mean of freedom.  Because Kurdish, they are biggest nation in this universe, at least 14 million

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                                    20

Kurdish like me, we are homeless, we are stateless, we are unoccupied territory, all for century. I knew the mean for freedom. When they told me freedom fighter, to be honest I'm not hiding anything, I'm not politician to lie. In the mosque, I preach same way; in the Court, I preach same way; in the jail, I told same way.

Prosecutor and FBI, they interview me, I talk same way. I am saying the truth. I support freedom for all the nations, including Kashmil (phonetic), including Kurdistan, including Palestine, I want them to be free. But never I supported any terrorist act, any bombing, any innocent killing, any harming for children, any target or targeting any civilian. And they ask me every single thing terrorist they believe, because they try to make me to say something in the cassette. They ask me about suicide bomb in their cassette. I say it is not allowed in Islam. They say why they do? I say go ask them. Does they do? Does they plan for them? Does they give him the permission fatwa to do them or they will be charged in front of God for what they did? They asked me about killing the innocent. I say no way in Islam to kill the innocent. He ask me about do something in this country. I say we are not in Palestine to fight. We are in this country. We came, we sign, we promise to obey the law. You want to make me like -- in my culture, they say you want to be more Catholic than Pope,

USA v. Aref - 04-CR-402                                              21

you want to tell me this is not Islamic law, why we should to respect it?  I say no, because Islam make it obligatory for us to do because when we came to this country, we sign we should to obey the law, we should to respect the law, and Islam make it obligatory to respect the law.

How I do crime because I knew JEM terrorist group?  I knew it was terrorist group, but what I have to do with JEM?  Ever in my life I say I no met anything from JEM, nothing.  He say you told us there will be attack in New York City.  How he say it?  Bring the cassette, tell me how he say it.  What I did?  I say God bless you, I say I'm coming to help you, I say who's doing it, why he doing it. When I hear that I kick him out from my house, I am Imam, not Muslim people allowed to disrespect their guest, doesn't matter what is they say.  But as much I get I kick him out. And because they don't bring the cassette, because it is proof, I don't give any proof for what he say, because they lie, they say in that day they explain for me the word of Chaudhry, never they going to hear if they bring the evidence, the cassette for that day, because they brought the person, they scaring him, he testify, he say he used to call FBI, but Yassin told him Malik joking, that's why he did not call the FBI.

I swear by God if you give me death penalty, I am not going to swear by God falsely.  I swear by God

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                                22

never I told him Malik he's joking.  Anyway, today I came here and they told me don't say anything about the case. I'm sorry, I did not came here -- and this is my disagreement with my lawyer all the time.  I say I believe in the court we should to talk about the evidence, not talk about Yassin is so funny and Yassin children.  Because if Yassin worry about his children, he should not commit the crime.  If I commit the crime, it is my problem, the children, not yours problem.

You should to be fair.  But I believe we have clear proof they did nothing.  But my lawyer's philosophy, he told me continuously, before and during the trial, it is no way, no way this jury, that time jury was sitting there, to make you guilty.  No way evidence to make you crime for anything.  But now I'm criminal, now I'm terrorist, now I'm guilty 10 charges which is still now I don't understand them, I don't know what is they are.  I don't know.  If somebody say he's going to -- he did not say he's -- if going to be some attack in New York City, I kick him out. What's my crime?  What's I did?  They told me oh, you are crime because you did not call the FBI.  I say I did not call FBI because he was liar.  Why you know he was liar?

Honor, if I do something like this or he knew something like this, why he were going to mention it? What's the reason for that guy to tell us next week it will

be some attack?  What's the reason?  He say the reason.  He say we told him because we want Yassin to be save, not go to New York City on that day.  This is true if every day I go to New York City or every week.  I am six years in this country, I did not went to New York City three time.  What I do with New York City?  Why you tell me that?

Say, Honor, I give -- say Malik, he trusted me, he told me.  I have the guest, never saw Malik in his life.  How somebody can in front of the guest to say something like this if it is true?  Does make me to have any doubt it's not true and I did not call.  And I don't know how I am crime.  I believe even if it is true, I will not be crime because I did not show any signing for my approval for that, for support for that idea.

Second, if I believe terrorist attack or suicide attack against the principle of my faith and this is the same FBI Agent Hoover, he testified here when he asked me I say that, maybe somebody say, oh, he was FBI, why you say that?  But where Malik he ask me, I don't know Malik, he's FBI, I say it's the same thing, society, it's against Islam.  And how am I gonna believe something against Islam?

I am going to stop to say about the case, but any human being, Honor, any human being he see this evidence, he cannot believe I am guilty.  And I believe many people, they wrote for you the letter, they was sitting

USA v. Aref - 04-CR-402                                                24

there, and every single day they came to the trial.  It is beyond any human being's mind to say jury came to the conclusion based of the evidence.  I'm not accusing them because we are human being, something maybe misguide us, something maybe confuse us, something maybe mistake we do.  But, strongly, I believe it is this Court's duty to find that error, to make sure that justice has been fair and the fair decision has been made.

I told this lawyer first time I saw him in my life, I say what's the evidence?  If you believe I'm guilty in any charge, don't bring it to the trial, don't defend, don't use your experience, your knowledge to bring out the criminal person on the street to harm the people.  If I did the crime, I will be happy to pay for it, to sleep in the jail; it's my crime, I pay for it.  But if not, why I do?  Why my daughter Dinya (phonetic), she's 15 months now, she don't know me, I was in jail when she born, she came to the jail, maybe they say a lot here, she believing I'm danger, I cannot carry her because she don't know me, she's scared from me, my daughter.  Why?  If I did the crime, I will not blame anyone.  But I did nothing.

And let me go back to what was in my mind to say because to be honest, they give me wrong information.  Never they told me you have the right to argue any evidence.  And never my lawyer he argue their evidence, even now, all

USA v. Aref - 04-CR-402                                             25

the time making the story, I say please, we are in court, leave the story, leave exaggerating Yassin he's this, he's this, he's peaceful man, Imam, brilliant, this and that. Yes, he suffered a lot in Iraq under Saddam and he has the family. No, this is all my problem. I suffered in Iraq, it is not your problem, Honor. My children suffer and it is not their problem, Honor. It is my problem. If I am worry about them, why I commit the crime? I say leave, don't beg them for mercy because my children's situation. Because I suffered alot under the Saddam. Don't beg that. Prove I didn't. And if I did something, I am in charge.

I am villager, Honor. I am villager. I born in the village, I live in the village. I have the parents; my father is the farmer in the isolated village in the third country. But every single person in my village, they believe human being they are in charge only for what they did and what they said. I'm not in charge what he say (indicating), doesn't matter what he say, only if I show my approval for it, only if I show the sign I am happy with that. But what he say what's my problem? I must to be in charge for what I did and what I say. I came to United State, I believe United State should be human being only in charge for what they did because no crime for talking in this country. This is not Iraq. I can talk, say something, criticize President Bush, I can say this government have the

USA v. Aref - 04-CR-402                                                    26

wrong policy.  I can't say they destroyed my country, they did not build it.  They took the sectarian to the Iraq, not the democracy.  I can't say they took Iraq hundred years back, not hundred years forward.  I cannot say they did not change Iraq or Baghdad to become New York or London.  They changed it back to be Magdule (phonetic) or Kabul.  I cannot say that.  In Iraq, if I say that, they will hang me.  If I criticize the Government, I will be under the ground.

That's why we came here, to be free, to live free, to have the dignity to live like the human being.  What happened in this country, not only they charge the people for whatever they say or did, because if they charge the people like the villager they do in the third country, I will not be guilty.  Honor, you or any human being search every single evidence, what is the act I do I am paying for?  Even what is the word I say I am paying for?  It's not there.  It's not there.

So what I am paying for?  In this country, they have charge, this is different charge, never I hear in my village anywhere.  They say he have intention, he will.  I am guilty for my intention.  But, Honor, I believe so, I believe God, only God, he know what is in the heart of the people.  And I believe God.  He did not gave the power to anyone, doesn't matter how much technology they have, they cannot go to my heart.

USA v. Aref - 04-CR-402                                              27

In jail, we say they can jail you, but not jail your mind, not jail your heart. You can be free in your mind. I believe my heart, God give it to us, every individual. Nobody can enter something or take out something, only by your key. This is not secret code in the computer or e-mail somebody can open. This, God gave to every individual, never to go to the heart and check what is there. I'm guilty for my intention? They must to show when I show that intention. If I say this is not allowed in my faith, how I do it? Where the intention? And I believe if I have intention to do something wrong, say I put it in my mind and I did not, I must not be guilty.

But God, he knew my heart. I swear by God I have no any intention, I never had intention to harm anyone in this country. And I don't know why I'm guilty. Sir, what's happen, I came from that country, from the village, which I believe I have no intention, I did nothing at all. I say nothing at all to be the criminal. And after that, all my life, Honor, because I am Kurd, they accuse the Kurd by being villager, by being danger, by being willed, by being animal, by being ignorant. This is description for Kurd in Iraq, in Turkish, in Iran, in all the country they have Kurdistan in. All of our life we struggle. We must to prove we are human being, nothing else. We are human being. Like any human being, God created us. Maybe we look a

little bit difference, but we are human being.  We have two eyes, one mouth, two ear, we don't have tails, don't have horn, we are normal human being.

All my life for century we must to do that. I come to this country and I say that over.  Everybody human being here, everybody in front of Honor and court, everybody have the same right for freedom of speech.  In this country, me and seven million Muslim live in this country, all has been accused, they are willed, they are animal, they are danger, they are terrorist, they are ignorant and they must to prove now no, we are not, we are just human being.

And this lawyer, he told me, he told me things, he say you don't have to argue anything about the case because they prove something against you.  All I want you to go there (indicating) and to speak so the jury they knew you are just human being.  Why?  Why they should to have the doubt I'm human being?  This is not help in this country, your Honor.  These seven million people they came to here as the Muslim, which is 95 percent of them citizen, they belong to this country.  My children don't have citizenship in Iraq, don't have citizenship in Syria, don't speak even the Kurdish.  Just they know English.  Why they should be criminal just because they are Muslim?  Why should we to prove we are human being?  We have no horn, no tails on our back.  Why?

USA v. Aref - 04-CR-402                                          29

And I believe this is wrong, I believe this is not being any good for this country, for the system here, for anything. I one person. But if you gave me death penalty, I would take it proudly because -- I know you, Honor, and every single person and everybody, FBI, they check all my record, all my life, they interview thousands of the people, they brought all my life in Iraq, too, they knew never I did any violence, never I participate in any fighting, never I support any terrorist group in any way. They have everything, they knew that. And I believe, Honor, you have no doubt their evidence not prove anything.

But with that, if they will be proud by putting me in the all my life in the jail and make my children to suffer, I will tell you and give you right, make them more proud and give me death penalty and I will take it proudly, not because I'm arrogant or proud person, because they knew and you knew and everybody knew I did nothing to be one day in the jail for. I did nothing to be one day in the jail for. And I did not came to this country to be in the jail. I came to be free. I did not came to this country to destroy this country. I came to be my life. I did not came to threaten any human being in this country, to terrorize any children. I came for my children to be safe from terrorist.

I am going to stop here and I am going to

USA v. Aref - 04-CR-402                                      30

don't finish.  I have many thing to say, but I will repeat,

I did nothing at all, even I say nothing at all.  And God,

he knew my heart I have no intention to harm anyone, and I

believe what's done for me it is unfair and I believe,

Honor, it is your duty to make sure that justice has been

served.  If not, give me death penalty.

            Thank you very much for your time.

            THE COURT:  All right.  Any reason I

shouldn't sentence your client now?

            MR. KINDLON:  No, sir, there's none.

            THE COURT:  Mr. Aref, do you know any legal

reason I shouldn't pass sentence on you?

            THE DEFENDANT:  I don't know.  I'm villager,

I don't know anything about legal, Honor, please.

            THE COURT:  Okay.

            THE DEFENDANT:  Thank you very much.

            THE COURT:  Well, sure, it's nice for you to

believe you're innocent, but, of course, you were convicted

here after proof was introduced before a jury, they heard

the proof, they made the decision.  The Court reviewed that

decision and decided that it was, in fact, correct, that you

did break the law, that you intended to help that group,

that you wanted to achieve those ends, even though you

weren't quite clear what they were.  But what you did do was

continue on and participated in a scheme that would launder

money, that would ultimately be used, so you were told by Malik, for the purposes of helping your Mujaheddin brothers. And my listening to the evidence made me believe that's exactly what you wanted to happen.  And that's without debating the issue, I am not gonna do that, because your point of view is going to be aired thoroughly in the Second Circuit Court of Appeals, and if this was done in error or unjustly done, they're gonna tell us about it, they will send it back for either a new trial or some other disposition, and that's fine, that's what their job is.

But from this Court's perspective, being here for the whole trial, my belief is that you were guilty of the crimes that the jury found that you committed, by your own free will, in a free country, not caring about your wife or your children, but caring about your purposes.  And, again, I don't want get into a political debate with you, because this is not the forum for that.

Now, this is gonna take a little bit of time. I want to apologize, in a fashion.  Not that I'm gonna do anything that I consider to be improper, but what I am gonna do is cite to a lot of sections in the Guidelines and a lot of case law, so some of you may not understand what I'm saying.  Of course, at the end of this recitation, you will all understand what my sentence will be in this case without question.  So, I am going to begin now, and hopefully, it

USA v. Aref - 04-CR-402                                           32

won't take too long.

The Court has, of course, reviewed and considered all the pertinent information, including what was said here today, presentence investigation report, and the addendum, all the submissions by counsel, the petitions, the letters, all the factors outlined in 18 U.S. Code Section 3553 and the Sentencing Guidelines.

Court adopts the factual information contained in the presentence investigation report.

As to the United States Sentencing Guidelines calculation, the Court will start by addressing the guideline calculation for Mr. Aref's convictions on Counts 20, 26 and 27.  On these counts, Mr. Aref was convicted of one count of conspiracy to provide material support to a Designated Terrorist Organization, in violation of 18 U.S. Code Section 2339B and two counts of attempting, or aiding and abetting an attempt, to provide material support to a Designated Terrorist Organization, in violation of 18 U.S. Code, Sections 2339B and 2.  The Sentencing Guidelines manual specifies that for violations of 18 U.S. Code Section 2339B, the applicable guideline is United States Sentencing Guidelines 2M5.3.  Under 2M5.3(a), the base offense level is a 26.

Section 2M5.3(b)(1), specific offense characteristics, provides that if the offense involved the

provision of funds or other material support or resources, with the intent, knowledge or reason to believe they are being used to commit or assist in the commission of a violent act, increase by 2 levels.  The facts at trial established that the material support in issue -- that is, the laundering of funds from the confidential witness' purported illegal importation of a surface-to-air missile -- was aided and abetted by Mr. Aref with the intent, knowledge, and belief that the surface-to-air missile would be used in an attack on the Pakistani Ambassador in New York City.  Thus, the offenses clearly involved the provision of material support with the intent, knowledge or reason to believe that the material support would assist in the commission of a violent act.  Accordingly, 2 points are added.

Section 3A1.4, the terrorism enhancement, provides at subsection (a) that if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32. This enhancement also provides at subsection (b) that in each such case, the defendant's criminal history category from Chapter 4, criminal history and criminal livelihood, shall be category 6.

Pursuant to application note 1, a federal

USA v. Aref - 04-CR-402                                           34

crime of terrorism has the meaning given that term in 18 U.S. Code Section 2332b(g)(5).  That provision contains a two-part definition:  One, the crime must be an offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and the crime must be listed in Section 2332b(g)(5)(B).

Both 2339A, which I will address in a moment, and Section 2339B, are listed in Section 2332b(g)(5)(B). Further, based on statements by the confidential witness during the course of the criminal venture, the evidence established that Mr. Aref committed the crimes believing that Jaish-e-Mohammad, the group that purportedly received the surface-to-air missile, was intending to deploy it against the Pakistani Ambassador in order to teach the President of Pakistan a lesson.  Thus, the evidence was sufficient to establish that the Section 2339B offenses involved a federal crime of terrorism that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government conduct.  See United States versus Arnaout, 431 F.3d 994 at 1001; United States versus Mandhai, 375 F.3d 1243 at 1247; United States versus Graham, 275 F.3d 490 at 516; see also United States versus Hale, 448 F.3d 971, footnote 1; United States versus DeAmaris, 406 F.Supp.2d 748

USA v. Aref - 04-CR-402                                          35

at 750.  Therefore, 12 levels will be added under the terrorism enhancement.

For the reasons set forth in the presentence report at paragraphs 84, 85 and 87, the Court finds that no other adjustments are warranted for offense level.

With regard to an obstruction of justice enhancement pursuant to 3C1.1 of the guidelines, the Court does not find that the enhancement applies simply because Mr. Aref chose to testify in his own behalf at trial.  As evidenced by the guilty verdicts on some, but not all, of the counts, the jury evidently chose not to credit all of his testimony.  However, this does not establish that he gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory.  United States versus Dunnigan, 507 US 87 at 94.  Accordingly, the total offense level is 40 for the 2339B convictions.

Turning to criminal history, the application of the terrorism enhancement results in a presumptive criminal history category of 6 for Mr. Aref.  While the Second Circuit has held that, quote, "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under Section 3A1.4(b)," the Circuit also noted, in the same case, that the District Court always has the discretion under

USA v. Aref - 04-CR-402                                         36

Section 4A1.3(b) to depart downward in sentencing. United States versus Meskini, 319 F.3d 88 at page 92. Thus, even where the terrorism enhancement applies, a horizontal departure on criminal history is warranted under 4A1.3(b) if the criminal history category of 6 substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.

The Court finds that a criminal history category of 6 does substantially overrepresent the seriousness of the defendant's criminal history. As indicated in the presentence investigative report at paragraphs 91 through 94, Mr. Aref has no prior criminal adjudications and received zero total criminal history points, as scored by the United States Probation Department. The credible and reliable evidence indicates that Mr. Aref came to this country with his family, with a limited understanding of the English language, and provided for his family, until his arrest, through lawful employment in various capacities. The information available to the Court indicates that he has been a good father and husband, and there's no indication that he's engaged in any other criminal activity in this country. Further, as indicated in the presentence report, Mr. Aref has been an Imam at the local mosque, in which capacity he has been a spiritual

USA v. Aref - 04-CR-402                                          37

leader for many members of the community in Albany, New York.  His positive impact on numerous members of the community is evidenced by the letters and petitions submitted on Mr. Aref's behalf.  Based upon Mr. Aref's lack of prior criminal history and his personal characteristics as set forth in -- that must be considered in the statute, the Court finds his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of 1.

Pursuant to United States Sentencing Guideline Chapter 5, Part A, based on the total offense level of 40, and a criminal history category of 1, the guideline range for imprisonment is 292 to 365 months. Pursuant to 18 U.S. Code Section 2339B, the statutory maximum term of imprisonment for Counts 20, 26 and 27 is 180 months.  The Court will address the relationship of the statutory maximum to the guideline range in a moment.

I can see your eyes are all glazed over, and I don't blame you one bit.

The Court turns next to Count 12, upon which Mr. Aref was convicted of conspiracy to conceal or disguise the nature, location, source or ownership of material support or resources in connection with an attack with a weapon of mass destruction on a person or property within the United States, in violation of 18 United States Code

USA v. Aref - 04-CR-402                                          38

Section 2339A; and Counts 18 and 19 upon which Mr. Aref was convicted of two substantive counts of attempting, or aiding and abetting an attempt, to conceal or disguise the nature, location, source or ownership of material support or resources in connection with an attack with a weapon of mass destruction on a person or property within the United States, in violation of 18 United States Code Section 2339A and 2.

For a violation of 18 U.S. Code Section 2339A, the applicable guideline is Section 2X2.1 or Section 2X3.1.  These provisions, in turn, direct that the offense level is the same as that for the underlying offense.  The underlying offense charged in these counts was a violation of 18 U.S. Code Section 2332a, the unauthorized use of a weapon of mass destruction on a person or property within the United States.

A guideline sentence for a violation of 2332a is determined using either 2K1.4 or Section 2M6.1. Section 2M6.1, which is the higher guideline, does not apply because the definition of weapon of mass destruction in application note 1 excludes the subsection of 2332a that is charged in the superseding indictment.  Under United States Sentencing Guidelines Section 2K1.4, the base offense level is, therefore, 24.

For the reasons discussed a moment ago, the

USA v. Aref - 04-CR-402                                        39

terrorism enhancement of United States Sentencing Guideline Section 3A1.4 applies to the 2339A convictions, resulting in a 12-point increase to an offense level 36.  Also for the reasons discussed a moment ago, the Court finds that no adjustments apply and that a downward departure to criminal history category 1 is warranted in this case.

Pursuant to United States Sentencing Guideline Chapter 5, part A, based on total offense level of 36, and a criminal history category of 1, the guideline range for imprisonment for Counts 12, 18 and 19 is 188 to 235 months.  Pursuant to 18 U.S. Code Section 2339A, the statutory maximum term of imprisonment for Counts 12, 18 and 19 is 180 months.

Mr. Aref was also convicted of conspiracy and two substantive offenses of money laundering in violation of 18 U.S. Code Section 1956.  See Counts 1, 10 and 11.  The Sentencing Guidelines manual specifies that for violations of 18 United States Code Section 1956, the applicable guideline is United States Sentencing Guideline Section 2S1.1.

Under Section 2S1.1(a)(2), the base offense level for these convictions is 8 plus the number of levels from the table in Section 2B1.1 corresponding to the value of the laundered funds.  Because the value of the laundered funds in this case was more than $30,000 and less than

USA v. Aref - 04-CR-402                                          40

$70,000, 6 additional levels are added.

As to specific offense characteristics, Section 2S1.1(b)(1) provides that if the defendant knew or believed that any of the laundered funds were the proceeds of or were intended to promote a crime of violence or an offense involving firearms or explosives, increase by 6 levels. The evidence established that Mr. Aref believed that the laundered funds were the proceeds of the illegal importation of a firearm or explosive and that he believed that money laundering scheme was intended to promote a crime of violence involving the use of a firearm or explosives. Accordingly, 6 additional levels are added.

Next is the question of whether the terrorism enhancement of Section 3A1.4 applies to the money laundering conviction. As the Court indicated previously, in order for this enhancement to apply, the offense must be a felony that involved or was intended to promote a federal crime of terrorism. Section 3A1.4(a), application note 1 provides that a federal crime of terrorism has the meaning given that term in 18 U.S. Code Section 2332b(g)(5). Under Section 2332b(g)(5), the crime must be an offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct and as listed in Section 2332b(g)(5)(B).

Since 18 U.S. Code Section 1956 is not listed

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                        41

in Section 2332b(g)(5)(B), this offense does not involve a federal crime of terrorism.  Nonetheless, the terrorism enhancement is properly applied to the money laundering convictions under the "intended to promote" prong of the enhancement's language if the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism.  United States versus Arnaout, 481 F.3d 994 at 1000-1001; see also United States versus Hale, 448 F.3d 971 at 988; United States versus Mandhai, 375 F.3d 1243 at 1247; United States versus Graham, 275 F.3d 490 at 517.

Here, the evidence established that Mr. Aref believed that funds being laundered were the proceeds from the sale of a surface-to-air missile that was to be used in an attack on the Pakistani Ambassador by Jaish-e-Mohammad to teach the President of Pakistan a lesson.  Thus, the evidence was sufficient to establish that, through the money laundering scheme, Mr. Aref intended to promote a federal crime of terrorism that was calculated to influence and affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  Accordingly, the terrorism enhancement applies to the Section 1956 convictions and 12 levels are added.  No additional adjustments are warranted, bringing the total offense level to 32.

Also, for reasons discussed a moment ago, the Court finds that a downward departure to criminal history category 1 is warranted.

Pursuant to United States Sentencing Guidelines Chapter 5, part A, based on a total offense level of 32, and a criminal history category of 1, the guideline range for imprisonment for Counts 1, 10 and 11 is 121 to 151 months.  Pursuant to 18 United States Code, Section 1956, the statutory maximum term of imprisonment for Counts 12, 18 and 19 is 240 months.

On Count 30, Mr. Aref was convicted of making a false statement to the FBI, in violation of 18 United States Code Section 1001.  Under guideline Section 2B1.1(a), the base offense level for this crime is 6.  No specific offense characteristics from 2B1.1(b) need to be applied.  Again, the Court applies a criminal history category of 1.

Pursuant to United States Sentencing Guidelines, Chapter 5, part A, based on a total offense level of 6 and a criminal history category of 1, the guideline range for imprisonment on Count 30 is zero to 6 months.  Pursuant to 18 United States Code Section 1001, the statutory maximum term of imprisonment for Count 30 is 96 months.

Now, United States Sentencing Guideline Section 5G1.2(d) provides, if the sentence imposed on the

USA v. Aref - 04-CR-402                                    43

count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.  In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

The counts carrying the highest statutory maximum are the 1956 counts, which carry a 240-month statutory maximum.  The guideline sentence for Section 1956 offenses is 121 to 151 months, which is less than the 240-month statutory maximum.  Referring to Section 5G1.2(d), the Second Circuit recently held, quote, "where the guidelines-recommended sentence exceeds the statutory maximum on some counts, but not others, the Court should impose no more than the statutory maximum on any one count, but should impose a sentence consecutively to the extent necessary to reach the recommended guideline range." United States versus Reifler, 446 F.3d 65 at 113.

The Section 2339B convictions carry the highest adjusted offense level.  Consequently, in accordance with United States Sentencing Guideline Section 3D1.3(a), these offenses are controlling for scoring purposes.  The guideline range for these offenses, which can be grouped with the other offenses of conviction under United States

USA v. Aref - 04-CR-402                                          44

Sentencing Guideline Section 3D1.3(b), constitutes the total punishment for purposes of Section 5G1.2(d).  See presentence report at paragraph 80, discussing grouping. The guideline range for the Section 2339B offenses is 292 to 365 months.

Thus, if the Court were to apply Section 5G1.2(d), Mr. Aref's sentence of imprisonment on the various convictions would be imposed within their statutory maximums but consecutively up to the point that the total punishment sentence of imprisonment under the guidelines was reached. In this regard, applying Section 5G1.2(d) would result in an aggregate sentence of at least 292 months, which is the lower end of the guideline range for the 2339B convictions.

However, as a result of United States versus Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, Section 5G1.2(d) of the sentencing guidelines is advisory. United States versus Kurti, 427 F.3d 159 at 164. Accordingly, this Court possesses discretion to determine, after application of the 3553(a) factors, whether to impose consecutive or concurrent sentences.  Now, the Court is gonna state for the record, it's well aware of each and every factor enumerated in that statute and I am not going to reiterate it here, because there's pages and pages of other Judge's stating those factors.  The Court's well aware of them and knows how to apply them.

USA v. Aref - 04-CR-402                                          45

Considering the factors set forth in Section 3553(a), the Court finds that an appropriate sentence is reached without applying Section 5G1.2(d).  The underlying terrorism crime around which the sting was purportedly based is a serious offense, and those who support these types of crimes deserve substantial punishment to deter them and others like them from committing similar crimes in the future.  But having said that, and having considered that Congress determined that the statutory maximum sentences for the Section 2339A and Section 2339B offenses to be 180 months, the Court finds that a sentence of 180 months is reasonable and sufficient to accomplish the goals set forth in Section 3553(a).

While the underlying crime is serious, the evidence does not support the proposition that Mr. Aref actively sought out some way to aid a terrorist crime; rather, the crimes were presented to him.  In addition, 27 of the 30 counts arose out of a sting operation and Mr. Aref was convicted of only 9 of those 27.  By the jury's determination, it can be fairly said Mr. Aref, while possibly aware of the criminal transaction for some time, did not knowingly, intentionally and criminally associate himself with it until July 1, 2004, over six months after he became involved in the transactions between the confidential witness and the defendant Hossain.  While his delay in

USA v. Aref - 04-CR-402                                                46

entering into the scheme does not diminish his criminal responsibility, it does play some role in consideration to the appropriate sentence for this defendant.  The Court finds that the need to punish this defendant and protect the public from further crimes of Mr. Aref is adequately served by a sentence of 180 months.

The Court has considered Mr. Aref's motion for a further departure under 5K2.0 of the sentencing guidelines based upon a combination of factors.  While the Court is aware that it has the authority to depart under Section 5K2.0 under appropriate circumstances, the Court finds that those circumstances are not present here.  The combination of factors argued by defendant does not remove this case from the heartland of cases covered by the guidelines.  Accordingly, the motion for a Section 5K2.0 downward departure is denied.

Therefore, Mr. Aref, upon your conviction at trial of Counts 1, 10, 11, 12, 18, 19, 20, 26, 27 and 30 of the superseding indictment, it is the judgment of this Court that you are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 151 months on each of Counts 1, 10 and 11; 180 months on each of Counts 12, 18, 19, 20, 26, and 27; and 6 months on Count 30.  The sentences on all counts are to run concurrently with one another. Therefore, the aggregate term of imprisonment for all counts

USA v. Aref - 04-CR-402                                      47

is 180 months.

Upon your release from imprisonment, you shall be placed on supervised release for a period of three years on each of the 10 counts of conviction.  These terms of supervised release are to run concurrently, pursuant to 18 U.S. Code Section 3624(e), for a total term of supervised release of three years.  While on supervised release, you shall not commit another federal, state or local crime and shall comply with the standard conditions that have been adopted by this Court and the following special conditions:

If you're deported or otherwise leave the United States, you shall not enter or attempt to enter the United States without the permission of the Secretary of the Department of Homeland Security.  If you do re-enter the United States, you shall report to the probation office in the Northern District of New York within 72 hours.

You shall report to and remain in contact and cooperate with the Bureau of Immigration and Customs Enforcement, and you shall fulfill any requirements of U.S. Immigration Law.

You shall provide the Probation Officer with access to any requested financial information.

You shall commit your person, property, vehicle, papers and effects to search at any time, with or without a warrant, by any federal probation officer with

USA v. Aref - 04-CR-402                                          48

reasonable suspicion concerning a violation of the conditions of supervised release or unlawful conduct by you.

The Court has reliable information which indicates you pose a low risk of future substance abuse, so the mandatory drug testing condition is suspended.

Pursuant to 18 United States Code Section 982(a)(1), 18 United States Code 981(a)(1)(C) and 28 United States Code Section 2461, and as fully outlined in the preliminary order of forfeiture, you shall forfeit to the United States all right title and interest in $40,000 United States currency, but shall receive credit for any funds previously recovered.

Further ordered you pay a special assessment to the Clerk of the Court of $100 on each count of conviction, for a total of $1,000, which is due immediately.

The Court finds, based on your financial resources, projected earnings and other income, as well as your obligations, that you do not have the ability to pay a fine.

Both you and the Government have the right to appeal this sentence under certain limited circumstances and you're advised to consult with your attorney to determine whether or not an appeal is warranted. Any appeal must be filed within 10 days of the date of this sentence.

You are remanded to the custody of the

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                    49

U.S. Marshal in accordance with the terms of this sentence.

Court stands adjourned in this matter.

MR. PERICAK:  Thank you, your Honor.

MR. KINDLON:  Thank you, Judge.

(This matter adjourned at 10:47 AM.)

- - - - -

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

USA v. Aref - 04-CR-402                                         50

CERTIFICATION:

I, THERESA J. CASAL, RPR, CRR, Official Court Reporter in and for the United States District Court, Northern District of New York, do hereby certify that I attended at the time and place set forth in the heading hereof; that I did make a stenographic record of the proceedings held in this matter and cause the same to be transcribed; that the foregoing is a true and correct transcript of the same and the whole thereof.

_____

THERESA J. CASAL, RPR, CRR

Official Court Reporter

DATE:

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY